Ramzi Abadou (SBN 222567)
**KAHN SWICK & FOTI, LLP**
912 Cole Street, # 251
San Francisco, California 94117
Telephone: (415) 459-6900
Facsimile: (504) 455-1498
ramzi.abadou@ksfcounsel.com

*Lead Counsel for Lead Plaintiff*
*Robert J. Allustiarti and the Putative Class*

*[Additional counsel on signature page]*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

|  |  |
|---|---|
| ROGER A. IKEDA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BAIDU, INC., YANHONG LI, and CHENG-CHUN YU,<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 5:20-CV-2768-LHK-VKD

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**CLASS ACTION**

DEMAND FOR JURY TRIAL

**TABLE OF CONTENTS**

I. NATURE OF THE ACTION ................................................................................1

II. PRELMINARY STATEMENT ........................................................................2

    A. Summary and Overview of the Action .................................................2

    B. The Class Period Begins .......................................................................3

    C. The Class Period Ends ...........................................................................6

III. JURISDICTION AND VENUE .......................................................................7

IV. PARTIES ..........................................................................................................7

    A. Lead Plaintiff ........................................................................................7

    B. Defendants .............................................................................................7

V. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT ......................10

    A. Company and Regulatory Background ................................................10

        1. Baidu's Internet Services ..........................................................10

        2. China's State Internet Information Office and the Cybersecurity
           Administration of China ............................................................15

        3. Baidu's Long History of Investigations by Chinese Regulators ................19

    B. Defendants' Materially False and Misleading Class Period Statements and
       Omissions .............................................................................................23

        1. 2018 Annual Report ..................................................................26

        2. May 16 and 17, 2019 Statements ..............................................28

        3. June 19, 2019 Report .................................................................31

        4. August 19, 2019 Press Release ..................................................33

        5. February 14, 2020 Annual Governance Report and February 28, 2020
           Earnings Call .............................................................................34

        6. March 13, 2020 2019 Annual Report ........................................37

VI. LOSS CAUSATION ......................................................................................42

VII. RELEVANT POST-CLASS PERIOD EVENTS ...........................................44

VIII. CLASS ACTION ALLEGATIONS ..............................................................45

IX.     **APPLICABILITY OF PRESUMPTION OF RELIANCE** ...........................................**46**

X.      **NO SAFE HARBOR**................................................................................................**48**

XI.    **PRAYER FOR RELIEF** .......................................................................................**50**

XII.   **JURY DEMAND** .................................................................................................**50**

1

2

## I.   NATURE OF THE ACTION

1.     Lead Plaintiff, Robert J. Allustiarti ("Plaintiff"), by and through his undersigned counsel, brings this action pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are brought on behalf of all persons who purchased or otherwise acquired the publicly-traded securities of Baidu, Inc. ("Baidu" or the "Company"), including Baidu American Depositary Shares ("ADSs"), between March 16, 2019 and April 7, 2020, inclusive (the "Class Period"), and were damaged by the conduct asserted herein (the "Class"). Plaintiff asserts violations of Sections 10(b) and 20(a) of the Exchange Act, and Securities and Exchange Commission ("SEC") Rule 10b-5(b) promulgated thereunder.

2.     In addition to Baidu, Defendants are (i) Baidu Co-Founder, Chairman, and Chief Executive Officer ("CEO") Yanhong "Robin" Li ("Li"); and (ii) Baidu Chief Financial Officer ("CFO") Cheng-Chun "Herman" Yu ("Yu") (together, the "Individual Defendants"). The Individual Defendants were at all relevant times described in the Company's filings with the SEC as its "Executive Officers."

3.     Plaintiff's allegations are based upon Lead Counsel's investigation, except as to the allegations specific to Plaintiff, which are based on his personal knowledge. Lead Counsel's investigation included among other things, a review of: (i) Baidu's public filings with the SEC; (ii) press releases and other public statements made by Baidu and the Individual Defendants; (iii) analyst and media reports; (iv) publicly-available information about Baidu and the Individual Defendants; (v) interviews with third parties, including former Baidu employees; and (vi) other documents and information obtained from third parties. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

4.     Plaintiff's claims arise out of a fraudulent or deliberately reckless course of business conduct whereby, throughout the Class Period, Defendants either knew or recklessly disregarded that: (i) the statements and omissions they made alleged herein were materially false and misleading; (ii) their statements would adversely affect the integrity of the market for Baidu securities; and (iii) their statements would deceive investors into purchasing shares of Baidu securities at artificially inflated prices.

5.     Specifically, Defendants either knowingly or with deliberate recklessness made materially false and misleading statements and/or omissions that: (i) misrepresented Defendants' ability to monitor illicit content on Baidu's platform; (ii) concealed that Baidu's products violated the People's Republic of China's ("PRC" or "China") regulatory requirements by enabling publication of pornographic content, spurious advertisements, and unauthorized news; (iii) failed to inform investors that Baidu had repeatedly been investigated by the Cyberspace Administration of China ("CAC"), even prior to the Class Period, for its inability or unwillingness to filter such questionable content; (iv) Baidu's increased enablement of third-party posting meant that Defendants could not adequately supervise content as required by PRC laws and regulations; (v) failed to disclose understaffing and the employment of a new, less effective senior content manager that allowed the publication of problematic content and ads on Baidu's platforms, heightening the risk of regulatory sanctions; and (vi) failed to disclose that Baidu was incapable of managing or filtering even its own problematic content given that its sales team pressured its content review team in order to meet sales goals.

## II.     PRELMINARY STATEMENT

### A.     Summary and Overview of the Action

6.     Baidu was founded as an internet search service company that has since grown into the second largest search engine in the world, behind Google. Currently, Baidu is the most widely used search engine in China, claiming a market share of more than 70%. The Company offers a multitude of mobile applications, including search, personalized news feed, social media, and user generated video sharing. Baidu also specializes in artificial intelligence ("AI"), often integrating its AI technology into its mobile applications, including its personalized news feed – Baidu Feed.

7.     Baidu Feed offers users a personalized timeline that suggests content based on users' demographics, browsing history, and past online behavior. Baidu Feed also uses the Company's AI algorithm to recommend content based on the content's quality, evaluate content quality and survey user comments to determine whether users like the material. Baidu's 2018 annual report, which was filed after market close on March 15, 2019 with the SEC on Form 20-F for the fiscal year ended December 31, 2018 ("2018 Annual Report"), touted Baidu Feed as a complimentary service to its

search products that "leverages Baidu AI recommendation algorithms and monetization platform, and contributes to user engagement and retention."

8.      Baidu derives most of its revenue from Baidu Core's online marketing services.[1] As such, the Company's business model is dependent on user engagement. To stay competitive, the Company must develop innovative products and service offerings to attract users, content generators, and customers. For instance, Baidu launched Baijiahao in 2016 as a blog platform that allows users to write articles and share image, video, and live content; since then, Baijiahao has exploded to a publisher network that hosts over 2 million accounts. The Company integrates its Baijiahao content along with paid-for advertisements into users' personalized search and feeds results.

9.      To comply with PRC regulations, Baidu utilizes a dual approach to filter content, implementing technological screening and human reviewers to review and remove illegal content from its apps and platforms. As Baidu's services and platforms expanded to mobile devices and grew to include a vast network of content publishers, the Company's ability to monitor and remove content has faced significant challenges, including blind spots with its blacklisted keywords, understaffing in its content review department, and difficulty ensuring the legitimacy of accounts.

**B.      The Class Period Begins**

10.     As alleged herein, throughout the Class Period, Defendants either knew or were deliberately reckless in not knowing about the Company's inability to screen and remove content deemed inappropriate under applicable PRC laws and regulations. The Class Period begins on March 16, 2019, the day after Baidu filed its 2018 Annual Report. There, Defendants underscored that they knew the critical importance of complying with Chinese content regulations and further emphasized, *via* an opinion from their legal counsel, that the Company was complying with current PRC laws and regulations in all material respects.

---

[1]      Baidu's business consists of two segments, Baidu Core and iQIYI, Baidu Core primarily comprises (i) search plus feed, including Baidu App, short video products, and knowledge and information products, such as Baidu Knows, Baidu Wiki, and Baidu Post, as well as our online marketing services, which the Company describes as its "mobile ecosystem," and (ii) new AI businesses, such as DuerOS (voice assistant and smart devices), Baidu Cloud (AI solutions and cloud services), and Apollo (autonomous driving and smart transportation). iQIYI is an innovative market-leading online entertainment service provider in China.

11.     The 2018 Annual Report, however, not only failed to disclose prior investigations Baidu had faced in failing to monitor illicit content, but affirmatively represented that it was complying with regulatory authorities by stating that, in the opinion of its legal counsel, Baidu "compl[ied] with current PRC laws and regulations in all material respects." Defendants made this material misrepresentation despite having been scrutinized by the CAC just two months prior on January 3, 2019 due to the Company's inability (or unwillingness) to filter questionable content, and were subsequently forced to remove illegal links to adult content just **two weeks** before filing the 2018 Annual Report. During a May 7, 2019 investor earnings call, Defendant Li all but touted the Company's ability to monitor lurid content using Baidu products, saying: "our AI-power algorithms **help male users** on the Baidu platform **find interesting content** in the social commerce company's Smart Mini Program, increasing a user group that has been historically underrepresented."

12.     Throughout the Class Period, the Individual Defendants were keenly aware that the Company's revenue and competitive market position benefitted from enabling or allowing its users to find lurid content on Baidu's platforms. At the same time, they knew that Chinese law prohibited the dissemination of such content. Defendants were motivated to and did mislead investors by materially overstating their ability to and willingness to comply with Chinese law while simultaneously deliberately turning a blind eye to the prevalence of illegal content on Baidu's platforms. Indeed, during a 2009 speech at Stanford University, Defendant Li discussed how Baidu's products exemplified search technology, stating: "[i]f you are looking for a beautiful girl, this is one that not only shows you the pictures but it's got a Flash application that you can browse through as well. It also automatically rotate[s]." Defendant Li also acknowledged that to be successful in China "[y]ou need to understand the regulatory environment" and "keep a good dialogue . . . with the government officials."

13.     On June 12, 2019, the CAC Shanghai Municipal Office ordered Baidu to remove click-bait advertisements featuring sexually explicit photos and promoting fraudulently low-priced items, further demanding that the Company resolve its serious network ecology issues. The CAC also admonished Baidu for these practices, noting that the Company's misconduct placed its own financial interest over China's social interest. One week later, on June 19, 2019, the Company issued a report

1  in Chinese titled "Baidu released its monthly information security governance report, cracking down

2  on 3.4 billion pieces of harmful information such as pornography and gambling in May." The

3  Company, however, failed to disclose any details surrounding the compliance order that the Shanghai

4  Municipal Office of the CAC had issued just one week prior.

5  14.  The CAC investigated Baidu again on February 5, 2020 for publishing purportedly

6  illegal news and short videos concerning the coronavirus that Chinese authorities claimed were

7  designed to create panic. The CAC yet again ordered the Company to "stop actions violating laws and

8  regulations, and conduct deep rectification." During an earnings call with investors on February 28,

9  2020, Defendant Yu, however, emphasized Baidu's ability to bring "more authoritative" and "more

10  reliable" information to its users, boasting that, given large amounts of fake healthcare related news

11  (*i.e.*, the coronavirus), users were "com[ing] to Baidu … to search, to get their information, to make

12  sure that this is correct." In doing so, Defendant Yu failed to disclose that Baidu itself had just been

13  recently admonished by the CAC earlier that month for publishing purportedly illegal news and short

14  videos about the coronavirus.

15  15.  On March 13, 2020, Baidu filed its annual report on Form 20-F for the fiscal year ended

16  December 31, 2019 with the SEC ("2019 Annual Report"), reiterating that the Company was in

17  compliance with current PRC laws and regulations in all material respects. The 2019 Annual Report

18  included purported risk disclosures, such as: "[r]egulation and censorship of information disseminated

19  over the internet in China *may* adversely affect our business, and subject us to liability for information

20  displayed on or linked to our websites, mobile apps, Smart Mini Program or Managed Page and

21  negative publicity in international media." The risk disclosure was itself materially misleading given

22  that the risk warned of had by then already materialized – indeed, Chinese regulations were then

23  already adversely affecting the Company's business as alleged throughout herein.

