PETER B. MORRISON (SBN 230148)
peter.morrison@skadden.com
VIRGINIA F. MILSTEAD (SBN 234578)
virginia.milstead@skadden.com
RAZA RASHEED (SBN 306722)
raza.rasheed@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

*Attorneys for Defendant*
BAIDU, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| ROGER A. IKEDA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BAIDU, INC., YANHONG LI, and CHENG-CHUN YU,<br><br>Defendants. | CASE NO.: 5:20-cv-02768-LHK<br><br>**BAIDU, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing:      March 4, 2021<br>Time:         1:30 p.m.<br>Courtroom:  8<br>Judge:        Hon. Lucy H. Koh<br><br>Complaint Filed: April 21, 2020<br>Am. Complaint Filed: September 18, 2020 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

NOTICE OF MOTION AND MOTION ............................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I.      PRELIMINARY STATEMENT ............................................................... 1

II.     BACKGROUND ......................................................................................... 4

     A.     Baidu's Evolving Regulatory Challenges ...................................... 4

     B.     Baidu's Disclosures ....................................................................... 5

     C.     Plaintiff's Purported "Corrective Disclosure" ............................... 7

III.    PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b)..................... 7

     A.     Plaintiff Fails To Plead A False Or Misleading Statement ............. 7

           1.     Baidu Fully Disclosed the Risk of Adverse Regulatory Action ......... 8

           2.     Baidu Was Not Required to Accuse Itself of Regulatory Violations . 9

           3.     Plaintiff Fails to Plead that Baidu Violated Any Preexisting Chinese Law ................................................................... 10

           4.     Plaintiff Fails to Plead That Any Statement Was False or Misleading ..................................................................... 12

                 (a)    Baidu's Opinions About Its Legal Compliance Were Not Misleading    12

                 (b)    Plaintiff's Allegation That Eight Statements Concerning Widely Varying Subjects Were All Misleading Because Baidu Allegedly Omitted It Could Not Comply With Chinese Regulations Also Fails    15

                       (i)     Online Marketing Statement ..................................... 16

                       (ii)    Statements About Filtering Out Undesirable Content .................................................................... 17

                       (iii)   Statements About COVID-19 Pandemic .................. 18

                       (iv)   Disclosure of Past Investigations ............................. 19

                       (v)     Description of Chinese Regulations.......................... 20

                 (c)    Baidu Did Not Misrepresent Its Control Over Its Websites  20

     B.     Plaintiff Fails to Plead Scienter For Any Statement ...................... 21

1             1.     Allegations Based On Individual Defendants' Positions Within
Baidu Are Insufficient To Plead Scienter ........................................... 22

2.     Lack Of Motive Negates Any Inference Of Scienter ........................ 24

3.     Viewed Holistically, Plaintiff's Scienter Allegations Fail To Raise
An Inference of Scienter ..................................................................... 24

IV.     CONCLUSION ........................................................................................................ 25

1

## TABLE OF AUTHORITIES

2 CASES                                                                                    PAGE(S)

3 In re Apple Inc. Securities Litigation,
       No. 19-cv-02033-YGR,
4      2020 WL 2857397 (N.D. Cal. June 2, 2020) .................................................................16

5 Asay v. Pinduoduo Inc.,
       No. 18-cv-7625 (PKC),
6      2020 WL 1530745 (S.D.N.Y. Mar. 30, 2020) ................................................................9

7 Brody v. Transitional Hospitals Corp.,
       280 F.3d 997 (9th Cir. 2002) ....................................................................15, 16, 18, 19, 20
8
   City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.,
9      856 F.3d 605 (9th Cir. 2017) ...............................................................................12, 13

10 City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG,
       752 F.3d 173 (2d Cir. 2014)...........................................................................................9
11
   Communications Workers of America Plan for Employees' Pensions & Death Benefits v. CSK
12     Auto Corp.,
       Nos. CV06–1503–PHX–DGC, (Lead), CV06–1580–PHX–JWS,
13     2007 WL 951968 (D. Ariz. Mar. 28, 2007) ..................................................................23

14 In re Downey Sec. Litig.,
       No. CV 08–3261–JFW (RZx),
15     2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ..............................................................24

16 In re Eventbrite, Inc. Securities Litigation,
       No. 5:18-cv-02019-EJD,
17     2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ............................................................3, 8

18 In re Facebook, Inc. Securities Litigation,
       No. 5:18-cv-01725-EJD,
19     2020 WL 4569443 (N.D. Cal. Aug. 7, 2020) .............................................................9, 10

20 In re FBR Inc. Securities Litigation,
       544 F. Supp. 2d 346 (S.D.N.Y. 2008)...............................................................10, 11, 13
21
   Glazer Capital Management, L.P. v. Magistri,
22     549 F.3d 736 (9th Cir. 2008) ...................................................................................3, 21, 22

23 Goldsmith v. Weibo Corp.,
       No. 17–4728 (SRC),
24     2018 WL 2733694 (D.N.J. June 7, 2018) ...........................................................13, 15, 18

25 Heliotrope General, Inc. v. Ford Motor Co.,
       189 F.3d 971 (9th Cir. 1999) ...........................................................................................14
26
   In re Immucor, Inc. Securities Litigation,
27     No. 1:09–CV–2351–TWT,
       2011 WL 2619092 (N.D. Ga. June 30, 2011) ......................................................10, 13
28

Jasin v. Vivus, Inc.,
No. 14-cv-03263-BLF,
2016 WL 1570164 (N.D. Cal. Apr. 19, 2016), aff'd, 721 F. App'x 665 (9th Cir. 2018) ..............20

In re Leapfrog Enterprises, Inc. Securities Litigation,
527 F. Supp. 2d 1033 (N.D. Cal. 2007) ...................................................................................19

Lefter v. Yirendai Ltd.,
No. CV 16–06437–MWF (AGRx),
2017 WL 2857535 (C.D. Cal. June 20, 2017) .....................................................................17, 20

Lipton v. Pathogenesis Corp.,
284 F.3d 1027 (9th Cir. 2002) .................................................................................................23

In re Lululemon Securities Litigation,
14 F. Supp. 3d 553 (S.D.N.Y. April 18, 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015) .....19, 23, 25

Luo v. Sogou, Inc.,
No. 19-cv-230 (LJL),
2020 WL 3051019 (S.D.N.Y. June 8, 2020) .....................................................................3, 9, 10

Mahapatra v. Truecar, Inc.,
No. CV 15-3979-R,
2015 WL 12552062 (C.D. Cal. Dec. 9, 2015) ..........................................................................22

Matrixx Initiatives, Inc. v. Siracusano,
563 U.S. 27 (2011)...................................................................................................................15

Metzler Investment GMBH v. Corinthian Colleges, Inc.,
540 F.3d 1049 (9th Cir. 2008) .............................................................................................7, 22

Nguyen v. Endologix, Inc.,
962 F.3d 405 (9th Cir. 2020) ...........................................................................................4, 21, 25

In re NVIDIA Corp. Securities Litigation,
768 F.3d 1046 (9th Cir. 2014) ...........................................................................................22, 23

Olkey v. Hyperion 1999 Term Trust, Inc.,
98 F.3d 2 (2d Cir. 1996)..............................................................................................................8

Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,
575 U.S. 175 (2015)............................................................................................................12, 13

Paracor Finance, Inc. v. General Electric Capital Corp.,
96 F.3d 1151 (9th Cir. 1996) .......................................................................................................1

In re PetroChina Co. Securities Litigation,
120 F. Supp. 3d 340 (S.D.N.Y. 2015)........................................................................................13

In re Plains All American Pipeline, L.P. Securities Litigation,
307 F. Supp. 3d 583 (S.D. Tex. 2018), aff'd, 777 F. App'x 726 (5th Cir. 2019) ..........................20

Police Retirement System of St. Louis v. Intuitive Surgical, Inc.,
759 F.3d 1051 (9th Cir. 2014) ...................................................................................3, 22, 23, 24

iv

Rapoport v. Asia Electronics Holding Co.,
    88 F. Supp. 2d 179 (S.D.N.Y. 2000)............................................................3, 11

Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard
    Co.,
    845 F.3d 1268 (9th Cir. 2017) ......................................................................7

In re Rigel Pharmaceuticals, Inc. Securities Litigation,
    697 F.3d 869 (9th Cir. 2012) ...................................................................18, 24

Ronconi v. Larkin,
    253 F.3d 423 (9th Cir. 2001) ........................................................................14

Rumbaugh v. USANA Health Sciences, Inc.,
    No. 2:17-CV-106,
    2018 WL 5044240 (D. Utah Oct. 17, 2018) ..................................................3, 12

SEB Investment Management AB v. Align Technology Inc.,
    No. 18-CV-06720-LHK,
    2020 WL 5408056 (N.D. Cal. Sept. 9, 2020) ....................................................21

SEC v. Jackson,
    908 F. Supp. 2d 834 (S.D. Tex. 2012) ............................................................10

Shields v. Citytrust Bancorp, Inc.,
    25 F.3d 1124 (2d Cir. 1994)..........................................................................15

In re Sina Corp. Securities Litigation,
    No. 05 Civ. 2154(NRB),
    2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006)....................................................9

Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,
    552 U.S. 148 (2008)....................................................................................7

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    551 U.S. 308 (2007).................................................................................22, 24

In re Textainer Partnership Securities Litigation,
    No. C-05-0969 MMC,
    2005 WL 3801596 (N.D. Cal. Dec. 12, 2005) .................................................14