24  16.  The 2019 Annual Report also affirmatively misrepresented that the Company was in

25  compliance with Chinese regulations despite the fact that Defendants had repeatedly – and as recently

26  as February 5, 2020 – been investigated and threatened by the CAC for their inability or unwillingness

27  to filter questionable content. The 2019 Annual Report further failed to disclose that Baidu was at a

28  heightened risk of facing sanctions due to technological loopholes and staffing inadequacies with its

content review department, including the termination of its senior content reviewer who supervised 90% of the 2,700 content reviewers at the time.

### C.     The Class Period Ends

17.     After the close of trading on April 7, 2020, the CAC publicly announced that it had ordered the Beijing Municipal Information Office to "seriously interview the person in charge of Baidu Company in response to *serious violations* of multiple channels on Baidu App and demanded that the violations be stopped immediately." The CAC further ordered that several Baidu channels be suspended starting the morning of April 8, 2020 to "clean up illegal content, and carry out in-depth rectification." The CAC's actions were reported in U.S. media outlets after market close on April 7, 2020. In an article published that same night, *Reuters* reported that China's powerful internet operator, the CAC, found that Baidu's content review was "not 'strict'" and "ha[d] exerted bad influences to the society." Baidu was further ordered "to clean up improper information and halt the spread of 'low-brow content.'" The following day, in an article titled "Baidu suspends app channels after regulator warning[,]" *Seeking Alpha* reported that Baidu did not provide a restart date for its suspended channels. The article further noted that the Company's "shares [were] down 4% premarket to $97.74."

18.     While the length of suspension was not disclosed by the CAC or Baidu, Morgan Stanley estimated that "it would take [a] few weeks to up to a month for normal operation of Baidu App to resume." On this news, Baidu's share price fell $4.46 per share, losing over 4% of its value, to close at $97.33 per share on April 8, 2020, on massive trading volume of over 10 million shares traded, thereby damaging investors.

19.     On April 9, 2020, Baidu issued a public statement confirming that it "suspended updating its content on certain newsfeeds channels within Baidu App and [would] conduct maintenance, beginning from April 8, 2020" and committed to "undertake additional measures to fully comply with the directives of the regulators." The Company also announced that it anticipated a negative impact to its marketing service revenue for the affected channels due to the suspension.

### III.  JURISDICTION AND VENUE

20.  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

22.  Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15. U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Defendants conduct business and maintain a place of business in this Judicial District.

23.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### IV.  PARTIES

#### A.  Lead Plaintiff

24.  Lead Plaintiff Robert J. Allustiarti purchased Baidu's securities during the Class Period as described in his Certification attached hereto as Exhibit A, and as incorporated by reference herein, and suffered damages thereon.

#### B.  Defendants

25.  Defendant Baidu ("Baidu" or "the Company") is a Cayman Islands corporation with its principal executive offices located at Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, People's Republic of China. Baidu provides Internet search services in China and internationally. Baidu operates in the United States through Baidu USA. Baidu USA is a California Limited Liability Corporation based in Sunnyvale, California. The Company was founded as Baidu.com, Inc. in 2000 and subsequently, renamed Baidu, Inc. on December 16, 2008. Because Chinese laws and regulations impose restrictions and conditions on foreign investment in, *inter alia*, internet content and online marketing, the Company conducts its operations in China primarily through its wholly owned subsidiary Baidu Online Network Technology (Beijing) Co., Ltd.

26.  Since at least 2005, Baidu has sponsored ADSs that trade on the NASDAQ. Initially, Baidu shares were listed on the NASDAQ National Market (later renamed the NASDAQ Global

Market), under the ticker symbol "BIDU." Currently, Baidu ADSs trade on NASDAQ's Global Select Market.

27.     Defendant Li is and was at all relevant times the Company's Co-Founder, Chairman of the Company's Board of Directors, and Chief Executive Officer ("CEO"). Defendant Li has served as Chairman of the Company's Board of Directors since Baidu's inception and as the Company's president from February 2000 until December 2003. Defendant Li became Baidu's CEO in February 2004. Prior to founding the Company, Defendant Li "worked as an engineer for Infoseek, a pioneer in the search industry, and as a senior consultant for [former Dow Jones subsidiary] IDD Information Services." During the Class Period, Defendant Li signed and/or had ultimate authority over the 2018 and 2019 Annual Reports. Defendant Li also signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which were included in the 2018 and 2019 Annual Reports.

28.     Defendant Li, who holds a Masters in Science from the State University of New York Buffalo in Computer Science, oversees Baidu's search operations. During a 2009 speech at Stanford University, Defendant Li even discussed how he had to "give up the CEO job and function as a project manager" to spur innovation, and how the Company has learned to integrate and "index the dark web or hidden web." Because of his senior position with the Company, Defendant Li possessed the power and authority to control the contents of the Company's press releases, investor and media presentations, and all filings Baidu made with the SEC during the Class Period. Defendant Li also participated in and made statements during the Company's Class Period earnings calls with analysts and investors including the May 7, 2019 and February 28, 2020 earnings calls.

29.     Defendant Yu has served as the Company's Chief Financial Officer at all relevant times, having been appointed to the position on September 17, 2017. Prior to joining Baidu, Defendant Yu served as Chief Financial Officer of the Chinese social media company Weibo Corporation from March 10, 2015 until September 15, 2017. Defendant Yu also worked for SINA Corporation, a Chinese internet portal company and Weibo's parent corporation, as Vice President and Corporate Controller from September 2004 to May 8, 2006 and as Chief Financial Officer from May 8, 2006 to March 10, 2015. According to Defendants' 2018 and 2019 Annual Reports, Defendant Yu is a California Certified Public Accountant.  Defendant Yu signed the SOX certifications included in the

2018 and 2019 Annual Reports. Because of his senior position with the Company, Defendant Yu possessed the power and authority to control the contents of the Company's press releases, investor and media presentations, and all filings Baidu made with the SEC during the Class Period. Defendant Yu also participated in and made statements during the Company's Class Period earnings calls with analysts and investors including the May 7, 2019 and February 28, 2020 earnings calls.

30.     Defendants Li and Yu are referred to herein as the "Individual Defendants."

31.     Baidu, Defendant Li, and Defendant Yu are collectively referred to herein as "Defendants."

32.     Because of the Individual Defendants' positions within the Company, they each had access to the adverse undisclosed information about Baidu's business, operations, and practices through access to internal corporate documents, conversations, and contact with other corporate officers and employees, attendance at meetings, and through reports and other information provided to them.

33.     The Individual Defendants, by virtue of their high-level position, were each directly involved in Baidu's day-to-day operations at the highest levels and were each privy to confidential information concerning the Company, its business, operations, and practices, including the misstatements alleged herein. Their positions of control and authority as officers or directors enabled the Individual Defendants to control the contents of the Company's SEC filings, press releases, presentations to securities analysts, and other public statements made to Baidu shareholders during the Class Period. Accordingly, each of the Individual Defendants bears responsibility for the accuracy of the public reports and press releases detailed herein and is therefore primarily liable for the misrepresentations and omissions contained therein.

34.     During the Class Period, each of the Individual Defendants substantially participated in the creation of and had exclusive authority and control over the content of Baidu's materially false and misleading statements and omissions, and how they were communicated to investors. The Individual Defendants also engaged in conduct in furtherance of a fraudulent scheme and course of business, and were involved in the preparation and dissemination of Baidu's misleading statements,

all of which made it necessary or inevitable that material misrepresentations and the Individual Defendants' scheme would be communicated to, and mislead, investors.

35.     The Individual Defendants were obliged to refrain from falsifying Baidu's books and were prohibited from using the instrumentalities of interstate commerce or the mails to: (i) employ any device, scheme, or artifice to defraud; (ii) knowingly or with deliberate recklessness make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice, or course of business which operates or would operate as a fraud upon any person. The Individual Defendants' conduct in this regard violated the federal securities laws and SEC regulations promulgated thereunder in connection with the purchase or sale of Baidu's securities.

36.     Both of the Individual Defendants are liable as participants in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchases of Baidu securities by disseminating materially false and misleading statements and/or concealing material adverse facts about Baidu's operations and compliance with PRC law. The Individual Defendants' scheme deceived the investing public regarding Baidu's operations and the intrinsic value of Baidu's ADSs, and damaged Plaintiff and other members of the Class in connection with their purchases of Baidu securities at artificially inflated prices. The Company's press releases, and SEC filings were group-published documents, representing the collective actions of the Company management. The Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, with respect to the statements at issue herein, that false and misleading statements were being issued regarding the Company. The Individual Defendants also approved or ratified these statements in violation of the federal securities laws.

## V.     DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT

### A.     Company and Regulatory Background

#### 1.     Baidu's Internet Services

37.     After Defendant Li was invited by the Chinese government to celebrate the communist regime's fiftieth anniversary in Beijing, he founded Baidu in January 2000 along with Eric Yong Xu

as a search service for other Chinese internet portals.[2]  Those services, which Baidu discontinued in 2006, allowed Chinese internet portals to offer search results without displaying Baidu's brand. In September 2001, Baidu pivoted its service offerings and launched as an independent search provider. Similar to Google, Baidu allows netizens (*i.e.*, internet users) to search for and access relevant Chinese language websites, news, images and multimedia files *via* links to the Company's own websites and to those of Baidu Union, the company's network of third-party websites.

38.     On August 5, 2005, Baidu's ADSs were publicly listed on the NASDAQ and, since then, the Company has grown to be the second largest search engine in the world behind Google. Baidu is the most widely used search engine in China, garnering a market share there of more than 70%. Baidu's search services expanded to mobile users in 2007 and continued to evolve with the rise in use of mobile devices, with Baidu Mobile becoming Baidu's "flagship" application.

39.     In its 2017 annual report, which was filed with the SEC on Form 20-F for Baidu's fiscal year ended December 31, 2017 on March 15, 2018 ("2017 Annual Report"),  the Company announced that it rebranded Baidu Mobile as Baidu App, highlighting its importance as the main avenue for users to access Baidu's products and service offerings. The application provides users with "a compelling experience" *via* a twin-engine search-plus-feed function that leverages the Company's AI algorithms and insight into user behavior to deliver content to users. By the end of 2017, Baidu App's daily active users ("DAUs"), "the number of unique mobile devices that have accessed [the] app at least once during a day[,]" reached 161 million.

40.     A critical component of Baidu App, Baidu Feed evolved from Baidu's original news offering, Baidu News. In lieu of actively searching for news, Baidu Feed offers users a personalized timeline that passively suggests content based on users' demographics, browsing history, and past online behavior. Baidu Feed also uses the Company's AI algorithm to recommend content based on the content's quality, evaluating the text of the content to determine whether it is good or bad and surveying comments posted by users to determine whether or not readers like the material. In its 2018

---

[2]     The Company's name comes from a thirteenth century Chinese poem, written by Xin Qiji, about a man who searches for a woman "hundreds and thousands of times." The word "baidu" literally means "hundreds of times[.]"

Annual Report, Baidu touted Baidu Feed as a complimentary service to its search products that "leverages Baidu AI recommendation algorithms and monetization platform, and contributes to user engagement and retention."

41.    A May 2019 article appearing in *TechCrunch* highlighted the importance of Baidu Feed to the Company's business model, stating "Baidu's new two-legged strategy means feed is now of equal, if not more, weight alongside search as the company better embraces the mobile age."

42.    Baidu's app portfolio also includes a multitude of products that allow users to generate and share content in various forms. For instance, Baidu Post Bar is a social media platform where users can build online communities by posting text, image, and video content in users' areas of interest and generating discussion groups around cultural trends. Baidu's Haokan allows users and professional content creators to generate and share short-form videos, typically several minutes long, and receive revenue from views. Similarly, Baidu's Quanmin allows users to create, edit using special effects, and share minute-long videos consisting of, *inter alia*, dance, comedy, and lip-synching routines. Baidu distributes these short videos in personalized Feed timelines, recommending them to users *via* the Company's AI algorithm.