In re Tibco Software, Inc.,
    No. C 05-2146 SBA,
    2006 WL 1469654 (N.D. Cal. May 25, 2006) ...................................................24

In re Violin Memory Securities Litigation,
    No.: 13–CV–5486 YGR,
    2014 WL 5525946 (N.D. Cal. Oct. 31, 2014)................................................8, 19

Webb v. Solarcity Corp.,
    884 F.3d 844 (9th Cir. 2018) ........................................................................24

In re Wet Seal, Inc. Securities Litigation,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ...........................................................25

Xu v. ChinaCache International Holdings Ltd.,
        18 Civ. 467 (PAC),
        2017 WL 114401 (C.D. Cal. Jan. 9, 2017) ................................................................16

In re Xunlei Ltd. Securities Litigation,
        No. 18 Civ. 467 (PAC),
        2019 WL 4276607 (S.D.N.Y. Sept. 10, 2019) ...........................................................11

In re Yukos Oil Co. Securities Litigation,
        No. 04 Civ. 5243(WHP),
        2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) .............................................................12

Zeid v. Kimberley,
        930 F. Supp. 431 (N.D. Cal. 1996) .............................................................................20

Zucco Partners, LLC v. Digimarc Corp.,
        552 F.3d 981 (9th Cir. 2009) ...................................................................4, 22, 23, 24

**Statutes**

15 U.S.C. § 78u-4 ................................................................................................................1, 7

**Rules**

Fed. R. Civ. P. 44.1 ................................................................................................................11

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on March 4, 2021, at 1:30 p.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Lucy H. Koh, United States District Judge for the Northern District of California, located at 280 South 1st Street, San Jose, CA 95113, the undersigned Defendant, Baidu, Inc. ("Baidu" or the "Company"), will and hereby does move the Court for an order dismissing Lead Plaintiff Robert J. Allustiarti's ("Plaintiff") Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF 41, hereafter the "AC") with prejudice.

Baidu's motion is made pursuant Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4. The motion is based on this Notice, the Memorandum of Points and Authorities that follows, the Request for Judicial Notice and Declaration of Raza Rasheed and attached exhibits,[1] the files in this action, the arguments of counsel, and any other items the Court may consider. Pursuant to Civil Local Rule 7-2(b)(3), Baidu requests that the Court dismiss the AC in its entirety, deny leave to amend, and enter judgment in favor of Baidu.[2]

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   PRELIMINARY STATEMENT

Baidu is an internet technology company that provides both a search engine and various mobile and web-based applications that allow Baidu's largely Chinese user base to send and receive news and entertainment content. (AC ¶¶ 37-44.) Baidu is subject to extensive regulation by the Chinese government to ensure, among other things, that the information made available through Baidu's platforms is consistent with the Chinese government's evolving standards and policies. As Baidu's SEC filings warned its NASDAQ-traded American Depositary Shares ("ADS") investors, the Chinese government's internet content regulations are "often uncertain and in flux," and enforcement actions may be driven by

---

[1] All references to "Ex." refer to the exhibits attached to the Declaration of Raza Rasheed. Unless otherwise noted, all emphases and alterations are added, and all citations, brackets, footnotes, and internal quotation marks are omitted from all quoted material for ease of reading.

[2] Plaintiff asserts a claim for violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 against Baidu, and a claim for violation of Section 20(a) of the Exchange Act against Yanhong Li and Cheng-chun Yu. (AC ¶¶ 155-62.) Messrs. Li and Yu live in China, have not been served with the AC, and, to the undersigned's knowledge, are not currently represented by counsel. Thus, this motion is brought solely on Baidu's behalf. However, because the AC fails to state a claim under Section 10(b) as explained below, the Section 20(a) claim also necessarily fails. See, e.g., Paracor Fin., Inc. v. Gen. Elec. Cap. Corp., 96 F.3d 1151, 1161 (9th Cir. 1996).

unpublished internal rules and policies that Baidu could not know in advance. (Ex. A at 10, 34; Ex. B at 9, 29.) Thus, Baidu could not guarantee "that the PRC regulatory authorities would find that [its] . . . business operations comply with PRC laws and regulations." (See Ex. A at 63.) Rather, Baidu told the market that it had "been and may be subject to penalties in the future for violations of those regulations arising from information displayed on or linked to [its] websites or mobile apps, including suspension and shutdown of our online operations." (Ex. A at 36-37; see also Ex. B at 31-32.)

On April 8, 2020, Chinese regulators temporarily suspended several Baidu channels after finding that they contained unspecified "low-brow content." (AC ¶ 129.) Notwithstanding the robust and repeated warnings Baidu disclosed to the market, Plaintiff nonetheless elected to file a lawsuit alleging that Baidu: (i) must have known that the April 8 suspension was inevitable because of Baidu's supposedly inadequate content monitoring procedures; and (ii) defrauded investors by making a series of public statements that allegedly failed to disclose its purported inability to comply with Chinese law. The Court should reject Plaintiff's allegations of securities fraud because the AC fails to plead falsity or scienter.

For at least three reasons, Plaintiff fails to plead particularized facts showing that any public statement by Baidu was false or misleading when made, as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). First, Plaintiff scours Baidu's public filings in search of any statement—no matter how unrelated to the April 8 temporary suspension of certain channels—that it can allege was somehow false in order to assert this lawsuit. The result of Plaintiff's exercise is that he alleges 12 unrelated Baidu statements—made over a one-year period, in a variety of contexts, on a host of different subjects—each misled investors into thinking that Baidu could comply with Chinese internet content regulations, when Baidu purportedly lacked that capability. (See ECF 41-2; AC ¶ 123.) Fatal to Plaintiff's claim, however, is that none of the widely varied statements the AC identifies actually affirmatively assured investors that Baidu could maintain perfect compliance with all PRC rules and regulations, or that Baidu would never be subject to adverse action by the Chinese government. To the contrary, Baidu warned investors that (i) the relevant regulations were "uncertain" and "evolving"; (ii) the Chinese government was "increasing enforcement efforts" and that "failure or perceived failure to comply" could result in adverse actions, including suspension of its online operations; and (iii) it could not guarantee that its compliance measures would be effective. (Ex. A at 5, 14-15, 36-37.) In light these disclosures, investors

were aware that adverse regulatory action was an ongoing risk for Baidu, dooming Plaintiff's claims. <u>See In re Eventbrite, Inc. Sec. Litig.</u>, 2020 WL 2042078, at *15-16 (N.D. Cal. Apr. 28, 2020) (dismissing claim where defendant "did disclose the exact risks that Plaintiffs argue were not disclosed").

<u>Second</u>, Plaintiff's related and repeated suggestion that Baidu's disclosures were inadequate because the Company did not accuse itself of violating Chinese law, or predict that PRC regulators would take adverse action, is equally meritless."[T]here is no free-standing obligation under United States law to disclose even criminal conduct that is uncharged—let alone insufficient [Chinese] regulatory compliance." <u>See</u> <u>Luo v. Sogou, Inc.</u>, 2020 WL 3051019, at *13 (S.D.N.Y. June 8, 2020).

<u>Third</u>, Plaintiff fails to plead any actionable misstatement for an additional reason—although the central premise of the AC is that Baidu violated Chinese law and concealed those violations, Plaintiff fails to identify any regulation Baidu supposedly violated or how it violated it. <u>See, e.g.</u>, <u>Rapoport v. Asia Elecs. Holding Co.</u>, 88 F. Supp. 2d 179, 184-85 (S.D.N.Y. 2000) (dismissing complaint that did not identify "the specific Chinese law that Defendants violated or the nature of the alleged violation"). Instead, Plaintiff assumes that a violation must have occurred because the Chinese government suspended certain Baidu channels. (AC ¶ 129.) This conclusion does not follow because the Chinese authorities' censorship of information over the Internet is driven by government policies that change over time, rather than by evidence that a company violated preexisting law. <u>See</u> <u>Rumbaugh v. USANA Health Scis., Inc.</u>, 2018 WL 5044240, at *6 (D. Utah Oct. 17, 2018) (dismissing complaint when plaintiff did not plead facts showing that a fine "reflected a conclusion by Chinese authorities" that the issuer violated the law).

Plaintiff also fails to plead facts giving rise to a strong inference of scienter, an intent to defraud. To plead scienter, Plaintiff must allege "specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." <u>Glazer Cap. Mgmt., L.P. v. Magistri</u>, 549 F.3d 736, 742–43 (9th Cir. 2008). Rather than allege facts "suggest[ing] that defendants had actual access" to information contradicting Baidu's public statements, as the law requires, <u>see</u> <u>Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.</u>, 759 F.3d 1051, 1062 (9th Cir. 2014), Plaintiff alleges that Baidu's CEO and CFO must have known about Baidu's purported inability to comply with Chinese internet content regulations by virtue of their positions. Federal securities laws require far more to plead that a defendant possessed an intent to defraud. <u>See</u> <u>id.</u> Accordingly, the Ninth Circuit has rejected attempts to plead scienter by alleging senior

officials "must have known" information about the company's operations, as Plaintiff attempts here. See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1001 (9th Cir. 2009). This alone is fatal to the AC.

A holistic review of Plaintiff's scienter theory further demonstrates its illogic and legal failings. Plaintiff's central premise is that Baidu intentionally misled investors about its compliance with Chinese law. (AC ¶¶ 12, 16.) Yet, Baidu's public filings contain robust risk disclosures about the unpredictable nature of the regulatory regime and the ongoing risk of adverse regulatory action. (Ex. A at 5, 10, 14–15, 36-37, 63.) Plaintiff does not—because he cannot—explain how Baidu could intend to mislead the market about its ability to avoid any regulatory entanglement, while simultaneously and expressly telling the market that its inability to avoid Chinese regulatory action with any certainty was an ongoing risk.