43.    Another Company offering, Baidu's blog platform, Baijiahao, consists of a network of over **two million** content providers who write articles and share content in various forms, including images, graphs, videos, and live broadcasts. Baidu launched Baijiahao in 2016 in an effort to compete with ByteDance's Toutiao and Tencent's WeChat. Baidu integrates the content generated through Baijiahao into users' personalized Search and Feed results.

44.    In July 2018, Baidu introduced its Smart Mini programs to the Baidu App, allowing users to access content from third-party apps through Baidu App in lieu of downloading the third-party app directly to its device. Baidu's Smart Mini program uses the Company's AI algorithm to screen and recommend content and services based on a user's past searches. By May 2019, Baidu's Smart Mini programs had 200 million monthly active users ("MAU").

45.    Baidu's Search, Feed, and video products, along with Baidu's knowledge and information products and AI businesses, comprise Baidu's Core business segment. Baidu derives the majority of its Baidu Core revenue from its online marketing services and as such, the Company's

business model is dependent on user engagement. For its 2019 Fiscal Year, of the Company's total $15.429 billion in revenue, $11.217 billion, ***more than 72%, was derived from online marketing***. Baidu's competitors, including ByteDance and Tencent, also seek to profit from China's $60 billion digital advertising market. To be competitive, therefore, the Company must develop innovative products and service offerings to attract users, content generators, and customers. Working in a circular fashion, the Company pays third parties to generate a plethora of quality content to attract a large base of users to Baidu products and service offerings so Baidu customers are able to market to that same large user base *via* pay for performance ("P4P") services and other marketing services.

46.     Baidu monetizes its Baidu Core products through auction based P4P services. Baidu's P4P Search customers create text-based descriptions of their websites, using Baidu's automated online tools, which correspond to the desired keywords. Those customers bid or pay a fixed fee for the keyword that provides them with priority placement in Baidu's Search results. Baidu's P4P customers advertising on Feed bid for priority placement of their sponsored links, which typically consist of image or video-based advertising. The ranking of the customer's advertisement placement corresponds to the amount of the customer's bid, with the highest bidder's links being displayed at the top of Baidu's Search or Feed results. Baidu receives revenues from its P4P customers when a user clicks on a customer's link in the Search or Feed results ("click-through").

47.     As described in the Company's 2019 Annual Report, to monetize its video traffic, Baidu offers its customers advertising products through "live streaming and short videos, equipped with video creative production tools," which Baidu asserts "provide[s] [its] customers with a richer and more effective brand communication medium." Baidu's customers typically either design their own ads in direct communication with Baidu's marketing team or they hire a third-party advertising agency that specializes in marketing on Baidu platforms. These third-party advertising companies receive more profit when their ads are successful, which incentivizes them to test the limits of Baidu's content policies. Baidu's customers are required to upload their ads to the Company's online content review system for review and approval prior to publication.

48.     Baidu employs a dual strategy, utilizing both technological screening and human reviewers, to review and remove illegal content from its apps and platforms. There are two steps in

content review: security review and quality review. Each is divided into machine and human review. The security review determines whether content can be published. The quality review decides whether the content can be recommended by the platform or not. At all relevant times, the Company utilized a "blacklist" of keywords to screen for illegal content, which had blind spots that needed to be constantly updated to comply with Chinese laws and regulations. Nevertheless, Baidu often failed to timely update the blacklist, which was compounded by issues with Baidu's human review component that suffered from severe understaffing.

49.     At all relevant times, Baidu lacked adequate managerial staff to enforce review standards and often relied on reviewers' personal judgments. Moreover, reviewers' workloads require that they review each article for content within 2 to 10 minutes. Thus, any slight carelessness by a reviewer can easily cause problems. As such, Baijiahao posed a significant challenge for the Company's content review procedures given that it was a new technology that involved a vast number of users posting longer content.  With sales quotas looming at the end of each month during the Class Period, Baidu's content reviewers applied a less rigorous content review standard to advertisements, allowing the publication of ads with questionable content in the interest of making the sale to the customer. Senior managers prioritized results (*i.e.*, hitting Baidu's sales goals) over process and, as such, internal sales pressure requirements compromised the strict enforcement of regulatory restrictions.

50.     Baidu's marketing and content review teams understood that it was more important to reach Baidu's sales goals than to strictly enforce content prohibitions. Oftentimes, Baidu published these questionable ads late at night to limit the likelihood that Chinese content regulators would find the ads. Additionally, Baidu's procedure for verifying its users' identities, which required real-name and facial recognition, could not adequately detect instances where a publisher registered using a fake name and a video of the person's face associated with the fake name to verify the account. This allowed publishers to register accounts using fake real-id registrations, in violation of PRC regulations to publish illegal content.

### 2. China's State Internet Information Office and the Cybersecurity Administration of China

51.     The Chinese government established the State Internet Information Office ("SIIO") in May 2011 to centralize internet regulations, promote cyberspace security, and supervise online content regulation. With respect to content, the SIIO's intended purpose was preventing abusive uses of the internet, like fraud, online pornography, vulgar content, and illegal online marketing schemes. After becoming President of the PRC on March 14, 2013, Xi Jinping undertook a campaign to build China into a cyber-power while simultaneously strengthening censorship over China's internet. On February 27, 2014, President Xi Jinping created the Central Leading Group for Internet Security and Information. At this time, President Xi Jinping also created the CAC as a subordinate organization responsible for establishing internet security. During the inaugural CAC meeting, President Xi Jinping proclaimed his intent for the CAC, stating in relevant part, "[w]ithout [i]nternet security there is no national security; without informatization, there is no modernization."

52.     To effect this purpose, a series of laws, regulations, and policies were promulgated to manage online content. For instance, in early August 2014, the SIIO promulgated regulations, entitled "the Provisional Regulations for the Development and Management of Instant Messaging Tools and Public Information Services[.]" These regulations required instant messenger users to agree, *via* the providers' terms of service agreement, to abide by the "seven baselines[,]" consisting of observing laws and regulations, the Socialist system, the national interest, citizens' lawful rights and interests, public order, social morality and truthfulness of information. To facilitate compliance monitoring, the regulations required that instant messenger providers register users' accounts only after verifying their real identities. The regulations also created an obligation for providers to log violating users and report them to the regulators. During an interview with a journalist from Chinese news agency *Xinhua*, a SIIO spokesperson indicated that the regulations were crafted to promote healthy and orderly instant messaging and serve Chinese netizens, who: ***"'deeply detest' the use of instant messaging 'to disseminate unlawful information about terrorism, violence and pornography, and to wantonly propogate [sic] slander and rumours [sic]....'"***

53.     On June 25, 2016, the CAC promulgated "Provisions on the Administration of Internet Information Search Services" banning search providers like Baidu from publishing prohibited content

in links, summaries, cached pages, searches, and recommended webpages. Under these regulations, search service providers were also prohibited from illegitimately benefiting from utilizing broken links or search results with false information to distribute illicit content. The regulations further placed the onus on the search service providers to perform real-time monitoring to prevent the publication of illegal content, remove it and report it to regulators. The search service regulations also extended to advertising in that the search service providers were required to verify the qualifications of customers utilizing paid ad services and clearly identify whether search results were paid-for advertisements or natural search results.

54.     On June 29, 2016, the SIIO and CAC issued "Regulations on the Management of Mobile Internet Application Information Services", governing the use of mobile applications. In addition to requiring that mobile application providers establish content review mechanisms and take measures to suspend or cancel violating accounts, the application regulations required that mobile app users' accounts be authenticated using their real identities and mobile phone numbers; the explicit purpose of which was preventing users from using fake names or another person's name to log in to apps and post prohibited content. To solidify internet service providers' roles in censoring content, in August 2016, the CAC met with over 60 internet website providers, such as Baidu, to levy "editor-in-chief" responsibility to senior staff, which made them responsible for ensuring that prohibited content was not publicly disseminated.

55.     In December 2016, the CAC issued the National Cyberspace Security Strategy for the purposes of "implement[ing] Xi Jinping 's 'Four Principles' concerning moving forward reform of the global Internet governance system and the 'Five Standpoints' on building a community of common destiny in cyberspace." This strategy identified certain "grave challenges" to information disseminated on the internet and explicitly noted that "[h]armful online information corrodes cultural society." On May 2, 2017, the CAC promulgated the "Provisions for the Administration of Internet News Information Service[,]" requiring online Chinese news providers to remove content found to be violating Article 3, which mandated that internet news services, *inter alia*, comply with the Chinese laws and regulations; adhere to the principles for serving the people and socialism as well as the guidance for public opinion; promote the formation of a positive, healthy, upward and benign online

culture; and safeguard national and public interests. In response to these regulations, Baidu required its Baidu Tieba (*i.e.*, Post Bar) users to register their accounts using their real names in advance of the June 1, 2017 effective date.

56.     On August 25, 2017, the CAC issued a set of regulations, entitled "Provisions on the Administration of Internet Forum Community Service Management[,]" extending the scope of its real-identification requirements to online forums. The regulations also imposed obligations on online forum providers like Baidu, mandating that they monitor for illegal content and if found, take actions to suspend or cancel the user's account, remove the content, create a record of the matter, and report it to the regulators. The online forum providers would also have to take measures to thoroughly investigate users who were suspected of using fake names and to report those instances to the regulators for inspection.

57.     On December 20, 2019, the CAC promulgated "Provisions on the Ecological Governance of Network Information Content" with the purpose of promoting a clean cyberspace with positive energy (*i.e.*, code for content in line with Chinese communist party policies) and eliminating illegal and bad information. Under these regulations, specifically Article 6, online content providers were forbidden from publishing content that, *inter alia*: ***"spreads obscenity, pornography, gambling, violence, murder, terror, or instigates crime...."*** The December 2019 regulations also mandated that online content providers prevent and avoid the use and publication of content that uses exaggerated titles and features content that is inconsistent with the title (*i.e.*, click-bait) or is sexually suggestive or provocative. In addition to promulgating specific content to be regulated, the December 2019 regulations placed the onus for managing content onto the providers.

58.     Specifically, it required that providers establish the following by its March 1, 2020 effective date: (i) a mechanism for governing content ecology; (ii) develop a system, working with the government, to evaluate the ecological governance; (iii) create rules to carry out that governance; (iv) improve user real identity registration; (v) perform information and comment review; and (vi) conduct real time inspections of content, advertising spaces, and advertising content displays. The December 2019 regulations also mandated that each internet provider issue an annual ecological governance

report, detailing the status of the network's content governance, the performance of the network's head of ecological governance, and an evaluation of the company's performance.

59.     The December 2019 regulations took further aim at providers, like Baidu, who tailored content to their users through personalized algorithm recommendations, specifically requiring that the provider ensure that the algorithm did not disseminate Article 6 prohibited content (*i.e.,* obscenity, pornography, gambling, violence, murder, terror, or content that instigates crime) and prevented the distribution of click-bait and sexually suggestive content. The regulations also demanded that providers enhance their ability to manually intervene in the algorithm to halt distribution of the content described above in ¶ 57, *supra*. Providers were instructed to log any illegal activities and identify violating users. Providers who failed to comply with these regulations faced various sanctions consisting of interviews with regulators, warnings, and time-limited corrective orders. If the provider refused to correct the behavior, or if the circumstances were sufficiently serious, then the provider could face suspension, civil liability, or even criminal liability.

60.     To further enforce these regulations, a team of five to six Beijing CAC officials, consisting typically of a deputy director and several junior leaders, visited Baidu's offices for presentations wherein the Company would report on, *inter alia*, its efforts to crack down on illegal content and content that damages the state and leadership's reputations, what privacy protection measures the company was employing, and mechanisms implemented to receive complaints from users. The Beijing CAC also sends emails to Baidu and other content providers reminding them to blacklist keywords, particularly when searches for certain blacklisted keywords are likely to increase due to an ongoing current event.