Likewise, the AC is silent about *why* any Defendant would engage in fraud to artificially inflate the price of ADSs. Plaintiff neither pleads that any Defendant engaged in insider stock sales while the price of Baidu's ADSs were allegedly inflated nor that any Defendant took any action to otherwise capitalize on the alleged "fraud." Thus, Plaintiff's theory rests on the implausible premise that Defendants intentionally sought to defraud the market for no reason and without ever taking advantage of the allegedly inflated price of the ADSs. The Ninth Circuit recently warned courts about securities fraud theories that defy common sense. See Nguyen v. Endologix, Inc., 962 F.3d 405, 408 (9th Cir. 2020) (dismissing fraud claims that had "no basis in logic or common experience"). This is precisely the type of case that the Nguyen court had in mind. The Court should grant the motion to dismiss.

## II.   BACKGROUND

### A.   Baidu's Evolving Regulatory Challenges

Since its founding in January 2000, Baidu has become the largest search engine in China and the second largest in the world. (AC ¶ 38.) Technology companies in the People's Republic of China ("PRC" or "China") are subject to an evolving—and often, uncertain—regulatory landscape. (Id. ¶¶ 51–60.) Under PRC regulations, companies are required to establish strict content review protocols and remove and report "prohibited" contents that include not only illegal and obscene materials, but also information that, in the opinion of the Chinese authorities, "corrodes cultural society." (Id. ¶ 55.) In addition, "the PRC legal system is based in part on government policies and internal rules, some of which are not published on a timely basis or at all." (Ex. A at 34.) Hence, as Baidu disclosed in its SEC filings, it "may not be aware of

1   [a] potential violation of these policies and rules." (Id.)

2         Compliance with these written and unwritten rules is enforced by the Cyberspace Administration

3   of China ("CAC"), which also coordinates periodic policy-driven campaigns to stamp out disfavored

4   online content. (AC ¶¶ 60–72.) Although Plaintiff describes past investigations involving Baidu dating

5   back to January 2009—more than *10 years prior* to the start of the Class Period—only two (from January

6   2019 and February 2020) relate to the securities claim at issue here. (See id. ¶¶ 91, 99, 110.) These actions

7   were widely reported by Chinese and Western media. (Id. ¶¶ 63, 65, 68, 72–74.)

8         To comply with content regulations, Baidu "employs a dual strategy, utilizing both technological

9   screening and human reviewers, to review and remove illegal content from its apps and platforms." (Id. ¶

10   48.) It also maintains a regularly updated "blacklist" of keywords to ensure that Baidu can keep up with

11   attempts to circumvent its review protocols with "coded language or slang." (Id. ¶¶ 48, 60, 62.) Plaintiff

12   concedes that Baidu has taken steps continually to improve its oversight capabilities and to reduce the

13   vulnerabilities in its controls.  (Id. ¶¶ 63-64, 67, 71.) For example, Baidu has strengthened its systems by,

14   among other things, "reviewing its decision-making and approval procedures," "implementing changes to

15   its auction-based paid search practices," "clearly identifying paid-for ads," "ending online marketing

16   services to unqualified organizations," "updat[ing] its entire content review standards," "upgrad[ing] its

17   video review system and strengthen[ing] training for reviewers." (Id. ¶¶ 63-64, 67, 72.)

18        **B.**    **Baidu's Disclosures**

19         On March 16, 2019, Baidu filed its 2018 Annual Report on Form 20-F. (Ex. B.) In it, Baidu

20   described applicable regulations, including content regulations, and disclosed that "we have been and may

21   be subject to penalties in the future for violations of those regulations arising from information displayed

22   on or linked to our websites or mobile apps, including suspension and shutdown of our online operations."

23   (Id. at 31-32.) While Baidu disclosed the opinion of its legal counsel that its business operations "comply

24   with current PRC laws and regulations in all material respects," (id. at 57; ECF No. 41-2, Stmt. 2), Baidu

25   also disclosed that "[w]e cannot assure you that the PRC regulatory authorities would find that our . . .

26   business operations comply with PRC laws and regulations." (Ex. B at 57.) Baidu explained: "We have

27   been and may continue to be subject to claims and investigations . . . based on the content found on our

28   platform, the results in our paid search listings or our other products and services . . . ." (Id. at 11–12.)

5

Baidu explained that it had "contractual control" over its websites. (ECF No. 41-2, Stmt. 1.) Baidu disclosed "several remedial measures" taken in response to past investigations, and warned that "there is no guarantee that the measures we have taken are effective at all times." (Ex. B at 12-13.)

On May 16, 2019, Baidu announced its Q1 2019 earnings, which were reported in the Company's Form 6-K filed on May 21, 2019. (Ex. C.) In this public filing and again on the earnings call the next day, Baidu referred investors to "risks . . . included in the Company's annual report on Form 20-F." (Ex. C at 7; Ex. D at 4.) Baidu stated in its Form 6-K that it "anticipate[s] online marketing in the near term to face a challenging environment." (ECF 41-2, Stmt. 3.) During the earnings call that followed, Mr. Li elaborated that given, *inter alia*, "tighter government scrutiny on content . . . we are taking a cautious view that online marketing in the near term will face a more challenging environment." (Ex. D at 4.) Mr. Li also stated that Baidu was "filtering out poor and questionable content with Baidu AI." (ECF 41-2, Stmt. 4.)

On June 19, 2019, Baidu published its monthly Information Security Report for May 2019. The brief report disclosed that Baidu had cleaned up 2 billion pieces of harmful information, 8,000 search terms, and more than 500,000 links. (ECF 41-2, Stmt. 5.)

On August 22, 2019, the Company reported its Q2 2019 earnings through a Form 6-K filed with the SEC. (Ex. E.) The Form 6-K again referred investors to the risk disclosures in its Form 20-F. (Id. at 7.) Baidu reported that it "continues to . . . identify and filter out low-quality, offensive and inappropriate ads and other content," including "over one billion misleading, low-quality ad materials and tens of billions of offensive, inappropriate images, texts, videos and web links." (ECF 41-2, Stmt. 6; Ex. E at 3.)

On February 27, 2020, Baidu hosted a call regarding its Q4 2019 earnings. (Ex. F.) During the call, Mr. Li described some of the challenges Baidu was facing "[a]s a result of the coronavirus outbreak," including that the "rebound for online marketing after Chinese New Year has been slow." (ECF 41-2, Stmt. 7.) He also noted that people had "come to Baidu during this time to search, to get their information, to make sure that this is correct . . . because this is where they can verify more reliable information." (Id. Stmt. 8.) Mr. Yu added that Baidu's feeds were tailored to combat "fake news," providing users with a specific outlet where "they can verify more reliable information." (AC ¶ 116; Ex. F at 14.)

On March 13, 2020, Baidu filed its 2019 Annual Report on Form 20-F. (Ex. A.) Baidu again described the opinion of its counsel that its operations materially complied with Chinese law. (ECF 41-2,

Stmt. 10.) The Annual Report (i) described certain PRC regulations (id. Stmt. 11); (ii) warned of "increasing enforcement efforts" and the risk that "failure or perceived failure to comply" could result in adverse actions (Ex. A at 10); (iii) disclosed that it had been and could continue to be subject to investigations relating to content on its platform (ECF No. 41-2, Stmt. 9); and (iv) noted that it could not guarantee the efficacy of the remedial "measures" it had implemented. (Ex. A at 5, 14-15, 36–37.)

### C.    Plaintiff's Purported "Corrective Disclosure"

On April 8, 2020, the CAC announced that it was investigating Baidu and temporarily suspended certain channels on the Baidu App. (AC ¶ 129.) The announcement did not specify that Baidu had violated any preexisting Chinese law or regulation, and was not accompanied by any formal factual findings or conclusions. Instead, the government simply ordered Baidu to remove certain unspecified "low-brow content," conduct "rectification," and cease exerting a "bad influence [on] society." (Id.) Plaintiff alleges that this news caused the price of Baidu securities to drop, precipitating this lawsuit.

## III.    PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(B)

To state a claim under Section 10(b), Plaintiff must allege, among other things, (i) a material misrepresentation or omission and (ii) scienter. See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc., 552 U.S. 148, 157 (2008). Plaintiff fails to satisfy either element.

### A.    Plaintiff Fails To Plead A False Or Misleading Statement

Plaintiff's claims are subject to the PSLRA's heightened pleading standard. See 15 U.S.C. § 78u-4(b). "The PSLRA has exacting requirements for pleading 'falsity.'" Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1070 (9th Cir. 2008). Plaintiffs must both "allege a misrepresentation or a misleading omission with particularity and explain why it is misleading." Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co., 845 F.3d 1268, 1274 (9th Cir. 2017).

Plaintiff targets 12 statements[3] Baidu made in a variety of contexts between March 2019 and March 2020. Plaintiff alleges that: (i) a pair of opinion statements in Baidu's 2018 and 2019 annual reports that its operations "comply with current PRC laws and regulations in all material respects" were false because the Company was not complying with all relevant PRC regulations (ECF 41-2, Stmt. 2, 10); (ii) eight statements Baidu made about its online marketing business, filtering of illegal content, effects of the

---

[3] Exhibit B to Plaintiff's complaint identifies 11 false or misleading statements. (ECF 41-2.) However, the exhibit omits one of the statements Plaintiff challenges in the AC, for a total of 12. (See AC ¶ 123.)