61.     When the CAC found illegal content on Baidu's applications or platforms, they would typically email the Company to request an in-person meeting. These meetings often went undisclosed as the issues were usually resolved privately between the regulators and representatives from Baidu's content risk control center and news content department. This discrete resolution is the result of a tacit understanding between the regulators and Baidu to resolve the issue privately. Moreover, Baidu's government relations department is often able to work with the regulators to reduce the severity of the

1    regulatory penalty. However, when the central-level CAC is involved and orders the Beijing CAC to

2    discuss Baidu's practices, the Company is less likely to be able to keep the matters private.

   **3. Baidu's Long History of Investigations by Chinese Regulators**

  62. As reported in an *itNews* article, Baidu issued a report in November 2007 identifying that more than one-third of the keyword searches for online videos were adult oriented. Given high demand for adult content and, in turn, higher revenue, providers and users like Baidu circumvented the Chinese's government's prohibition against pornography by using coded language or slang, uploading homemade content to cloud services, or using livestreaming wherein users can gift virtual gifts to sexually suggestive anchors to share the illicit content.

  63. As alleged in ¶¶ 12, 51-61 *supra*, PRC laws and regulations, however, required Baidu to screen for illegal content, prevent its publication, and remove it immediately from its platforms. Beginning as early January 2009, Baidu came under scrutiny by the SIIO and CAC for hosting vulgar content and pornography. The Company has been investigated, fined, and had its services suspended for such content. In January 2009, for instance, Baidu was subject to "severe punishment" from the Chinese government for allowing its users to find and access pornography. In a statement published on Baidu's own website, the Company formally acknowledged its role in disseminating the illicit content and issued an apology "to the Netizens at large for the negative impacts [the company] brought upon the society." Baidu further claimed that it took steps to delete the obscene content and improve its oversight. Nevertheless, Baidu again came under scrutiny for hosting pornographic content on its Baidu Cloud accounts on August 10, 2014 and was yet again instructed to clean up its platforms by Chinese regulators. In March 2015, the Chinese government fined Baidu more than 210,000 yuan or $33,800 USD for uploading obscene pornographic novels on Baidu App and for carrying online publications without the requisite permits.

  64. On January 15, 2016, the SIIO summoned Baidu executives for questioning for hosting forums containing pornography and libelous posts, selling advertising to unlicensed hospitals, and hosting and selling the management of its Baidu Post medical forums to private hospitals, who used the forums to peddle their own services. In addition to immediately ordering the company to remove the harmful content, the SIIO ordered the internet regulators in Beijing to punish the company. As

reported by the SIIO, Baidu having "fully realized the severe inadequacies in its management and the resulting negative social impact" committed to "reviewing its decision-making and approval procedures so as to fix the problem at the source."

65.     On or around Saturday April 30, 2016, Chinese media reported that Wei Zexi, a Chinese college student, had died from cancer following unsuccessful experimental immunotherapy treatment he received at a hospital. Media and internet commentary also reported that Wei Zexi had learned of the hospital and treatment program when a paid listing for it appeared on the first page of Baidu's search results. Following this news, Baidu's share price dropped to a closing price of $178.91 on Monday, May 2, 2016, down from Friday, April 29, 2016's closing price of $194.30.[3] The decline between these two trading days was more than $15.00, representing a drop of approximately 7.9%, on unusually high volume of more than 10 million shares traded.[4] Accordingly, no later than May 2016, particularly given the massive impact on the Company's ADS price that the Wei death had on the Company's operations, the Individual Defendants were keenly focused on the content provided on the Company's platforms.

66.     On May 3, 2016, the CAC, working in tandem with the State Administration of Industry and Commerce and the National Health and Family Planning Commission, released the results of an investigation into Baidu's auction-based P4P services, concluding that "the bidding price by Baidu's online marketing customers [was] given significant weight in search results ranking, and that certain results are not clearly identified as online marketing. The PRC regulators believe[d] these practices affect the fairness and objectivity of search results and might mislead internet users."

67.     Baidu formally responded in a May 11, 2016 press release filed with the SEC on Form 6-K where the Company disclosed the three agencies' findings, and committed to setting aside one billion RMB (approximately $151 million USD) to compensate users harmed by fraudulent marketing information. Baidu also committed to implementing changes to its auction-based paid search practices

---

[3]     Friday, April 29, 2016 was the last trading day before the news broke over the weekend, when the markets were closed.

[4]     Comparatively, April 29, 2016 had only 6.95 million shares traded and May 3, 2016 traded approximately 5.48 million shares.

by including "credibility" and "reputation" as factors to rank results, clearly identifying paid-for ads, and ending online marketing services to unqualified organizations. A May 12, 2016 *Morningstar* report estimated that Baidu's share price decreased by approximately 14% in the aftermath of the Wei Zexi incident.

68.    The events described in ¶¶ 64-67, *supra*, continued to negatively impact the Company's operations because, according to a May 22, 2019 *Morningstar* research report, Baidu's search revenue and reputation were severely damaged in the Wei Zexi incident. Following the incident, Chinese authorities launched new regulations for online search and advertising, which clearly defined paid search results as advertising; the new regulations came into effect on September 1, 2016. Though *Morningstar* reported that it believed that "the worst ha[d] passed" by May 2019, it also noted that, as a result of stricter standards for online advertisers, "***Baidu's active online marketing customers decreased by 6% and its search revenue declined by 0.5% in 2016***."

69.    On May 6, 2016, the Chinese authorities again fined Baidu and suspended the Company's cloud storage services for storing tens of thousands of pornographic videos and selling access to the accounts on e-commerce platforms. In August 2017, the CAC investigated Baidu for hosting content on Baidu Tieba (*i.e.*, Post Bar), in violation of "Provisions for the Administration of Internet News Information Service." The CAC lambasted the company for hosting content that contained violence, rumors, obscenity and pornography, and information that harms national security, public safety, and social order. The CAC reported that Baidu, along with two additional companies, "did not fully take on their management responsibilities toward information posted by users that are prohibited by laws and regulations." The CAC further committed to vigorously enforcing cybersecurity law and supervising content on the internet. Subsequently, on September 25, 2017, the CAC levied the maximum fine available under the law against Baidu for its violations.

70.    On June 11, 2018, Baidu and the *People's Daily* - the Chinese Communist Party's newspaper - launched the People's Express, an AI enabled news platform that links with commercial media platforms to provide comprehensive mobile content. In doing so, Baidu signed a strategic agreement with the People's Express to allow registered Baijiahao users to open People's Express accounts to share content while providing People's Express with exposure *via* Baijiahao user traffic.

On November 16, 2018, the CAC collectively interviewed at least one Baidu executive and several other Chinese social media platforms executives, during which it ordered the companies to clean up their content.

71.     The CAC specifically addressed the Company's need to remove, *inter alia*, vulgar pornography, rumors, illegal publications, and click-bait advertising maliciously designed to generate traffic. Just three months later, on January 3, 2019, the CAC ordered a one-week suspension for some of Baidu's Search and Feed platforms after finding that they were spreading vulgar content. Specifically, the suspension impacted Baidu Feed's "Recommended Channel[,]" "Woman Channel[,]" "Fun Channel[,]" and "Emotional Channel[.]" The CAC admonished Baidu, citing the need for the Company to perform "deeper rectification." Baidu once again committed to following the instructions of the CAC and making improvements to promote the "healthy development of the industry." On news of the CAC's action, the price of Baidu's ADS's fell approximately 5%.

72.     In a January 6, 2019 article titled, "China's Censors Crack Down on Baidu and Sohu.com (Again)," *Motley Fool* reported, that "the cyberspace administration will be a thorn in Baidu and Sohu's sides for the foreseeable future, and that the only choice is to roll with the punches. … ***investors should see if the temporary ban leads to something bigger***, like the crackdown on medical ads in 2016 or the fines in 2017. If that happens, we'll need to revisit Baidu and Sohu to see if their growth forecasts remain intact." The CAC's January 3, 2019 actions specifically centered around Baijiahao, Baidu's network of over two million of content providers. Baijiahao posed a significant challenge for the Company's content review procedures given that it was a new technology that involved a vast amount of users posting longer content. In response, Baidu "updated its entire content review standards, redefining vulgarity into three main categories: text, video, and images[,]" and "upgraded its video review system and strengthened training for reviewers."

73.     Baidu also faced public criticism in January 2019 after veteran Chinese political journalist and Assistant Professor of the School of Journalism and Communication at the Chinese University of Hong Kong, Fang Kecheng, Ph.D., published an article, which is no longer publicly available, accusing the Company of programming its Search results to redirect users to content

published on its own platforms.[5] Dr. Fang found that Baidu largely directed users to Baijiahao and Baike (*i.e.*, Baidu Encyclopedia) to boost its digital ad revenues. On January 23, 2019, Baidu issued a response on Weibo, disputing Fang's findings and asserting "that less than 10% of its search results directed content from Baijiahao." That same day, *Reuters* reported in an article titled, "China's Baidu pledges to improve search service after complaint[,]" that Baidu's competitors offer a broader range of ad placement styles, stating in relevant part: "[t]hese platforms are different in nature but they are competing for the same budget … I think Baidu is still in the basket, but not gaining too much traction for key accounts overall."

74.     Before the beginning of the Class Period, on or about February 28, 2019, Baidu faced additional scrutiny after a tip from a Baidu Baike (*i.e.*, Baidu Encyclopedia) user revealed that broken, innocuous-seeming links on Baidu's Baike pages about kindergartens and primary schools were redirecting users to pornography sites. According to a March 1, 2019 *SixthTone* article, Fang Kecheng, Ph.D. reprimanded Baidu, stating "'[t]echnically, it's not hard for Baidu to write a program to check broken links and the suspicious redirection of web pages,' ... '[u]nfortunately, Baidu did not do this and instead let the operators of porn websites take advantage of these loopholes.'" Baidu subsequently removed the links and committed to checking Baidu Baike links regularly. Hence, by the commencement of the Class Period, Baidu was facing increasing pressure to compete and generate revenue without running afoul of Chinese authorities by continuing to enable users on its platform to access, *inter alia*, pornographic content.

**B.     Defendants' Materially False and Misleading Class Period Statements and Omissions[6]**

75.     Throughout the Class Period, Defendants either knowingly or with deliberate recklessness made materially false and misleading statements and/or omissions that: (i) concealed that

---

[5]     Echo Huang, *An obituary for Baidu argues China's vast internet has no search engine*, Quartz (Jan. 24, 2019); Yi Hong Poo, *Baidu is dead – tech companies and fake news in China*, Medium (Feb. 4, 2019).

[6]     In accordance with the Court's "Guidelines for Securities Class Action Cases" issued September 23, 2019, attached hereto as Exhibit B is a summary chart of the false and/or misleading statements and omissions alleged below; the speaker, date, and medium of each statement or omission; the reasons why each statement or omission was false and/or misleading when made; and the facts giving rise to a strong inference of scienter as to each statement or omission.

Baidu's protocols for monitoring illicit content were critically inadequate; (ii) Baidu's product offerings violated PRC laws and regulatory requirements because they enabled the publication of illegal content; (iii) concealed that Defendants had repeatedly been investigated by the CAC based on their inability and/or unwillingness to identify and filter questionable content; (iv) Baidu's increased enablement of third-party posting meant that they were incapable of adequately supervising content as required by PRC laws and regulations; (v) concealed that Defendants' understaffing and employment of a new, less effective senior content manager allowed the publication of illegal content on Baidu's platforms, heightening the risk of regulatory sanctions; and (vi) failed to disclose that Baidu was incapable of managing or filtering even *its own problematic content* given that its sales team pressured Baidu's content review team to achieve monthly sales goals. Further, Defendants had motive to commit fraud and made their materially false and misleading statements with scienter as alleged in ¶¶ 76-81, 86, 99-101, 105, 107, 111, 117, 121-122, 124, 126-127, *infra*.

76.     *First*, to address increasing competition from platforms, including ByteDance's Tiktok and Tencent's WeChat and WeChat mini program, Baidu expanded its mobile device content offerings with Baijiahao, Haokan, Quanmin, and Smart Mini program. In doing so, the number of users and publishers generating content ballooned to encompass millions of contributors. This expansion was new territory for the Company which was grounded in search and sorely lacking in experience operating – and monitoring - content-related products.