COVID-19 pandemic, past investigations, and content of Chinese regulations were each misleading because Baidu omitted its alleged inability to comply with Chinese law (id. Stmt. 3–9, 11); and (iii) Baidu misled the market in its 2018 and 2019 annual reports by stating that it only has "contractual control" over its websites. (Id. Stmt. 1; AC ¶ 123.) Each of Plaintiff's claims share the common theory that Baidu misled investors into believing that Baidu could comply with Chinese content regulations, when Baidu was allegedly violating these regulations and lacked the capacity to comply. Plaintiff alleges that the Chinese government's April 8, 2020 enforcement action revealed the falsity of Baidu's statements, because it allegedly showed that Baidu did not comply with internet content regulations during the class period. Plaintiff's falsity allegations all fail for four independently dispositive reasons.

### 1.      Baidu Fully Disclosed the Risk of Adverse Regulatory Action

Plaintiff's core theory is that the 12 statements challenged in the AC misled investors about the risk that Baidu could be subject to adverse regulatory action. (See AC ¶¶ 91, 99, 105, 107, 117, 121, 127.) However, a plaintiff cannot maintain a claim when the defendant's public filings "warn investors of exactly the risk the plaintiffs claim was not disclosed." See Olkey v. Hyperion 1999 Term Tr., Inc., 98 F.3d 2, 5 (2d Cir. 1996); Eventbrite, 2020 WL 2042078, at *15-16 (dismissing claim where issuer "did disclose the exact risks that Plaintiffs argue were not disclosed"). Thus, where "a company's filings contain abundant and specific disclosures regarding the risks facing the company . . . the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies." In re Violin Memory Sec. Litig., 2014 WL 5525946, at *12 (N.D. Cal. Oct. 31, 2014).

Plaintiff's theory that Baidu misled investors about the risk of adverse regulatory action fails because Baidu repeatedly disclosed this exact risk in its public filings. In particular, Baidu warned:

- Although Baidu had "removed . . . questionable paid search listings" and "taken steps to implement measures requested by PRC regulatory authorities . . . PRC regulations on online marketing services are evolving, and uncertainties remain with respect to implementation of and compliance with new regulations that may emerge, which in turn may have a material adverse impact on our business" (Ex. A at 5; Ex. B at 5);

- While "authorities in China are increasing enforcement efforts against non-compliance relating to companies operating content delivery networks . . . the interpretation and application of relevant laws in China . . . are often uncertain and in flux, and any failure or perceived failure to comply with all applicable laws and regulations may result in . . . regulatory actions against us, and could have a material adverse effect on our business" (Ex. A at 10; Ex. B at 9);

- "We are subject to rules and regulations by . . . the various regulatory authorities in

China . . . and to new and evolving regulatory measures under applicable law . . . . [B]ecause these laws, regulations, and standards are subject to varying interpretations, their application in practice may evolve over time . . . . This evolution may result in continuing uncertainty regarding compliance matters . . . . " (Ex. A at 28); and

- "To the extent that PRC regulatory authorities find any content displayed on our websites or mobile apps illegal, they may require us to limit or eliminate the dissemination of such information on our websites or mobile apps . . . . In addition, we have been and may be subject to penalties in the future for violations of those regulations arising from information displayed on or linked to our websites or mobile apps, including suspension and shutdown of our online operations." (Ex. A at 37; see also Ex. B at 31-32 (similar).)

Thus, Baidu warned the market of exactly the risk that manifested on April 8, 2020, when Chinese officials required Baidu to temporarily suspend certain feeds for perceived noncompliance with internet content standards. Plaintiff therefore cannot premise a claim on the notion this risk was somehow concealed. See, e.g., Luo, 2020 WL 3051019, at *11 (dismissing securities fraud claim where issuer's disclosures "warned of the exact risk that was threatened and later materialized—that the PRC would issue a new law or regulation, that [issuer] might have difficulty policing the content that was prohibited, and that the failure to detect prohibited content would prevent [issuer] from operating its Internet platform and impact its revenues"); Asay v. Pinduoduo Inc., 2020 WL 1530745, at *7 (S.D.N.Y. Mar. 30, 2020) (dismissing claim that issuer hid difficulties in complying with Chinese anti-counterfeiting laws where issuer's disclosures "depicted its anti-counterfeiting efforts as an ongoing battle" and explained that it "may not always be successful"); In re Sina Corp. Sec. Litig., 2006 WL 2742048, at *8 (S.D.N.Y. Sept. 26, 2006) (rejecting argument "that defendants should have disclosed information because they should have anticipated the actions of the Chinese government" where investors had "already been thoroughly and repeatedly warned about the risks of investing in a Chinese company").

## 2.   Baidu Was Not Required to Accuse Itself of Regulatory Violations

Plaintiff's fraud theories also fail because the federal securities laws do not require Baidu to predict that it would violate, or accuse itself of violating, Chinese law. Disclosure under the federal securities laws "is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 184 (2d Cir. 2014); In re Facebook, Inc. Sec. Litig., 2020 WL 4569443, at *30 (N.D. Cal. Aug. 7, 2020) ("[C]ompanies are not required to engage in 'self-flagellation' by disclosing unproven allegations."). This rule extends to allegations of insufficient regulatory compliance. See Luo, 2020 WL 3051019, at *13 ("[T]here is no free-

1    standing obligation under United States law to disclose . . . insufficient regulatory compliance.").

2       Plaintiff's claims are premised on the notion that Baidu should have disclosed that its content

3    monitoring efforts were "critically inadequate," Baidu was violating or certain to violate Chinese law,

4    Baidu was "incapable" of complying with regulations, and Baidu's compliance management personnel

5    were inadequate. (See AC ¶¶ 91, 99, 105, 107, 117, 121, 127.) Not only are these conclusions unsupported

6    by particularized facts—as set forth in greater detail below—but Baidu was under no duty to accuse itself

7    of lawlessness or predict that Chinese regulators would take enforcement action. See Luo, 2020 WL

8    3051019, at *13 (rejecting argument that Chinese issuers was required to accuse itself of violating Chinese

9    internet content regulations in order to avoid federal securities liability); Facebook, 2020 WL 4569443, at

10   *30 (rejecting argument that company had an "obligation to tell investors that [it] *might* not be in

11   compliance with the FTC consent decree" (emphasis in original)).

12          **3.    Plaintiff Fails to Plead that Baidu Violated Any Preexisting Chinese Law**

13      Plaintiff alleges that each of the 12 statements challenged in the AC were part of a fraudulent

14   scheme to hide alleged violations of Chinese law. To state a claim using this theory, Plaintiff must plead

15   particularized facts establishing that Baidu was in violation of Chinese law at the time each statement was

16   made. See In re Immucor, Inc. Sec. Litig., 2011 WL 2619092, at *4 (N.D. Ga. June 30, 2011) ("Where

17   false or misleading statements are based on the failure to disclose illegal activity, the allegations about the

18   underlying illegal activity must also be stated with particularity."); In re FBR Inc. Sec. Litig., 544 F. Supp.

19   2d 346, 354 (S.D.N.Y. 2008) ("[I]n order to state a claim that defendants violated the securities laws

20   because they failed to disclose the insider trading scheme, plaintiffs must plead the alleged trading scheme

21   with particularity."). Plaintiff fails to do so, for several reasons.

22      As a threshold matter, Plaintiff is required to identify and provide translations of the specific

23   regulatory provisions Baidu supposedly violated. See SEC v. Jackson, 908 F. Supp. 2d 834, 858-59 &

24   n.15 (S.D. Tex. 2012) (dismissing complaint where factual predicate of claims depended on content of

25   Nigerian law, and SEC failed to plead the law at issue). The AC instead provides only high-level

26   summaries of what Plaintiff claims Chinese law requires. (See AC ¶¶ 52–58.)[4] These general allegations

27   _____

28   [4] For example, Plaintiff points to Article 6 of the CAC "Provisions on the Ecological Governance of
     Network Information Content," alleging it forbids content that "spreads obscenity, pornography,
     gambling, violence, murder, terror, or instigates crime." (AC ¶ 57.) But Plaintiff provides no basis to
     *(cont'd)*

1    are insufficient because issues of law are for the Court to decide. The Court cannot simply rely on

2    Plaintiff's interpretation of Chinese regulations. See Fed. R. Civ. P. 44.1 (court must determine foreign

3    law); In re Xunlei Ltd. Sec. Litig., 2019 WL 4276607, at *9 (S.D.N.Y. Sept. 10, 2019) ("Absent conclusive

4    authority on the legality of [the defendant's conduct] under Chinese law, the Court must make its own

5    assessment."). On this basis alone, the Court should dismiss the AC. See Rapoport, 88 F. Supp. 2d at

6    184-85 (dismissing claims based on nondisclosure of alleged legal violations where complaint did not

7    identify "the specific Chinese law that Defendants violated or the nature of the alleged violation").

8         Plaintiff also fails to plead facts demonstrating that Baidu actually violated any regulation, let

9    alone did so at the time of the relevant statements. Plaintiff alleges that Baidu knowingly published ads

10   with "questionable content" at nighttime and towards the end of each month to meet sales goals. (AC

11   ¶¶ 50, 78.) However, Plaintiff does not explain what this questionable content was, or how it violated any

12   specific rule or regulation. Plaintiff also charges that Baidu's compliance monitoring procedures were

13   "critically inadequate." (Id. ¶¶ 75, 84.) However, Plaintiff fails to identify with what standards Baidu was

14   required to comply, and thus provides no way to evaluate how Baidu supposedly fell short. Thus, Plaintiff's

15   conclusory allegations do not plead a regulatory violation with sufficient particularity. See, e.g., FBR, 544

16   F. Supp. 2d at 354-55 (dismissing "conclusory claims of undisclosed wrongdoing" that did not show "how

17   what defendants did constituted the alleged violation").