77.     *Second*, Baidu's content and review teams lacked a clear and consistent process for staying informed of content that the government deemed objectionable and as a result, changes in content review standards and blacklisted keywords were not updated in a timely manner. Moreover, during the Class Period, Baidu did not have adequate managerial staff to enforce review standards and often relied on reviewers' personal judgments. Understaffing in the content review department also left reviewers with only 2 to 10 minutes to review each article or video. This was particularly problematic for Baijiahao given the vast amount of content with longer lengths.

78.     Regardless, problematic content would still be published at the end of the month when content reviewers would knowingly publish ads with questionable content in the interest of ensuring that the marketing department hit monthly sales goals. By way of his direct involvement in overseeing

Baidu's Mobile Ecology sales division, Defendant Li either knew or was reckless in not knowing that the Company's inability or unwillingness to adequately monitor content meant that it was violating PRC law. These internal issues were compounded by the Chinese government's persistent campaign to crack down on content prior to and during the Class Period.

79.    ***Further***, the Chinese government's tightening grip over dissemination of content and enforcement actions against Baidu were no surprise for Defendant Li, who as of May 2018 served as vice president of the China Federation of Internet Societies ("CFIS"). CFIS is an internet-related social organization – directly supervised by the CAC – that provides political guidance for member organizations, encourages operation improvements, and promotes development of the Chinese Communist Party in the internet industry. Defendant Li also has direct access to Xi Jinping and other top Chinese communist party leaders by way of his professional and political status. In 2017, Defendant Li accompanied President Xi Jinping to the World Economic Forum in Davos, Switzerland.

80.    Defendant Li was also appointed as a delegate of the Chinese People's Political Consultative Conference ("CPPCC"), China's top political advisory board responsible for presenting a Chinese united front, in February of 2013 along with Yu Zhengsheng, a high-ranking Communist party member and former Communist Party secretary of Shanghai. According to the CPPCC's website, its members consult "[b]efore the [Chinese] state adopts important measures or makes decisions on issues having a bearing on the national economy and the people's livelihood[s]." Defendant Li continues to serve as a member and participated in the 13th National Committee of the CPPCC in March of 2019.

81.    In sum, the Individual Defendants boasted about Baidu's Search and Feed products throughout the Class Period, including their expanding network of content, while simultaneously representing that they were able to remove vast amounts of problematic content. Defendants, however, concurrently concealed issues with both their machine and human content review components and their disregard for content review standards to meet monthly sales targets. Defendants further failed to specifically disclose that they faced multiple CAC investigations for publishing and failing to remove illegal click-bait, fraudulent ads, unauthorized news, and salacious pornographic content

1  during the Class Period. As a result, Defendants materially mispresented the Company's ability to

2  comply with PRC laws and regulations.

### 1. 2018 Annual Report

4  82.   The Class Period begins on March 16, 2019 with the filing of Baidu's 2018 Annual

5  Report with the SEC after market close on March 15, 2019. The 2018 Annual Report represented

6  online marketing revenue of US $11.9 billion, roughly 80% of Baidu's total revenue of US $14.9

7  billion. Defendant Li signed the 2018 Annual Report and the Individual Defendants each signed SOX

8  Certification certifying the accuracy of the 2018 Annual Report's contents.

9  83.   The 2018 Annual Report boasted that online marketing revenues for Baidu Core in

10  2018 were "mainly due to strength in education, franchising, personal care, and business services

11  sectors, while financial services, media and entertainment, and machinery and equipment sectors were

12  less vibrant." As evidence that Baidu understood the importance of complying with Chinese content

13  standards, the 2018 Annual Report also stated that, "if the content on our platform or found, stored, or

14  shared through our other products and services contains information that government authorities find

15  objectionable, our platform or relevant products or services may be shut down and we may be subject

16  to other penalties."

17  84.   The 2018 Annual Report, however, failed to disclose the issues Baidu was facing

18  complying with the CAC's regulations for monitoring illicit content and the resulting scrutiny by the

19  CAC. For example, Baidu maintained a "blacklist" of keywords that Baidu knew had blind spots which

20  needed to be constantly updated. There are two steps in content review: security review and quality

21  review and each is divided into machine and human review. Baidu's security review determines

22  whether content can be published and the quality review determines whether or not the content can be

23  recommended. Defendants knew, or were reckless in not knowing, that the human review components

24  were critically inadequate due to understaffing at the Company. Reviewers' workloads required that

25  each article be reviewed within 2 to 10 minutes. Baidu similarly lacked adequate managerial staff to

26  enforce review standards and often relied on reviewers' personal judgments.

27  85.   The 2018 Annual Report contained purported risk disclosures such as, "we cannot

28  assure you that the PRC government would agree that our contractual arrangements comply with PRC

licensing, registration or other regulatory requirements, with existing policies or with requirements or policies that may be adopted in the future." Such statements, however, were not tailored to the known and foreseeable risks the Company then faced. The purported risk disclosures were materially inadequate when made for the added reason that Defendants either knew or deliberately disregarded that their current protocols for monitoring illicit content were *already* critically deficient, and that Baidu's products then did not comply with PRC regulatory requirements.

86.     The 2018 Annual Report also stated that: ***"[w]e only have contractual control over our websites.***" The statement "[w]e only have contractual control over our websites," was materially false and misleading when made because, at all relevant times, Baidu generated content through its advertising department and monitored content *via* a dual system of artificial intelligence and human content reviewers. In other words, Baidu can and did exercise control over websites, if not directly then through their wholly owned subsidiaries. The 2018 Annual Report also contained the following representation:

> In the opinion of Han Kun Law Offices, our PRC legal counsel, (i) the ownership structure relating to our consolidated affiliated entities complies with current PRC laws and regulations; (ii) subject to the disclosure and risks disclosed under "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure," "—Risks Related to Doing Business in China" and "—Regulations," our contractual arrangements with our consolidated affiliated entities and the nominee shareholders are valid and binding on all parties to these arrangements and do not violate current PRC laws or regulations; and (iii) subject to the disclosure and risks disclosed under "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure," "—Risks Related to Doing Business in China" and "—Regulations," ***the business operations of our consolidated affiliated entities, as described herein, comply with current PRC laws and regulations in all material respects.***

87.     The statement highlighted in ¶ 86, *supra*, that Baidu's business operations "comply with current PRC laws and regulations in all material respects" was materially misleading when made because Defendants knew or were reckless in not knowing, and did not disclose that the statement (a) falsely conveyed that the Company complied with PRC law and (b) omitted that: (i) Defendants' current protocols for monitoring illicit content were critically inadequate, and that Baidu's products were not complying with PRC laws and regulatory requirements; (ii) Defendants had repeatedly – and as recently as January 3, 2019 – been investigated by the CAC based on their inability and/or

unwillingness to filter questionable content; (iii) the Individual Defendants' close ties to Communist Party officials and the CAC meant that they would have received advanced notice of their lack of compliance; and (iv) Baidu's increased enablement of third-party posting meant that they were incapable of adequately supervising content as required by PRC laws and regulations.

### 2.     May 16 and 17, 2019 Statements

88.     On May 16, 2019, the Company announced their financial results for the first quarter of 2019, after the markets closed. This announcement was filed with the SEC on Form 6-K on May 21, 2019. The 6-K was signed by Defendant Yu. As reported in the May 16, 2019 6-K, the Company's earnings reflected a significant growth slowdown, compared to the previous year, and its own expectations. The 6-K also announced the sudden resignation of Baidu's senior vice president of Search, Hailong Xiang.

89.     Compared with its SEC filings from 2007 and continuing through 2018, Baidu consistently announced its first quarter earnings during the end of April. In 2019, for the first time, Baidu delayed the release of its first quarter earnings for several weeks. Defendants' announcement, published on the Company's website and over *PR Newswire* on April 19, 2019, provided no explanation for the delay. On April 29, 2019, analysts at UBS issued a report on Baidu, noting that it was: "***conservative on 2019 due to market-wide macro and regulatory uncertainty***, and healthcare search result changes for Baidu. But we are positive on Baidu's news feed and see room to improve conversion and increase ad."

90.     In the May 16, 2019 6-K announcement, Defendant Yu stated: "[d]espite government policies to improve the market condition for SMEs[7], ***we anticipate online marketing in the near term to face a challenging environment.***"

91.     Defendant Yu's highlighted statement in ¶ 90, *supra*, was materially false and misleading when made because it: (a) conveyed the impression that regulatory compliance did not contribute to the company's near-term challenges; and (b) it omitted that: (i) the risks posed by the Company's inability and/or unwillingness to comply with PRC laws and regulations on future revenue; (ii) Defendants had repeatedly – and as recently as January 3, 2019 – been investigated by the CAC

---

[7] "SMEs" means small to medium-sized enterprises.

based on their inability and/or unwillingness to filter questionable content; (iii) Defendants' purposeful disregard of content review standards and night-time publications of questionable content in the name of hitting sales targets; and (iv) Baidu's increased enablement of third-party posting meant that they were incapable of adequately supervising content as required by PRC laws and regulations.

92.    On this news, the price of Baidu's ADSs declined from a closing price on $153.70 on May 16, 2019 to $128.31 on May 17, 2019 - a single day decline of $25.39 and representing a drop of approximately 16.52%. Had the Company revealed its continued problems with complying with PRC laws and regulations, the decline in the Company's ADS price would have been larger.

93.    On May 17, 2019, the Company hosted a call to discuss its First Quarter 2019 earnings but did not address the Company's delay in announcing its financial results.

94.    During the call, Defendant Li lauded the Company's expanding ecosystem of third-party of content and services, remarking that "Baijiahao, our feed content network, now hosts 2.1 million publisher accounts, up 89% year-over-year as more and more top publishers, creators and media companies are taking advantage of Baidu's large search plus feed distribution scale." Defendant Li further noted that the Chinese government was exercising "tighter government scrutiny on content." Nevertheless, Defendant Li went on to tout the Company's ability to screen content saying, "[W]e are strengthening our vertical offerings such as health care and online literature, *filtering out poor and questionable content with Baidu AI.*"

95.    On the same call, Defendant Li discussed the resignation of Baidu's senior vice president of Search, Xiang. In response to a question from a Citigroup analyst, Defendant Li revealed that Xiang, who had also previously led sales in Baidu's Search business, left the company for "personal reasons." Xiang was one of five Baidu to executives to tender their resignation since April 2019, including vice president Wu Haifeng, vice president and sales manager Gu Guodong, and executive director Sun Wenyu, all of whom held positions in Baidu's Search division, as well as vice president of government relations, Zhao Cheng.

96.    A May 24, 2019 *Caixin* article, titled "Baidu's Management Reshuffle Taps Young Blood After First Quarterly Loss in 15 Years[,]" noted that, Baidu faced its most significant reputation-damaging crisis with Xiang as the Company's head of search in 2016 when the Wei Zexi incident

occurred. *See* ¶¶ 65-68, *supra*. As reported by the *Caixin* article, "[t]hat scandal prompted Baidu to tighten control of medical advertising — a primary source of ad revenue — squeezing its bottom line." In a report issued on May 3, 2016, *Morningstar* underscored the extent of the reputational damage, stating in relevant part: "[t]he public criticised [sic] Baidu's revenue-oriented business model and its lack of control over medical and health-care related advertising. We think ***Baidu is facing a public reputational crisis***, and its reputation in China has further deteriorated after a scandal related to selling management rights for a haemophilia [sic] forum in Baidu Post Bar early this year." Moreover, in a May 2016 internal letter, Defendant Li emphasized the financial stakes of failing to adequately oversee its search results, stating in relevant part, ***"[i]f we lose our users' support or fail to stick to our values, Baidu will be only 30 days away from bankruptcy."***

97.     Xiang was replaced by Shen Dou, who previously oversaw "the development of Baidu App, Haokan short video app and Baidu smart mini program." After Xiang's resignation in May 2019, Defendant Li and his wife, Dongmin "Melissa" Ma, who also serves as special assistant to the Company's CEO, oversaw sales in Baidu's Mobile Ecology Group (*i.e.*, Search and Feed) until June 3, 2019 when the Company rehired one of its founding members, Shi Youcai.