18        At bottom, Plaintiff presumes that Baidu must have violated some preexisting regulation because

19   the Chinese government required Baidu to suspend several channels on April 8, 2020, to remove "illegal

20   content." (AC ¶ 129.) This assumes the Chinese regulators only intervene when there is a violation of

21   formally published rules. However, as Baidu disclosed in its public filings, "the PRC legal system is based

22   in part on government policies and internal rules, some of which are not published on a timely basis or at

23   all," meaning that companies like Baidu "may not be aware of" any "potential violation of these policies

24   and rules" until they are enforced. (Ex. A at 34.) Moreover, precedents interpreting Chinese law are

25   "limited" and "nonbinding," creating "substantial uncertainties regarding the legality of . . . the businesses

26   and activities of, internet businesses in China, including" Baidu. (Id. at 34–35.)

27        In short, because China's legal system is driven as much by the government's changing policy

28   ────────────────
     believe that Baidu violated Article 6, and the Chinese government did not cite Article 6 or explain what
     content it was ordering Baidu to take down in its April 8, 2020 order. (Id. ¶ 129.)

1   priorities as by published rules, it is improper to assume that the Chinese government's April 2020 decision

2   to suspend certain Baidu channels reflected a finding that Baidu violated Chinese law. <u>See, e.g.</u>,

3   <u>Rumbaugh</u>, 2018 WL 5044240, at *6 (dismissing allegations of nondisclosure of Chinese law violations

4   where plaintiff did not plead that regulatory fine "reflected a conclusion by Chinese authorities" that issuer

5   violated the law); <u>see also</u> <u>In re Yukos Oil Co. Sec. Litig.</u>, 2006 WL 3026024, at *14-16 (S.D.N.Y. Oct.

6   25, 2006) (dismissing complaint where plaintiff failed to show that adverse action by Russian government

7   reflected a violation of established law). Because the AC fails to provide other allegations sufficient to

8   show a violation of Chinese law, it should be dismissed. <u>See</u> <u>Rumbaugh</u>, 2018 WL 5044240, at *6.

9       **4.**    **Plaintiff Fails to Plead That Any Statement Was False or Misleading**

10       Apart from the three dispositive, threshold defects identified above, Plaintiff's falsity allegations

11   also fail when each of the 12 statements challenged in the AC are examined individually.

12       **(a)**    **Baidu's Opinions About Its Legal Compliance Were Not Misleading**

13       Baidu's 2018 and 2019 annual reports state that, in the opinion of Baidu's Chinese legal counsel,

14   and subject to Baidu's risk disclosures about the difficulties of complying with Chinese regulations, the

15   Company's operations "comply with current PRC laws and regulations in all material respects." (ECF 41-

16   2, Stmt. 2, 10.) Plaintiff alleges that these statements were false because Baidu was not actually in material

17   compliance with PRC laws and regulations. Plaintiff's allegations are legally insufficient, however,

18   because Plaintiff cannot meet the particularly demanding standard for challenging opinion statements like

19   those Plaintiff identifies. As the U.S. Supreme Court itself has held, challenging an issuer's opinion

20   statement is "no small task for an investor." <u>Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.</u>

21   <u>Pension Fund</u>, 575 U.S. 175, 194 (2015).

22       <u>First</u>, Plaintiff fails to plead facts showing that Baidu's legal opinions were material

23   misrepresentations. To claim that an opinion statement like those at issue are material misrepresentations,

24   an investor must allege both subjective falsity—"that the speaker did not hold the belief she professed"—

25   and objective falsity—"that the belief is objectively untrue." <u>City of Dearborn Heights Act 345 Police &</u>

26   <u>Fire Ret. Sys. v. Align Tech., Inc.</u>, 856 F.3d 605, 615-16 (9th Cir. 2017). The AC does neither.

27       Plaintiff has not pled "facts that would allow [the Court] to infer subjective falsity." <u>See</u> <u>id.</u> at 617.

28   No facts support that Baidu did not believe its counsel's legal opinion. On the contrary, as Baidu disclosed,

1   "the interpretation and application of relevant laws in China . . . [is] often uncertain and in flux, and any

2   failure or perceived failure to comply . . . may result in [adverse] legal proceedings or regulatory

3   actions[.]" (Ex. A at 10; see also id. at 28, 34.) It defies logic to infer that, after recognizing and disclosing

4   these uncertainties, Baidu reached a conclusion contrary to its own counsel's opinion about the legality of

5   its business practices. In re PetroChina Co. Sec. Litig., 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015) (auditor's

6   opinion that issuer's internal controls were "effective" was not misleading where plaintiff did not allege

7   that no internal controls evaluation took place).

8          Nor has Plaintiff alleged facts showing that Baidu's counsel's opinion concerning the legality of

9   Baidu's business operations was "objectively untrue." Dearborn, 856 F.3d at 616. To allege objective

10  falsity, Plaintiff must plead particularized facts establishing that Baidu was in violation of Chinese law at

11  the time it disclosed its counsel's opinions. See Immucor, 2011 WL 2619092, at *4; FBR, 544 F. Supp.

12  2d as 354. As explained above, Plaintiff fails to carry this burden because Plaintiff does not plead facts

13  establishing a violation of Chinese law. (See supra, § III.A.3.)

14         Second, Plaintiff fails to plead facts showing that Baidu's legal compliance opinions were

15  misleading because they omitted material information. To claim that an opinion statement is misleading

16  because it omits material information, an investor must allege facts showing that the issuer knew

17  undisclosed information that seriously undermined the basis for its opinion. See Dearborn, 856 F.3d at

18  615-16; Omnicare, 575 U.S. at 194; Goldsmith v. Weibo Corp., 2018 WL 2733694, at *12 (D.N.J. June 7,

19  2018) (opinion regarding issuer's compliance with PRC law not actionable where there was no basis "for

20  concluding that Weibo failed to disclose facts regarding [its] knowledge of what the regulatory scheme

21  permits"). Plaintiff fails to do so.

22         As an initial matter, Plaintiff's allegation that Baidu omitted that its monitoring processes were

23  "critically inadequate due to understaffing," fails to identify facts that seriously undermined Baidu's

24  opinion. (AC ¶¶ 77, 84, 87, 124.) Plaintiff fails to allege that any such understaffing caused Baidu to be

25  out of compliance, let alone that Baidu believed that it would. Plaintiff alleges that the reviewers who

26  screened materials for Baidu's content spent "2 to 10 minutes" on "each article or video," but Plaintiff fails

27  to explain why that average review time was inadequate. (Id. ¶¶ 77, 84.) Plaintiff also alleges that Baidu

28  lacked "adequate managerial staff to enforce review standards and often relied on reviewers' personal

1   judgments." (Id.) But Plaintiff does not explain how this undermined Baidu's opinion it was in compliance.

2   Plaintiff does not allege, for example, that reviewers' judgments were somehow inadequate.

3          Moreover, Plaintiff's allegation that Baidu did not disclose past investigations by Chinese

4   regulators also fails to identify facts that seriously undermined Baidu's opinion, making it misleading. (AC

5   ¶¶ 87, 124.) For one thing, if information is already public, investors are aware of it, and the failure to

6   disclose it cannot be misleading. See, e.g., Heliotrope Gen., Inc. v. Ford Motor Co., 189 F.3d 971, 976-77

7   (9th Cir. 1999) (affirming dismissal of claim based on nondisclosure of publicly available government

8   information); In re Textainer P'ship Sec. Litig., 2005 WL 3801596, at *6 (N.D. Cal. Dec. 12, 2005) ("[T]he

9   securities laws do not require disclosure of information that is readily available in the public domain.").

10  Here, the only "investigations" during the class period to which Plaintiff points are: (i) the Chinese

11  government's January 3, 2019, suspension of certain Baidu channels for spreading "vulgar" content (AC

12  ¶¶ 71-72); and (ii) a "talk" Baidu had with Chinese regulators on February 5, 2020, where regulators

13  ordered Baidu to take stronger steps to screen out content about the COVID-19 pandemic at odds with the

14  government's official messaging.[5] (Id. ¶ 110.) The Chinese government formally announced both of these

15  alleged incidents, and various English language outlets also reported them. (See id. ¶¶ 71–72; Ex. G.)

16  Because they were already public, Baidu's legal opinion was not misleading for failing to disclose them.

17         Plaintiff's allegation that Baidu's legal opinion failed to disclose past government actions also fails

18  because neither purported incident is inconsistent with counsel's opinions that Baidu was in material

19  compliance with Chinese law *at the time* those opinions were issued. To plead that a statement was

20  misleading, the Plaintiff must identify "specific contemporaneous statements or conditions that

21  demonstrate the . . . misleading nature of the statements *when made*." See Ronconi v. Larkin, 253 F.3d

22  423, 432 (9th Cir. 2001). Here, one past incident allegedly took place on January 3, 2019, when the

23  Chinese government suspended certain Baidu channels for spreading "vulgar" content. (AC ¶¶ 71–72.)

24  However, Baidu's allegedly offending legal opinion was not issued until March 16, 2019, two-and-a-half

25  months *after* the suspension of certain channels. Thus, even assuming *arguendo* a lack of compliance on

26  January 3, 2019, the AC does not allege that Baidu did not become compliant between the date of the

27  government's action in January 2019 and the time Baidu issued its annual report with the legal opinion in

28  _____
[5] This "talk" had not even occurred when Baidu released its 2018 annual report on March 16, 2019, making
it irrelevant to the legal compliance opinion contained in that report. See Ronconi, 253 F.3d at 432.