98.     Around this same time, the Shanghai Administration for Market Regulations ("Shanghai SAMR") received a consumer complaint about Baidu from a consumer who purchased an item from a Baidu Feed ad, which turned out to be a scam. The Baidu advertising design department created the fraudulent Baidu Feed in-feed ad and though it was reviewed by the content production and review department, the problematic content was published nevertheless, likely due to sales pressure from the marketing department.

99.     Defendants knew or were reckless in not knowing that Defendant Li's statement touting Baidu's ability to filter content (highlighted in ¶ 94 *supra*) was materially false and misleading when made because it: (a) conveyed the false impression that Baidu was able to effectively filter out poor and questionable content; and (b) omitted that: (i) Baidu's protocols for monitoring illicit content were critically inadequate, and as a result, Baidu's products were not complying with PRC laws and regulatory requirements; (ii) Defendants had repeatedly – and as recently as January 3, 2019 – been investigated by the CAC based on their inability or unwillingness to filter questionable content; (iii)

the Individual Defendants' close ties to Communist Party officials and the CAC meant that they would have received advanced notice about their lack of compliance; (iv) Defendants' purposeful disregard of content review standards and night-time publications of questionable content in the name of hitting sales targets; and (v) Baidu's increased enablement of third-party posting meant that they were incapable of adequately supervising content as required by PRC laws and regulations.

100.    Defendant Li's knowledge of this inadequacy is further supported by his comment during the Company's May 17, 2019 earnings call that: "our AI-power algorithms **help male users on the Baidu platform find interesting content** in the social commerce company's Smart Mini Program, increasing a user group that has been historically underrepresented."

101.    Responding to the Company's May 16 and 17 disclosures, Jeffries Equity Research China issued a report on May 19, 2019 noting that: "the magnitude of growth slowdown in Baidu Core suggests exacerbated pricing pressure under macro challenges and intensifying competition that will likely persist throughout 2019." The report went on to note, that one of the "key risks" Baidu was facing was "**[r]egulatory risks leading to ad clean-up in other verticals**." Similarly, on May 17, 2019, UBS issued a report that it believed low earnings from online marketing services "**suggests weak advertising demand**…." On this news, the price of Baidu's ADSs declined from a closing price of $128.31 on May 17, 2019 to $117.55 on May 20, 2019 - a decline of an additional $10.76 and a drop of approximately 8.39%.

102.    Had the Company revealed the full extent of its continued inability and/or unwillingness to comply with PRC law, and related risks to future online marketing revenues, the decline in the Company's ADS price would have been larger.

### 3.    June 19, 2019 Report

103.    On June 19, 2019, the Company issued a report in Chinese, titled "Baidu released its monthly information security governance report, cracking down on 3.4 billion pieces of harmful information such as pornography and gambling in May." The report stated, in part, that "Baidu search has cleaned up more than 2 billion pieces of harmful information that is mainly harmful to social security and other illegal categories. A total of more than 8,000 groups of search terms including

pornography, gambling, drugs, etc. were cleaned up, and more than 500,000 harmful links were cleaned up."

104.    Though it specifically related to Baidu's ability to filter content, the report failed to disclose that the CAC acted against Baidu just a week earlier on June 12, 2019 when it ordered Baidu to immediately rectify serious network ecology problems stemming from the company's advertisements. The ads featured click-bait headlines, like "Shanghai housing prices plummet" or "Female North Korean soldiers don't wear underwear" as well as tempting, sexual photos, explicit text, and tempting but misleading low prices to induce users to click through; however, when users clicked-through, they were directed to Baidu's information flow advertainment (*i.e.*, entertainment that incorporates elements of advertising). Noting that this was not the first time that Baidu's "behavior in the search field … put the company's interest above social interests[,]" the CAC Shanghai branch condemned Baidu for disregarding "social order and morality" and internet regulations in order to attract users. The regulator required Baidu to "understand the problem at its roots, to rectify the issues fundamentally, and remove such advertisements completely."

105.    Defendants knew or were reckless in not knowing that the statements in ¶ 103, *supra*, were materially false and misleading when made because they omitted that: (i) the Company's current protocols for filtering illicit content were critically inadequate, and as a result, Baidu's products were not complying with PRC regulatory requirements; (ii) Defendants' purposeful disregard of content review standards and night-time publications of questionable content to meet monthly sales targets; (iii) Baidu's increased enablement of third-party posting meant that they were incapable of adequately supervising content as required by PRC laws and regulations; and (iv) Baidu was incapable of managing or filtering even ***its own problematic content***. Defendants' June 19, 2019 report also failed to disclose that the sanctions imposed by the CAC in June 2019 were instigated by a consumer complaint based on a Baidu Feed advertisement, ***which was created and reviewed internally at Baidu***, when the product advertised turned out to be a scam. Further, Defendant Li was acutely aware of the problematic advertising in the Company's Mobile Ecology Division due to his role overseeing sales after the resignation of Xiang.

#### 4.      August 19, 2019 Press Release

106.      On August 19, 2019, Baidu issued a press release announcing Baidu's financial results for the second quarter fiscal year 2019 for the period ended June 30, 2019 ("2Q19"). The press release was filed with the SEC on Form 6-K on August 22, 2019. Defendant Yu signed the 2Q19 press release. The 2Q19 press release announced that as of June 2019 Baidu's Baijiahao consisted of 2.2 million publisher accounts "enable[ed] influencers and media firms to not only share their information on Baidu's newsfeed and short video apps but also make their information fully searchable." The 2Q19 press release went on to note that "Baidu continues to improve the user experience on its platform with Baidu AI, to identify and filter out low-quality, offensive and inappropriate ads and other content. *In the first half of 2019, Baidu's AI filtered over one billion misleading, low-quality ad materials and tens of billions of offensive, inappropriate images, texts, videos, and weblinks*." Though Baidu boasted about the ability of its AI to monitor for illicit content and more specifically low-quality ads, it misleadingly omitted the June 2019 enforcement action taken by the CAC.

107.      Defendants either knew or deliberately disregarded that the statement in ¶ 106, *supra* was materially false and misleading when made because it omitted that: (i) the Company's current protocols for filtering illicit content were critically inadequate, and as a result, Baidu's products were not complying with PRC laws and regulatory requirements; (ii) Defendants' purposeful disregard of content review standards and night-time publications of questionable content in order to meet monthly sales targets; (iii) Baidu's increased enablement of third-party posting meant that they were incapable of adequately supervising content as required by PRC laws and regulations; and (iv) Baidu was incapable of managing or filtering even *its own problematic content*. Defendants' 2Q19 press release also failed to disclose that the sanctions imposed by the CAC in June of 2019 were instigated by a consumer complaint based on a Baidu Feed advertisement, *which was created and reviewed internally at Baidu*, when the product advertised turned out to be a scam. Further, Defendant Li was acutely aware that the Company faced sanctions as recently as June 2019 for problematic low-quality, offensive and inappropriate ads due to his role overseeing sales in the Company's Mobile Ecology Division after the resignation of Xiang.

108.    On August 20, 2019, UBS Global research issued a report observing that "cost control softened the blow from weak ad revenues" and cautioning, "we still see macro, *regulation* and competition headwinds in both Baidu Core and iQiyi beyond the healthcare vertical." A "pivotal question" identified by UBS was whether Baidu could maintain advertising market share over the next three years. UBS's answer to this question was "Unlikely. We are conservative on 2019 ad revenue due to market-wide macro *and regulatory uncertainty*, healthcare search result changes for Baidu, and importantly competition."

109.    On this news, Baidu's ADS stock price increased from a closing price of $96.70 on August 16, 2019, to a closing price of $104.22 on August 19, 2019 on massive trading volume. Baidu's ADS share price continued to climb on August 20, 2019, closing at $108.72, on even larger trading volume. By omitting the CAC June 2019 enforcement action from its 2Q19 press release, Baidu sought to downplay the likelihood of further government interference with their operations. The Company's share price increases on August 19 and 20, 2019 were due to the Company's failure to disclose their continued inability and/or unwillingness to comply with PRC law.

### 5.    February 14, 2020 Annual Governance Report and February 28, 2020 Earnings Call

110.    In early 2020, Baidu fired its senior content reviewer who was responsible for overseeing over two-thousand content reviewers. The replacement senior manager failed to coordinate with regulatory authorities, and thus heightened the risk of publication of non-compliant content and sanctions by regulatory authorities. On February 5, 2020, the CAC "had a talk" with Baidu for lax management that allowed the publication of short videos and the illegal release of coronavirus related news, designed to create panic, in violation of CAC regulations. The regulator ordered Baidu to "stop actions violating laws and regulations, and conduct deep rectification."

111.    On February 8, 2020 the *Motley Fool* published an article, "The 4 Biggest Risks Facing Baidu's Stock," in which it reported that "the unpredictable nature of [the CAC] crackdowns is a volatile headwind for Baidu, and it forces the search giant to hire more censors and tighten up its own algorithms" and that "the government's actions could dent Baidu's revenue growth and cause its operating expenses to rise." The article went on to identify mounting competition from Tencent,

1    Alibaba, and ByteDance, which in the last year "replaced Baidu as the second-largest digital

2    advertising platform in China after Alibaba."

3        112.    The following week, on February 14, 2020, Baidu released its annual governance report

4    for 2019, informing the Chinese regulators and netizens as to the actions taken by the Company to

5    handle illegal content. In doing so, the Company stated that it had removed over 53 billion pieces of

6    content with over half of them relating to pornography; it did not, however, disclose the CAC's recent

7    actions against the Company.

8        113.    On February 28, 2020, the Company hosted a call to discuss its Fourth Quarter and Full

9    Year 2019 earnings. During this call, Defendant Li described how:

10              While the near-term impact on the business has been negative, as many of
                our top industries, such as travel, real estate, auto, healthcare and
11              franchising, suffer from reduced offline activities, the side effect is that
                people are staying home more, and they have the opportunity to get to know
12              Baidu's products and services better. For example, we are seeing new highs
                in Baidu App DAUs and time spent on Xiaodu smart speakers. ***Search
13              queries on coronavirus exceeded 1 billion during the Chinese New Year,
                as users came to Baidu for fact-checking and finding more reliable
14              information.***

15

16       114.    Defendant Yu explained that: "[m]arketing services in the fourth quarter saw strength

17   from retail e-commerce, gaming, and services sectors, offset by softness from financial services,

18   healthcare, franchising and auto sectors." Describing the Company's experience thus far in 2020,

19   Defendant Yu stated that: ***"[a]s a result of the coronavirus outbreak***, the Chinese New Year golden

20   week that was originally scheduled to end on January 30, was extended by a week in Beijing. And in

21   some regions in China, the holidays were extended even longer. […] ***Consequently, the rebound for***

22   ***online marketing after Chinese New Year has been slow this year****. [...]* As Robin mentioned, a big

23   portion of our marketing services is dependent on offline activities, and we expect these sectors to see

24   negative growth this quarter."

25       115.    During the same call, Defendant Li touted Baijiahao's increasing value as it

26   accumulated more publishers and users, stating in relevant part, "[a]s more content providers with

27   original content join Baidu's Baijiahao (BJH) publisher platform, user engagement on Baidu Feed is

28

growing and the network effect is taking shape."[8] Defendant Li further emphasized the dramatic

increase in publishers contributing content to the Baidu's mobile ecosystem, stating in relevant part,

> Baijiahao now hosts over 2.6 million publisher accounts. That's up 38% year-over-year. The increasing scale and media influence of Baidu App is drawing more original content creators to Baidu's content ecosystem. In December, the number of publishers providing original content grew 116%, while original content pieces grew more than threefold year-over-year.

116. Later in the call, Citigroup analyst Alicia Yap asked Defendants whether the Company

anticipated the surge in medical queries to translate to increased advertising revenue opportunities in

the future. In responding, Defendant Yu misleadingly described Baidu's Feed as a venue for accurate

information:

> You also know that when you have a lot of feeds and so forth, you have things, what they call fake news. So what people want to do when these things impact people's health, impact people's lives, they want a place where they can go and have information that's more authoritative, that's more reliable. ***And that's why you're seeing people come to Baidu during this time, to search, to get their information, to make sure that this is correct.*** So I think we talked about a lot of things we're doing with healthcare. But I think when this is over, it's not just going to be focused on healthcare advertiser**s, but more broadly, the users are going to come here because this is where they can verify more reliable information.** As a result, that overall traffic growth is probably going to spill to other sectors for our advertisers.