BAIDU, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT          CASE NO.: 5:20-cv-02768-LHK

mid-March. Similarly, Plaintiff fails to explain how the February 5, 2020 "talk"—which was unaccompanied by government action or penalties—contradicted Baidu's opinion that it was in material compliance with Chinese law as of March 13, 2020, when it filed its annual report. See Goldsmith, 2018 WL 2733694, at *11 (dismissing claim where plaintiff "fail[ed] to allege facts that provide a plausible basis for connecting Defendants' disclosures with the misleading message Plaintiff maintains was communicated to investors"). If anything, the "talk" is consistent with Baidu's "tacit understanding" with regulators to conduct its business in ways that are responsive to the government's shifting political and messaging priorities, even in the absence of formal sanctions that result from legal violations. (AC ¶ 61.)

Finally, Plaintiff claims that Baidu's opinion should have disclosed that it was "incapable" of complying with Chinese law because it permitted third-parties to post content to its various apps and feeds. (AC ¶¶ 87, 124.) This allegation also fails. The AC does not allege that Baidu was "incapable" of monitoring the third party content it permitted. Thus, the AC does not allege any basis on which to conclude that permitting third-party content rendered Baidu "incapable" of compliance. See, e.g., Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129-30 (2d Cir. 1994) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of [their] business[.]").

### (b)   Plaintiff's Allegation That Eight Statements Concerning Widely Varying Subjects Were All Misleading Because Baidu Allegedly Omitted It Could Not Comply With Chinese Regulations Also Fails

Plaintiff alleges that eight statements Baidu made in 2019 and 2020 about its online marketing business, filtering undesirable content, the impact of the COVID-19 pandemic, past investigations, and Chinese regulations, were each false and misleading because they omitted predictions that Baidu could not comply with Chinese internet content regulations. (ECF 41-2, Stmt. 3–9, 11.) These claims each fail.

Section 10(b) does "not create an affirmative duty to disclose any and all material information." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011). Issuers are required to make disclosures only "when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." Id. Thus, Section 10(b) "prohibit[s] *only* misleading and untrue statements, not statements that are incomplete." Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis in original). An omission is misleading only if it would give a reasonable investor the

1  "impression of a state of affairs that differs in a material way from the one that actually exists." Id.

2      In Brody, for example, the plaintiff alleged that two press releases were misleading with regard to

3  a pending merger. The first press release provided information about a stock repurchase program but did

4  not disclose a possible corporate takeover. See id. The second press release stated that the company had

5  received "expressions of interest" from potential acquirers "when in fact it had received actual proposals."

6  Id. at 1007.  The court reasoned that the first press release "neither stated nor implied anything regarding

7  a merger," id. at 1006 (emphasis in original), and the second "did not give the impression that [the

8  company] had *not* received actual proposals." Id. at 1007.  Under Brody's demanding standard, Plaintiff's

9  effort to read misleading implications into a wide variety of Baidu's statements necessarily fails because

10  these statements either had nothing at all to do with Baidu's compliance or did not suggest that Baidu

11  faced no risk of adverse regulatory action.

12              **(i)    Online Marketing Statement**

13      Plaintiff alleges the following statement in Baidu's May 16, 2019 first quarter 2019 earnings report

14  was misleading: "Despite government policies to improve the market conditions for [small and medium

15  enterprises], we anticipate online marketing in the near term to face a challenging environment." (ECF

16  No. 41-2, Stmt. 3; AC ¶ 90.) Plaintiff alleges that this statement was misleading because it "conveyed the

17  impression that regulatory compliance did not contribute to the company's near-term challenges" and

18  omitted information about alleged inadequacies in Baidu's content monitoring process and past instances

19  where the Chinese government took issue with the content available through Baidu's services. (AC ¶ 91.)

20      Plaintiff's allegations fail as a matter of law. Baidu's statement about market conditions for online

21  marketing "neither stated nor implied anything regarding" the efficacy of its regulatory compliance efforts.

22  Therefore, Baidu had no duty to accompany the statement with any information about regulatory

23  compliance. See Brody, 280 F.3d at 1006; In re Apple Inc. Sec. Litig., 2020 WL 2857397, at *17 (N.D.

24  Cal. June 2, 2020) (rejecting claim that disclosures about the risk of economic downturn failed to discuss

25  business outlook in China because disclosures were "silent" on issuer's China outlook).

26      Plaintiff's argument fails for the additional reason that a court evaluates a plaintiff's allegations of

27  "false statements in the context in which they were made, especially in regard to contemporaneous

28  qualifying or clarifying language." Xu v. ChinaCache Int'l Holdings, Ltd., 2017 WL 114401, at *5 (C.D.

16

Cal. Jan. 9, 2017). Plaintiff's allegation ignores that during the May 16, 2019 call to discuss its earnings report, Baidu disclosed the following:  "Although the Chinese government has announced many economic policies to bolster the economy given the current macro conditions, *tighter government scrutiny on content . . .* and so forth, *we are taking a cautious view* that online marketing in the near term will face a *more challenging environment*." (Ex. D at 4.) Thus, on the day immediately following the release of its earnings results, Baidu explicitly told investors that regulatory compliance had become even "more challenging" because of "tighter government scrutiny on content."  No reasonable investor could have heard or read this disclosure and believed that Baidu faced no regulatory challenges.

### (ii)    Statements About Filtering Out Undesirable Content

Plaintiff also alleges that Baidu's public filings were false and misleading because they failed to disclose purported deficiencies in Baidu's content monitoring processes and past investigations. (AC ¶¶ 99, 107.)  In particular, Plaintiff alleges the following statements were misleading: (i) the May 17, 2019 quarterly earnings call where Mr. Li stated that Baidu was "filtering out poor and questionable content with Baidu AI" (ECF 41-2, Stmt. 4); (ii) Baidu's monthly security report, dated June 19, 2019, where it stated that it had cleaned up "more than 2 billion pieces of harmful information" and "more than 500,000 harmful links" (id. Stmt. 5); and (iii) Baidu's report on Q2 2019 earnings where it stated that in "the first half of 2019, Baidu's AI filtered over one billion misleading, low-quality ad materials and tens of billions of offensive, inappropriate images, texts, videos, and weblinks" (id. Stmt. 6).

None of these statements stated or implied that Baidu could guarantee perfect compliance with all applicable regulations. To the contrary, that Baidu was filtering billions of pages of "low quality" materials is consistent with Baidu facing ongoing challenges in keeping all "low quality" material off its sites and apps. See Lefter v. Yirendai Ltd., 2017 WL 2857535, at *7 (C.D. Cal. June 20, 2017) (no actionable omission where defendant's statements were "entirely consistent" with the risk of regulatory exposure and "disclosures never created the impression that [certain] Draft [regulatory] Measures did not put its business model at risk."). Moreover, even if Baidu had a duty to comment on its regulatory compliance efforts, Plaintiff has not pled facts showing that these efforts were deficient, see supra, § III.A.3, III.A.4(a), and Baidu was not required to accuse itself of regulatory violations, see supra, § III.A.2.

Plaintiff also alleges Baidu's June 19, 2019 security report and its August 19, 2019 earnings report

were misleading because they omitted that Chinese regulators had ordered Baidu to remove certain ads with "click-bait headlines" on June 12, 2019. (AC ¶ 104.) However, Baidu's reports about content it had "cleaned up" or filtered using AI do not create the impression that no content was removed at the behest of the government. See In re Rigel Pharms., Inc. Sec. Litig., 697 F.3d 869, 880 (9th Cir. 2012) (disclosure about key side effects of medication not misleading for failing to disclose all side effects). If anything, Baidu's statements that its AI removed "harmful" content are consistent with the notion that "harmful" content regularly needs to be removed, including when government censors flagged such content.

### (iii)   Statements About COVID-19 Pandemic

During a February 27, 2020 quarterly earnings call, Mr. Yu stated that as a result of coronavirus related business closures in China, "the rebound for online marketing after Chinese New Year has been slow this year." (ECF 41-2, Stmt. 7; Ex. F at 9.) On that same call, in response to an analyst question, Mr. Li predicted that Baidu's healthcare advertising would grow as Chinese users accessed the Baidu platform to obtain "more reliable information" on the COVID-19 pandemic than the rumors widely circulating on the internet.[6] (ECF 41-2, Stmt. 8; Ex. F at 13-14.)

Plaintiff alleges that Mr. Yu's statement about the effect of the COVID-19 pandemic on online marketing revenues was misleading because it conveyed that the post-New Year rebound "in marketing revenue was slow entirely due to the COVID-19 pandemic," while omitting Baidu's supposed inability to comply with Chinese internet content regulations. (AC ¶ 117.) But the Chinese government did not temporarily suspend any Baidu channels until April 8, 2020. The statement concerning a slowdown in marketing revenues concerned January, months *before* any alleged compliance event. Plaintiff fails to explain how alleged regulatory compliance difficulties in April could have had any effect on Baidu's online marketing revenues in January. Plaintiff thus fails to show that Mr. Yu's attribution of the early-2020 slowdown to COVID-related business closures was misleading. See Goldsmith, 2018 WL 2733694, at *11 (plaintiff must connect "Defendants' disclosures with the [allegedly] misleading message").