117. Defendants knew or were reckless in not knowing that the statements in ¶¶ 112-116,

*supra* were materially false and misleading when made because they: (a) falsely conveyed that Baidu's

post-Chinese New Year's "rebound" in marketing revenue was slow entirely due to the Covid-19

pandemic; (b) falsely conveyed that Baidu effectively filtered poor and questionable content to give

users "reliable information"; and (c) materially omitted that: (i) the Company's current protocols for

monitoring illicit content were critically inadequate, and that Baidu's products were not complying

with PRC regulatory requirements because they allowed the publication of short videos and the illegal

release of coronavirus related news; (ii) Defendants had repeatedly – and as recently February 5, 2020

(three weeks prior) – been investigated by the CAC based on their inability to filter questionable

---

[8] The network effect is an economic principle wherein the value of a product or service increases according to the number of users.

content; (iii) in early 2020, Baidu fired a senior content manager who had supervised 90% of the 2,700 content reviewers at the time, replacing him with an ineffective senior manager that did not coordinate with regulatory authorities, risking publication of non-compliant materials and sanctions by regulatory authorities; (iv) Baidu's expansion into the mobile marketplace and increased allowance of third-party posting meant that they were not capable of adequately supervising content as required by PRC laws and regulations; and (v) the Company faced a heightened risk of sanctions because of the content review team's failure to maintain a process for keeping reviewers informed of content deemed objectionable by the government, which resulted in the use of outdated keyword blacklists. Moreover, Baidu's marketing revenue stream was materially threatened by the possibility of sanctions since the Company could not earn revenue from nonoperational websites and apps.

### 6. March 13, 2020 2019 Annual Report

118. On March 10, 2020 the *South China Morning Post* ("SCMP") published an article titled, "People are searching for porn while stuck at home during the coronavirus: Porn-related keyword searches surge on Baidu, China's largest search engine." While the Company "declined to comment on the spike of porn-related searches," it reiterated that "it removed more than 53 billion pieces of harmful information last year, and nearly half of the removals were related to porn."

119. On March 13, 2020, the Company filed its 2019 Annual Report. Defendant Li signed the 2019 Annual Report, and the Individual Defendants signed the 2019 Annual Report's SOX Certifications. The 2019 Annual Report identified several Risk Factors that ***could*** cause the Company's operating results to vary between quarters, stating in relevant part:

> Any of the risk factors listed in this 'Risk Factors' section, and in particular the following factors, could cause our results of operations to fluctuate from quarter to quarter … PRC regulations or government actions pertaining to activities on the internet, including various forms of entertainment, online payment and activities otherwise affecting our online marketing customers, and those relating to the products and services we provide[.]

120. The 2019 Annual Report included purported risk disclosures, such as: "[r]egulation and censorship of information disseminated over the internet in China may adversely affect our business, and subject us to liability for information displayed on or linked to our websites, mobile apps, Smart

1   Mini Program or Managed Page and negative publicity in international media." The 2019 Annual

2   Report went on to state:

> Although we attempt to monitor the content in our search results, mobile
> apps, online communities such as Baidu Post, and Smart Mini Programs and
> Managed Page, we are not able to control or restrict the content of other
> internet content providers linked to or accessible through our websites,
> mobile apps, or content generated or placed on our Baidu Post message
> boards, mini programs, Managed Page, or our other online communities by
> our users. To the extent that PRC regulatory authorities find any content
> displayed on our websites or mobile apps illegal, they may require us to
> limit or eliminate the dissemination of such information on our websites or
> mobile apps. To the extent that PRC regulatory authorities find any content
> displayed on our websites or mobile apps objectionable, they may suggest
> that we limit or eliminate the dissemination of such information on our
> websites or mobile apps. If third-party websites linked to or accessible
> through our websites or mini programs accessible through our mobile apps
> conduct unlawful activities such as online gambling, PRC regulatory
> authorities may require us to report such unlawful activities to relevant
> authorities and to remove the links to such websites or mobile apps, or they
> may suspend or shut down the operation of these third-party websites. PRC
> regulatory authorities may also temporarily block access to certain websites
> or mobile apps for a period of time for reasons beyond our control. Any of
> these actions may reduce our user traffic and adversely affect our business.
> ***In addition, we have been and may be subject to penalties in the future
> for violations of those regulations arising from information displayed on
> or linked to our websites or mobile apps, including a suspension or
> shutdown of our online operations***.

18   121.    The purported risk disclosures highlighted in ¶¶ 119-120, *supra*, were materially false

19   and misleading when made because they: (a) conveyed that prior enforcement actions were immaterial

20   and that the future risk was abstract; and (b) further omitted that: (i) in February 2020, Baidu fired a

21   senior content manager who supervised 90% of the 2,700 content reviewers at the time, replacing him

22   with an ineffective senior manager that did not coordinate with regulatory authorities, risking

23   publication of non-compliant materials and sanctions by regulatory authorities; (ii) Defendants'

24   purposeful disregard of content review standards and night-time publications of questionable content

25   in order to meet monthly sales targets; (iii) Baidu's expansion into the mobile marketplace and

26   increased third-party posting meant that they were incapable of adequately supervising content as

27   required by PRC laws and regulations; and (iv) loopholes in the registration management of publisher

28   accounts led some users who were dissatisfied with certain state policies to register their accounts and

publish articles that were unfavorable to regulators, such as controversial opinions on the US-China trade war. One of the loopholes was that their real-name authentication and facial recognition software were subject to tampering, allowing users to publish under others user's names.

122.    Defendants knew or were reckless in not knowing that the purported risk disclosures were also materially false and misleading because at the time the hypothetical risk of future penalties was a present reality as Defendants misleadingly omitted that they were summoned by the CAC just three weeks earlier based on their inability to filter questionable content. Further, Defendants knew, or were reckless in not knowing, that the Company was at heightened risk for sanctions because of the content review team's failure to maintain a process for keeping reviewers informed of content deemed objectionable by the government, which resulted in the use of outdated keyword blacklists. Moreover, Baidu's marketing revenue stream was materially threatened by the possibility of sanctions since the Company could not earn revenue from nonoperational websites and apps.

123.    The 2019 Annual Report further stated that, "[w]e only have contractual control over our websites."  The statement, that "[w]e only have contractual control over our websites" is false and misleading because Baidu both generated content through its advertising department and monitored content *via* a dual system of artificial intelligence and human content reviewers.  In other words, Baidu can and did exercise control over websites, if not directly then through their wholly owned subsidiaries. The 2019 Annual Report also contained the following statement:

> In the opinion of Han Kun Law Offices, our PRC legal counsel, (i) the ownership structure relating to our consolidated affiliated entities complies with current PRC laws and regulations; (ii) subject to the disclosure and risks disclosed under "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure," "—Risks Related to Doing Business in China" and "—Regulations," our contractual arrangements with our consolidated affiliated entities and the nominee shareholders are valid and binding on all parties to these arrangements and do not violate current PRC laws or regulations; and (iii) subject to the disclosure and risks disclosed under "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure," "—Risks Related to Doing Business in China" and "—Regulations," **the business operations of our consolidated affiliated entities, as described herein, comply with current PRC laws and regulations in all material respects.**

124.    Defendants knew or were reckless in not knowing that the statement that Baidu's business operations "comply with current PRC laws and regulations in all material respects" was

1   materially false and misleading when made because it: (a) falsely conveyed that the Company

2   complied with PRC law; and (b) omitted that: (i) the Company's current protocols for monitoring

3   illicit content were critically deficient, and as a result, Baidu's products were not complying with PRC

4   regulatory requirements; (ii) Defendants had repeatedly – and as recently February 5, 2020 (three

5   weeks prior) –  been investigated by the CAC based on their inability to filter questionable content;

6   (iii) the Individual Defendants' close ties to Communist Party officials and the CAC meant that they

7   would have received advanced notice about their lack of compliance; (iv) Defendants' purposeful

8   disregard of content review standards and night-time publications of questionable content in the name

9   of hitting sales targets; and (v) Baidu's expansion into the mobile marketplace and increased allowance

10  of third-party posting meant that they were not capable of adequately supervising content as required

11  by PRC laws and regulations.

12         125.    The 2019 Annual Report included the following language about the regulations

13  introduced by Chinese authorities in December of 2019:

> At the end of 2019, the CAC issued the Provisions on the Management of Network Information Content Ecology, or the CAC Order No.5, which became effective on March 1, 2020, to further strengthen the regulation and management of network information content. Pursuant to the CAC Order No.5, *each network information content service platform is required, among others, (i) not to disseminate any information prohibited by laws and regulations, such as information jeopardizing national security*; (ii) to strengthen the examination of advertisements published on such network information content service platform; (iii) to promulgate management rules and platform convention and improve user agreement, such that such network information content service platform could clarify users' rights and obligation sand perform management responsibilities required by laws, regulations, rules and convention; (iv) to establish convenient means for complaints and reports; and (v) to prepare annual work report regarding its management of network information content ecology. *In addition, a network information content service platform must not, among others, (i) utilize new technologies such as deep-learning and virtual reality to engage in activities prohibited by laws and regulations*; (ii) engage in online traffic fraud, malicious traffic rerouting and other activities related to fraudulent account, illegal transaction account or maneuver of users' account; or (iii) infringe a third party's legitimate rights or seek illegal interests by way of interfering with information display.

       126.    Defendants knew or were reckless in not knowing that the purported risk disclosure

about the December 2019 regulations was materially false and misleading when made because it

omitted that the Company could not ensure that its products did: (i) "not … disseminate any information prohibited by laws and regulations"; or (ii) "utilize new technologies such as deep-learning and virtual reality to engage in activities prohibited by laws and regulations." Additionally, the purported risk disclosure was false and misleading because loopholes in the registration management of publisher accounts and more specifically, their real-name authentication and facial recognition software allowed users to publish problematic content under others' names in violation of PRC regulations.

127.    The highlighted statements referenced in ¶¶ 119-120, 123, and 125, *supra*, were materially false and misleading when made because Defendants failed to disclose material adverse facts about the Company's business and operations, including that: (i) Baidu's Feed services were not in compliance with applicable PRC regulatory standards; (ii) the Company faced a heightened risk of regulatory enforcement, including removal or suspension of certain Baidu services and products in light of the newly promulgated December 2019 regulations, due to the foregoing noncompliance; (iii) Chinese regulatory officials had found Baidu non-compliant on at least three occasions in 2019 and 2020, before and during the class period; and (iv) accordingly, the Company's revenues derived from its online marketing services were adversely affected.

128.    On this news, Baidu's ADS share price declined from a closing price of $100.29 on March 13, 2020 to a closing price of $89.68 on March 16, 2020; a decline of $10.61 and a share price drop of approximately 10.6%. On March 31, 2020, while the Company's securities remained artificially inflated, Baidu announced that it filed a prospectus with the SEC for the purpose of selling senior notes. On April 2, 2020, Baidu "announced the pricing of its public offering of US$1.0 billion aggregate principal amount of its notes … consist[ing] of US $600 million of 3.075% notes due 2025 and US$400 million of 3.425% notes due 2030." The Company anticipated "receiv[ing] net proceeds … of approximately US$0.99 billion[.]"

129.    After the close of trading on April 7, 2020, the CAC publicly announced that it had ordered the Beijing Municipal Information Office to "seriously interview the person in charge of Baidu Company in response to *serious violations* of multiple channels on Baidu App and demanded that the violations be stopped immediately." The CAC further ordered the suspension of several Baidu

channels starting the morning of April 8, 2020 to "clean up illegal content and carry out in-depth rectification." The CAC's actions were reported in U.S. media outlets after market close on April 7, 2020. In an article published that same night, *Reuters* reported that China's powerful internet operator, the CAC, found that Baidu's content review was "not 'strict'" and "ha[d] exerted bad influence to the society." Baidu was further ordered "to clean up improper information and halt the spread of 'low-brow content.'" On this news, Baidu's share price fell $4.46 per share, losing over 4% of its value, to close at $97.33 per share on April 8, 2020, on massive trading volume of over 10 million shares traded, damaging investors and ending the Class Period.