Moreover, Mr. Yu's statement about customer demand for online marketing services did not state or imply anything at all about Baidu's regulatory compliance efforts. Therefore, Baidu had no obligation to accompany Mr. Yu's online marketing discussion with additional statements about regulatory

---

[6] Plaintiff wrongly attributes this statement to Mr. Yu in his complaint. (See AC ¶ 116.)

BAIDU, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT                    CASE NO.: 5:20-cv-02768-LHK

1  compliance. See Brody, 280 F.3d at 1006.

2       Plaintiff also alleges that Mr. Li's statements predicting a surge in healthcare advertising as users

3  came to Baidu for "more reliable information" about the COVID-19 pandemic was misleading. Plaintiff

4  alleges that Mr. Li's statement conveyed that Baidu could filter out "poor and questionable content," and

5  was thus misleading because Mr. Li did not also say that Baidu was incapable of filtering out undesirable

6  content as required by Chinese regulations. (AC ¶¶ 116-17.) However, Plaintiff pleads no facts showing

7  that Baidu did not in fact provide reliable information about the COVID-19 pandemic. The April 8, 2020

8  announcement by the Chinese government did not state that Baidu's pandemic-related news was the cause

9  of the suspension. Plaintiff thus fails to plead that Mr. Li's statement misled investors about Baidu's ability

10  to provide reliable information about the COVID-19 pandemic. See In re Lululemon Sec. Litig., 14 F.

11  Supp. 3d 553, 571, 579 (S.D.N.Y. 2014) (dismissing claim that statement about use of third parties to

12  inspect its products was misleading where plaintiff failed to plead that company did not in fact "partner

13  with a third-party testing company, or that it did not conduct tests" on its products).

14       Moreover, Mr. Li's statement about Baidu's ability to provide reliable news about the COVID-19

15  pandemic did not state or imply anything about whether Baidu's regulatory compliance efforts would

16  prevent future enforce actions by the Chinese government. Therefore, Baidu had no duty to comment on

17  the adequacy of its regulatory compliance efforts. See Brody, 280 F.3d at 1006.

18                    **(iv)    Disclosure of Past Investigations**

19       Plaintiff next challenges Baidu's statement in its 2019 annual report that it had "been and may be

20  subject to penalties in the future for violations of those regulations arising from information displayed on

21  or linked to our websites or mobile apps." Plaintiff alleges that this statement was misleading because it

22  supposedly "conveyed . . . that the future risk of enforcement action was abstract" and omitted facts about

23  past investigations Plaintiff claims would have clarified the risk. (ECF 41-2, Stmt. 9.) This theory fails.

24       First, once Baidu fully disclosed the risks associated with adverse regulatory action, Plaintiff was

25  "on notice of these risks and cannot be heard to complain that the risks were masked as mere

26  contingencies." Violin Memory, 2014 WL 5525946, at *12; In re Leapfrog Enters., Inc. Sec. Litig., 527

27  F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) (risk disclosures "are not actionable to the extent plaintiffs

28  contend defendants should have stated that the adverse factors 'are' affecting financial results rather than

1    'may' affect financial results"). This is especially so when Baidu disclosed that "we *have been* and may be

2    subject to penalties in the future for violations of those regulations." (Ex. A at 37.) It did not characterize

3    "enforcement risk" as something abstract, but as something that had already occurred.

4        <u>Second</u>, Plaintiff cannot state a claim merely because he wishes Baidu's risk disclosures were more

5    detailed. <u>See, e.g.</u>, <u>Lefter</u>, 2017 WL 2857535, at *7 (rejecting claim that risk disclosure was misleading

6    because it "did not explain the risk in the manner or level of detail that Plaintiff would have preferred");

7    <u>Jasin v. Vivus, Inc.</u>, 2016 WL 1570164, at *18 (N.D. Cal. Apr. 19, 2016) (similar); <u>Zeid v. Kimberley</u>,

8    930 F. Supp. 431, 437 (N.D. Cal. 1996) (rejecting claim that "warnings should have been more specific").

9        **(v)**    **Description of Chinese Regulations**

10       Baidu's 2019 annual report contained a description of CAC Order No. 5, one of China's internet

11   content regulations. (AC ¶ 125; ECF No. 41-2, Stmt. 11.) Plaintiff does not claim that this description was

12   inaccurate. Instead, Plaintiff claims that the description was misleading because Baidu did not tell the

13   market that it could not assure compliance with this regulation, and that Baidu's products and services

14   would likely be the subject of enforcement actions. (<u>AC</u> ¶ 126.)

15       These allegations fail for two reasons. <u>First</u>, Baidu's description of Order No. 5 did not state or

16   imply anything about Baidu's ability to comply with it, and Baidu thus had no duty to speculate as to its

17   future compliance prospects. <u>See</u> <u>Brody</u>, 280 F.3d at 1006; <u>In re Plains All Am. Pipeline, L.P. Sec. Litig.</u>,

18   307 F. Supp. 3d 583, 622 (S.D. Tex. 2018) (holding that accurate description of U.S. regulations made

19   "no representation about" issuer's compliance and was not actionable). <u>Second</u>, Baidu ***did*** expressly tell

20   the market that it could not assure compliance with Chinese internet content regulations, including Order

21   No. 5. (<u>See</u> Ex. A at 63 ("We cannot assure you that the PRC regulatory authorities would find that our . . .

22   business operations comply with PRC laws and regulations. . . .").) Plaintiff thus cannot claim that Baidu

23   somehow misled the market into thinking adverse regulatory actions were impossible or unlikely.

24       **(c)**    **Baidu Did Not Misrepresent Its Control Over Its Websites**

25       Plaintiff also challenges Baidu's statements in its 2018 and 2019 annual reports that Baidu "only

26   [has] contractual control over [its] websites." (ECF 41-2, Stmt. 1; Ex. A at 34; Ex. B at 29.) Plaintiff

27   alleges that these statements were misleading because "Baidu can and did exercise control over websites,

28   if not directly then through their wholly owned subsidiaries." (AC ¶¶ 86, 123.)

Contrary to Plaintiff's theory, Baidu's statement does not say that it does not control its websites. The statement discloses that Baidu *does* control its websites, but that Baidu has "contractual control," as opposed to ownership control. Read in context, the risk Baidu disclosed was not that it could not exercise control over its websites, but that it might not be able to control its websites *in the future*. The next sentence in the report after the "contractual control" statement is an explanation that Baidu does "not own the websites due to the restriction of foreign investment in businesses providing value-added telecommunications services in China, including online information services." (Ex. B at 29.) Earlier in report, Baidu explained that because it is a Cayman Islands company and the PRC government limits foreign ownership of domestic telecommunications companies, Baidu controls its Chinese subsidiaries (the entities that own Baidu's websites) through contractual arrangements rather than direct ownership. (See Ex. B at F-10–F-14.) Because Baidu does not directly own the websites, its control over the websites could someday be interrupted if the Chinese government passes laws that invalidate Baidu's contracts with its subsidiaries, or the contracts are breached (Ex. B at F-14-15 (if PRC authorities disapprove Baidu's ownership structure, "the Company may not be able to operate or control" its subsidiaries; id. at 25-26 (disclosing risk that subsidiaries could breach contracts); see also Ex. A at 30-31, F-12-F-17.)

Baidu never represented to investors that having only contractual control over its websites meant that it could not control the sites' content. To the contrary, Baidu explicitly stated that through its various agreements, it maintains a *de facto* "parent-subsidiary relationship" with the entities that own its websites, and it has "the power to direct the activities that most significantly impact the [subsidiaries'] economic performance." (Ex. B at F-10.) Because a reasonable investor reading *all* of Baidu's risk disclosures—and not just the ones Plaintiff cherry picked for his complaint—could not get the impression that Baidu lacked effective control over its websites, Plaintiff's claim fails. See SEB Inv. Mgmt. AB v. Align Tech., Inc., 2020 WL 5408056, at *7 (N.D. Cal. Sept. 9, 2020) (plaintiff may not "selectively ignore[]" the "surrounding context" of a statement or "cherry-pick portions of . . . statements and ignore other portions").

### B.   Plaintiff Fails to Plead Scienter For Any Statement

Plaintiff fails to allege scienter, a "mental state embracing intent to deceive, manipulate, or defraud." Nguyen, 962 F.3d at 414. To allege scienter under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with . . . no less than a degree

of recklessness that strongly suggests actual intent." <u>Glazer</u>, 549 F.3d at 742-43. In "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." <u>Tellabs, Inc. v. Makor Issues & Rts., Ltd.</u>, 551 U.S. 308, 323 (2007). The complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Id.</u> at 324. To impute scienter to Baidu, Plaintiff must first plead the scienter of Messrs. Li and Yu. <u>See In re NVIDIA Corp. Sec. Litig.</u>, 768 F.3d 1046, 1063 (9th Cir. 2014).

### 1.    Allegations Based On Individual Defendants' Positions Within Baidu Are Insufficient To Plead Scienter

Plaintiff alleges that by virtue of Messrs. Li's and Yu's senior positions at Baidu, they must have known that Baidu's public statements were false and misleading. (AC ¶¶ 32–34, 79–80, 107.) However, courts consistently conclude that they cannot infer scienter based on the defendants' positions alone. <u>See, e.g.</u>, <u>Metzler</u>, 540 F.3d at 1068 ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter."); <u>Zucco</u>, 552 F.3d at 1000 (rejecting allegation that "facts critical to a business's core operations . . . are so apparent that their knowledge may be attributed to the company and its key officers"); <u>Glazer</u>, 549 F.3d at 746 ("[G]eneral allegations of defendants' 'hands-on' management style . . . are insufficient to create a strong inference of scienter.").