## VI.    LOSS CAUSATION

130.    Throughout the Class Period, Baidu improperly touted the Company's products while concealing its inability and/or unwillingness to comply with PRC laws and regulations, and the devastating effects of non-compliance might have on its future market revenues, as was seen following the 2016 Wei Zexi incident. Defendants' misleading statements and omissions artificially inflated the price of Baidu's securities, including ADSs. When Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent to investors, the inflated price of Baidu securities was eliminated. As a result of their purchases of Baidu securities, during the Class Period, Plaintiff and other members of the Class suffered economic losses, *i.e.,* damages under the federal securities laws.

131.    At all relevant times, the material misrepresentations and omissions alleged in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. The timing of Baidu's securities price decline negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Baidu's operations and compliance, and inability and/or unwillingness to comply with PRC law. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Baidu, its operations, its compliance, and its ability to comply

with PRC law, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period caused Plaintiffs and other members of the Class to purchase the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

132. On April 7, 2020, the CAC instructed the Beijing Municipal Information Office to "seriously interview the person in charge of Baidu Company in response to serious violations of multiple channels on Baidu App and demanded that the violations be stopped immediately." The CAC further ordered that several Baidu channels to be suspended starting the morning of April 8, 2020 to "clean up illegal content and carry out in-depth rectification."

133. According to the CAC:

> The relevant person in charge of the Beijing Internet Information Office pointed out that Baidu App violates relevant national Internet laws, regulations and management requirements, is ineffective in implementing the main responsibility, disseminates a large number of vulgar and vulgar information, publishes intensively 'Third Party' articles, public account registration management and content review are not strict, Dissemination order and ecological problems are prominent, and the social impact is bad.

> The person in charge of Baidu said that it will strictly implement management requirements, earnestly perform the main responsibility, carry out comprehensive rectification of violations, suspend relevant channel updates, close illegal accounts, and seriously deal with those responsible. At the same time, strengthen internal management and improve the information security management mechanism to ensure that similar problems do not occur again.

134. The CAC's actions were reported by U.S. media outlets after market close on April 7, 2020. The Company did not indicate how long it anticipated the suspension to last or the estimated amount by which revenue would be impacted. While the length of suspensions was not disclosed by the CAC or Baidu, Morgan Stanley analysts anticipated in an April 8, 2020 analyst report titled "Thoughts on Suspension of Baidu App Recommendation Feed Updates" that the suspension could last anywhere between one week to a month based on similar regulatory incidents involving Baidu's peers. Similarly, Oppenheimer analysts speculated in an intraday report titled "Thoughts on Channel Suspension in Baidu App" that Baidu's Feed services could be suspended for one to four weeks and would have a one to four percent impact on Baidu's second quarter fiscal year 2020 Core revenue

(between approximately $28.5 and $114 million based on Baidu Core's Second Quarter 2019 earnings (as reported in Baidu's Report filed with the SEC on Form 6-K on August 22, 2019)).

135.   On this news, Baidu's share price fell $4.46 per share, losing 4% of its value, to close at $97.33 per share on April 8, 2020, on massive trading volume, damaging investors. During this same period, the NASDAQ Global Select Market Composite Index *increased* by 2.54%.

136.   The decline in Baidu's ADS price following the April 7, 2020 disclosure event was an obvious and direct result of the market learning new information about the extent to which the Company did not, and was not able to, comply with PRC law; as the sanctions jeopardized the Company's ability to earn revenue through online marketing. On April 9, 2019, Baidu issued a public statement confirming that the Company "has suspended updating its content on certain newsfeeds channels within Baidu App and conduct maintenance, beginning from April 8, 2020." The statement went on to say:

> The Company expects that the suspension may have impact on the marketing services revenue related to the suspended channels.
>
> The Company will undertake additional measures to fully comply with the directives of the regulators, including enhancing its monitoring and management over its platform, strengthening the quality and integrity of content on its platform, and continuing to improve its business practices to provide better services to users.

137.   On information and belief, this statement was the first time during the Class Period that the Company admitted that the Company's inability to comply with PRC law might impact its marketing revenue.

## VII.   RELEVANT POST-CLASS PERIOD EVENTS

138.   On April 11, 2020 the *Motley Fool* published an article, "Baidu Gets Bludgeoned by China's Censors Again," in which it reported that "the government-mandated suspension of 'certain' newsfeed channels within the app could throttle its growth in users and ad revenue. That slowdown might cause Baidu to lose ground to popular news apps like ByteDance's Toutiao or Tencent News, which is tethered to WeChat." Baidu's news feeds resumed normal operations on April 24, 2020, having been suspended for more than two weeks.

139.   On April 27, 2020 Oppenheimer issued a report estimating that the suspension had a "2-3% negative impact on 2Q Core revenue." Similarly, on April 22, 2020 Barclays issued a report wherein they lowered their price target to $132 (from $150) based, in part, on "increasing uncertainty from government regulation, as multiple news feed channels of Baidu app remain suspended."

140.   On May 21, 2020, *Reuters* published an article titled "Exclusive: Baidu considers leaving the Nasdaq to boost its valuation – sources[,]" reporting that "Baidu [was] considering delisting from the U.S. Nasdaq and moving to an exchange closer to home to boost its valuation amid rising tension between the United States and China over investments." Though Baidu declined to comment on the article, "[t]he [C]ompany pointed to comments by […] Li who told the state-controlled China Daily […] that Baidu was paying close attention to the tighter U.S. scrutiny of Chinese companies listed in the country."[9] On August 14, 2020, at 9:15 EST, Baidu hosted an earnings call to discuss Second Quarter 2020 results. During their prepared remarks, Defendants Li and Yu avoided any mention of the CAC action or their suspension.

141.   During this call, one analyst, James Lee of Mizuho, asked specifically if the "Baidu App DAU decline" was "due to suspension of your app" or "because more people [were] returning back to work here?" In response, Defendant Yu avoided any mention of the suspension saying, "I think the big differentiation between March and June is the fact that people were running about outside of their house. And as a result they have probably less time spent on their app."

142.   These post-Class Period events further demonstrate that the CAC's sanctions had a material impact on Baidu's: (i) Second Quarter 2020 marketing revenue; and (ii) continued ability to comply with PRC law and regulations.

## VIII.   CLASS ACTION ALLEGATIONS

143.   Plaintiff brings this matter as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class of all persons and entities who purchased or otherwise acquired Baidu securities between March 16, 2019, and April 7, 2020, inclusive. Excluded from the Class are Defendants, directors, and officers of Baidu, as well as their families and affiliates.

---

[9]   Julie Zhu and Zhang Yan, *Exclusive: Baidu considers leaving the Nasdaq to boost its valuation – sources*, Reuters (May 21, 2020).

144.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of April 8, 2020, Baidu had more than 30 million ADSs outstanding, owned by hundreds if not thousands of persons.

145.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)  whether Defendants violated the Exchange Act;

(b)  whether Defendants omitted and/or misrepresented material facts;

(c)  whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)  whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)  whether the price of Baidu securities was artificially inflated during the Class Period; and

(f)  the extent of damage sustained by Class members and the appropriate measure of damages.

146.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

147.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation and possess the necessary financial resources to pursue this matter on behalf of the Class. Plaintiff has no interests that conflict with those of the Class.

148.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE

149.     As a result of the foregoing, the market for Baidu's securities promptly digested current information regarding Baidu from all publicly available sources and reflected such information in the

prices of the stock. Under these circumstances, all purchasers of Baidu's securities during the Class Period suffered similar injury through their purchase of Baidu's securities at artificially inflated prices, and the *Basic* presumption of reliance applies.

150.    Plaintiff and the putative Class are also entitled to the *Affiliated Ute* presumption of reliance due to Defendants' failure to disclose material facts, inter alia, regarding the Cyberspace Administration of China's interviews and investigations, information which Plaintiff would have wanted to know and would have caused investors to avoid purchasing shares of Baidu's securities at the prices they traded at during the Class Period.

151.    At all relevant times, there existed a substantial likelihood that the disclosure of the omitted facts would have been viewed by a reasonable investor as having significantly altered the total mix of information made available to Baidu's shareholders. The Cyberspace Administration of China's interviews and investigations were also "hard information" that is and was at all relevant times objectively verifiable.

152.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) the Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities traded in efficient markets;

(d) the misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e) the Plaintiff and other members of the Class purchased Baidu's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts; and

(f) at all relevant times, the markets for Baidu's securities were efficient for the following reasons, among others: (i) Baidu filed periodic public reports with the SEC; (ii) its shares traded on the NASDAQ – a presumptively efficient national exchange; and (iii) Baidu regularly communicated with public investors *via* established market

communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services. Plaintiff and the Class relied on the price of Baidu's securities, which reflected all the information in the market, including the misstatements and material omissions by Defendants.

## X.   NO SAFE HARBOR

153.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as and were not "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

154.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Baidu who knew that those statements were false when made.

**FIRST CLAIM**
**Violation of Section 10 (b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against All the Defendants)**

155.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

156.   During the Class Period, Defendants participated in the preparation and/or disseminated or approved the false statements and omissions specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired Baidu ADSs during the Class Period.

158. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Baidu securities, including ADSs. Plaintiff and the Class would not have purchased Baidu's ADSs at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and material omissions.

159. Baidu and the Individual Defendants, individually and together, had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Baidu's true financial condition from the investing public and supporting the artificially inflated price of Baidu's ADSs.

## SECOND CLAIM
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

160. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

161. The Individual Defendants acted as controlling persons of Baidu within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants were provided with or had unlimited access to the fraudulent SEC filings and other reports alleged by Plaintiff to be misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of these materials or cause them to be corrected so as not to be misleading.

162.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Class Counsel;

B.    Awarding compensatory and punitive damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount proven at trial, including pre-judgment and post-judgment interest thereon;

C.    Awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D.    Awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## XII.    JURY DEMAND

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Respectfully submitted,

Dated: September 18, 2020

**KAHN SWICK & FOTI, LLP**

By:    s/ *Morgan M. Embleton*
Morgan M. Embleton (admitted *pro hac vice*)
Lewis S. Kahn (*pro hac vice to be submitted*)
Alexander L. Burns (admitted *pro hac vice*)
Alayne K. Gobeille (admitted *pro hac vice*)
**KAHN SWICK & FOTI, LLC**
1100 Poydras Street, Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
morgan.embleton@ksfcounsel.com

1

2

lewis.kahn@ksfcounsel.com
alexander.burns@ksfcounsel.com
alayne.gobeille@ksfcounsel.com

3

-and-

4

5

Ramzi Abadou (SBN 222567)
ramzi.abadou@ksfcounsel.com
**KAHN SWICK & FOTI, LLP**
912 Cole Street, # 251
San Francisco, California 94117
Telephone: (415) 459-6900
Facsimile: (504) 455-1498

6

7

8

9

10

*Lead Counsel for Lead Plaintiff
and the Putative Class*

11

12

13

## CERTIFICATE OF SERVICE

14

15

16

17

18

I hereby certify that on September 18, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

19

20

*s/ Morgan M. Embleton*
MORGAN M. EMBLETON

21

22

23

24

25

26

27

28

## Mailing Information for a Case 5:20-cv-02768-LHK Ikeda v. Baidu, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com,Ashley.Errington@ksfcounsel.com

- **Adam Marc Apton**
  aapton@zlk.com

- **Alexander Louis Burns**
  alexander.burns@ksfcounsel.com

- **Morgan Michelle Embleton**
  Morgan.Embleton@ksfcounsel.com

- **Alayne K Gobeille**
  alayne.gobeille@ksfcounsel.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,tcrockett@pomlaw.com,abarbosa@pomlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com

- **Virginia Faye Milstead**
  virginia.milstead@skadden.com,nandi.berglund@skadden.com,dlmlclac@skadden.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomla

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)