Instead, Plaintiff must allege (i) facts that "suggest that defendants had actual access to the disputed information," or (ii) the "rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." <u>Intuitive</u>, 759 F.3d at 1062. Plaintiff makes no attempt to plead facts under either of these theories.

<u>First</u>, Plaintiff fails to allege that Mr. Li or Mr. Yu had actual access to information contradicting Baidu's statements. "Proof under this theory is not easy. A plaintiff must produce either specific admissions by . . . corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, or witness accounts demonstrating that executives had actual involvement in creating false reports." <u>Id.</u> "The Ninth Circuit has repeatedly rejected vague allegations of access to unspecified information." <u>Mahapatra v. Truecar, Inc.</u>, 2015 WL 12552062, at *2 (C.D. Cal. Dec. 9, 2015).

Plaintiff points to no "specific admissions" by Mr. Li or Yu of their "detailed involvement in the minutia of [Baidu's] operations," or "witness accounts demonstrating that [they] had actual involvement

22

in creating false reports." <u>Intuitive</u>, 759 F.3d at 1062; <u>see also</u> <u>Lipton v. Pathogenesis Corp.</u>, 284 F.3d 1027, 1035-36 (9th Cir. 2002) (no scienter where plaintiffs did not "identify any internal reports of 'sales data,' much less plead, in any detail, the contents of any such report"). Plaintiff assumes that Messrs. Li and Yu had notice of Baidu's noncompliance with regulations given their alleged close relationships with Communist Party officials. (AC ¶¶ 79–80, 87, 124.) However, the AC identifies no report, conversation, or meeting that provided Mr. Li or Yu with information, from the Communist Party or otherwise, providing such notice. Plaintiff alleges no facts showing, for example, that Mr. Li or Yu learned "content reviewers would knowingly publish ads with questionable content" or that "blacklisted keywords were not updated in a timely manner." (<u>Id.</u> ¶¶ 77, 78, 86.) Nor does Plaintiff allege facts showing that Mr. Li or Yu learned Baidu's staffing was insufficient to ensure compliance with content regulations. (<u>Id.</u> ¶ 75.)

Plaintiff's allegation that Messrs. Li and Yu must have been aware of Baidu's alleged compliance issues because of past interactions with Chinese regulators fails to show they had actual access to information contradicting Baidu's statements. (<u>Id.</u> ¶ 107.) Knowledge of past issues with regulators—which were satisfactorily resolved according to Plaintiff's own allegations—does not equate to knowledge of current problems. <u>See</u> <u>NVIDIA</u>, 768 F.3d at 1059 (knowledge of product failure did not mean defendants knew of company's responsibility for the failure); <u>Lululemon</u>, 14 F. Supp. 3d at 582 (prior quality issues with product did not support scienter when defendant believed issue had been resolved).

Plaintiff's assertion that Messrs. Li and Yu participated in creating Baidu's statements does not suggest they had actual access to information contradicting those statements. (AC ¶ 34.) Boilerplate allegations that a defendant played an unspecified role in preparing a statement fail to raise any inference of scienter. <u>Commc'ns Workers of Am. Plan for Emps.' Pensions & Death Benefits v. CSK Auto Corp.</u>, 2007 WL 951968, at *4 (D. Ariz. Mar. 28, 2007) (rejecting allegations that CEO "was responsible for the financial results and press releases issued by the Company"). Moreover, just because Messrs. Li and Yu played some role in preparing the statements does not mean they believed the statements were misleading. <u>See</u> <u>Rigel</u>, 697 F.3d at 883-84 (awareness of omitted information "not sufficient to allege . . . defendants believed that they were making false or misleading statements"); <u>Zucco</u>, 552 F.3d at 1000-01 (management's access to accounting numbers does not mean they knew numbers were manipulated).

<u>Second</u>, this is not the "'rare circumstance' in which it would be 'absurd' to suggest that

23

1  management was without knowledge" that Baidu's statements were allegedly misleading. Intuitive, 759

2  F.3d at 1063. Such circumstances arise only when "the information misrepresented is readily apparent" to

3  management because it concerns "prominent facts" that are "obvious from the operations of the company."

4  Zucco, 552 F.3d at 1001. Plaintiff has made no attempt to identify such "prominent facts" or explain how

5  such facts would necessarily demonstrate to Messrs. Li and Yu that Baidu's statements were misleading.

### 2.     Lack Of Motive Negates Any Inference Of Scienter

7          Plaintiff's scienter allegations also fail because even "a strong inference of scienter is negated when

8  there is an absence of stock sales or where such sales are minimal." In re Downey Sec. Litig., 2009 WL

9  2767670, at *13 (C.D. Cal. Aug. 21, 2009). In Rigel, the court concluded that the fact that no defendant

10  sold stock during the time "they would have benefitted from any . . . fraudulent statements" undermined

11  any inference of scienter. Rigel, 697 F.3d at 884-85. Here, likewise, Plaintiff does not allege that Mr. Li

12  or Yu sold stock at inflated prices or otherwise benefitted from any fraud. Thus, Plaintiff fails to allege

13  that Defendants had any reason to make false statements. Accordingly, it makes no sense to infer that

14  Baidu made any false statements deliberately. See In re Tibco Software, Inc., 2006 WL 1469654, at *21

15  (N.D. Cal. May 25, 2006) ("Plaintiffs have not even shown that Defendants were motivated to commit

16  fraud, much less that they acted with deliberate or reckless intent.").

17          Plaintiff's attempt to identify a motive for fraud fails. Plaintiff makes conclusory assertions that

18  Baidu was motivated to commit fraud because it was facing competitive and financial pressures. (See AC

19  ¶¶ 43, 45, 65, 67–68, 76, 111.) But *every* company faces competitive and financial pressures, which is

20  why such generic allegations are insufficient to plead scienter. See Webb v. Solarcity Corp., 884 F.3d 844,

21  856 (9th Cir. 2018) (motive allegations that defendants misrepresented issuer's financial condition to hide

22  unprofitability and keep stock price high "unhelpful"); Rigel, 697 F.3d at 884 ("[A]llegations of routine

23  corporate objectives . . . are not, without more, sufficient to allege scienter; to hold otherwise would

24  support a finding of scienter for any company that seeks to enhance its business prospects.").

### 3.     Viewed Holistically, Plaintiff's Scienter Allegations Fail To Raise An Inference of Scienter

26          Viewed holistically, Plaintiff's scienter allegations do not establish an inference of scienter that is

27  "cogent and at least as compelling as any opposing inference." Tellabs, 551 U.S. at 324. In conducting a

28  holistic inquiry, courts should not credit scienter allegations that do "not resonate in common experience."

24

1   <u>Nguyen</u>, 962 F.3d at 415. In <u>Nguyen</u>, plaintiff's "core theory" was that defendants made false statements

2   about their prospects for obtaining FDA approval for a product, knowing "based on their experience," that

3   the product would not be approved. <u>Id.</u> The Court rejected this theory because it depended on the idea

4   "that defendants would rather keep the stock price high for a time and then face the inevitable fallout once"

5   the FDA denied approval. <u>Id.</u> Without other allegations that defendants sought some personal benefit from

6   the alleged "scheme," the court found no inference of scienter. <u>See id.</u> at 415, 419.

7        Here, likewise, Plaintiff fails to explain why Baidu would misrepresent its ability to comply with

8   regulations if it knew the purported fraud would inevitably be discovered when the government took

9   enforcement action. This theory is particularly implausible given that neither Mr. Li nor Mr. Yu are alleged

10  to have sold Baidu ADSs or personally benefitted from the purported fraud. <u>See</u> <u>Nguyen</u>, 962 F.3d at 415.

11       Similarly, Plaintiff fails to explain why Baidu would have repeatedly warned investors of the risk

12  of adverse regulatory action if its goal were to create the impression that regulatory compliance was not

13  an issue. As Baidu disclosed, regulatory enforcement in China is unpredictable, "uncertain and in flux,"

14  and regulatory issues were a key risk to Baidu (AC ¶¶ 101, 111; Ex. A at 10; Ex. B at 9). In light of Baidu's

15  voluntary disclosure of the regulatory risks, <u>see</u> <u>supra</u> § III.A.1, as well as the public's awareness of

16  "CAC[] crackdowns" (AC ¶ 111), and the lack of any attempt by any Defendant to benefit from any

17  purported fraud, it is implausible that Messrs. Li and Yu intended to mislead investors about Baidu's

18  content monitoring measures. <u>See, e.g.</u>, <u>In re Wet Seal, Inc. Sec. Litig.</u>, 518 F. Supp. 2d 1148, 1172 (C.D.

19  Cal. 2007) (no scienter when allegedly misleading practice was disclosed). The more plausible inference

20  is that Baidu believed it could maintain compliance, particularly since, as Plaintiff acknowledges, Baidu

21  was usually able to resolve issues with regulators informally. (<u>See</u> AC ¶ 61); <u>Lululemon</u>, 14 F. Supp. 3d

22  at 582 (allegations that defendant knew of product issues "support[ed] the more reasonable inference that

23  [defendant] believed the statements she made" and "expected that these issues would be resolved").

24  **IV.    <u>CONCLUSION</u>**

25       For these reasons, the Court should dismiss the AC with prejudice.

26      DATED: November 2, 2020        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

27                    By:        */s/Virginia F. Milstead*

                                VIRGINIA F. MILSTEAD

28                                 *Attorneys for Defendant Baidu, Inc.*