Ramzi Abadou (SBN 222567)
KAHN SWICK & FOTI, LLP
912 Cole Street, # 251
San Francisco, California 94117
Telephone: (415) 459-6900
Facsimile: (504) 455-1498
ramzi.abadou@ksfcounsel.com

*Lead Counsel for Lead Plaintiff
and the Putative Class*

*[Additional counsel on signature page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

|  |  |
|---|---|
| ROGER A. IKEDA, Individually and On Behalf of All Others Similarly Situated, | Case No. 5:20-CV-2768-LHK-VKD |
| Plaintiff, | **LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS** |
| v. | <u>**CLASS ACTION**</u> |
| BAIDU, INC., YANHONG LI, and CHENG-CHUN YU, | Judge:      Hon. Lucy H. Koh<br>Date:       March 4, 2021<br>Time:       1:30 p.m.<br>Courtroom: 8 – 4th Floor |
| Defendants |  |

## **TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................1

II.  STATEMENT OF FACTS ...............................................................................4

    A.  Baidu's Online Marketing Services are Critical to the Company's Operations .....4

    B.  Chinese Authorities Sanctioned Baidu before the Class Period ............................4

    C.  Baidu Recklessly Concealed Compliance Issues During the Class Period .............5

III.  LEGAL STANDARDS ..................................................................................8

IV.  ARGUMENT .................................................................................................9

    A.  Defendants' False and Misleading Class Period Statements Are Actionable..........9

        1.  The Company's Statements about Compliance with PRC Law Were Materially Misleading (Statements 2 & 10)..................................................9

        2.  Defendants Materially Misrepresented Baidu's Ability to Filter Illicit Content on its Platform (Statements 4-6)...................................................13

        3.  Defendants' Search Reliability Statements are Actionable (Statement 8) ...............................................................................................14

        4.  Defendant's Risk Disclosures Are Actionable (Statements 9 & 11) .........15

        5.  Baidu's Boilerplate Risk Warnings Are Actionable (Statements 3 & 7)...18

    B.  The Complaint Adequately Pleads Scienter ........................................................20

V.  CONCLUSION................................................................................................24

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**Cases** **Page(s)**

4

*Amgen Inc. Sec. Litig.*,
    2014 U.S. Dist. LEXIS 183034 (C.D. Cal. 2014) ........................................................ 3

5

6

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (C.D. Cal. 2013) ....................................................................................... 3

7

*Apple Sec. Litig.*,
    2020 U.S. Dist. LEXIS 206298 (N.D. Cal. 2020) .................................................. 21, 23

8

9

*Asay v. Pinduoduo Inc.*,
    2020 U.S. Dist. LEXIS 56179 (S.D.N.Y. 2020) ........................................................... 11

10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................................................... 8

11

12

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ............................................................................ 2, 17, 20

13

14

*Binder v. Gillespie*,
    184 F.3d 1059 (9th Cir. 1999) ....................................................................................... 8

15

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
    2020 U.S. Dist. LEXIS 141724 (N.D. Cal. 2020) .................................................. 12, 15

16

17

*Commc'ns. Workers of Am. Plan for Emps. Pensions & Death Bens. v. CSK Auto Corp.*,
    525 F. Supp. 2d 1116 (D. Ariz. 2007) .......................................................................... 8

18

19

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*,
    660 F.3d 1170 (9th Cir. 2011) ....................................................................................... 3

20

*Desaigoudar v. Meyercord*,
    223 F.3d 1020 (9th Cir. 2000) ....................................................................................... 9

21

22

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ....................................................................................................... 8

23

*Flynn v. Sientra, Inc.*,
    2016 U.S. Dist. LEXIS 83409 (C.D. Cal. 2016) ............................................... 16, 20, 21

24

*Goldsmith v. Weibo Corp.*,
    2018 U.S. Dist. LEXIS 95592 (D.N.J. 2018) .............................................................. 10

25

26

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
    189 F.3d 971 (9th Cir. 1999) ....................................................................................... 12

27

*In re Amgen Inc. Sec. Litig.*,
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) ........................................................................ 3

28

*In re Apple Sec. Litig.*,
    2020 U.S. Dist. LEXIS 96953 (N.D. Cal. 2020) ............................................ 14

*In re Atossa Genetics Inc. Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017) ............................................ 14, 17

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015) ............................................ 9, 11

*In re BofI Holding, Inc. Secs. Litig.*,
    2017 U.S. Dist. LEXIS 79062 (S.D. Cal. 2017) ............................................ 9

*In re Complete Mgmt. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001) ............................................ 21

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ............................................ 22

*In re Daou Sys.*,
    411 F.3d 1006 (9th Cir. 2005) ............................................ 20, 21

*In re Enron Corp. Secs., Litig*,
    2003 U.S. Dist. LEXIS 1668 (S.D. Tex. 2003) ............................................ 4

*In re Enzymotec Secs. Litig.*,
    2015 U.S. Dist. LEXIS 167403 (D.N.J. 2015) ............................................ 12-13

*In re Eventbrite, Inc. Sec. Litig.*,
    2020 U.S. Dist. LEXIS 74651 (N.D. Cal. 2020) ............................................ 17

*In re Facebook, Inc.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013) ............................................ 2, 18

*In re Immucor, Inc.*,
    2011 U.S. Dist. LEXIS 73279 (N.D. Ga. 2011) ............................................ 10

*In re Lason Secs. Litig.*,
    143 F. Supp. 2d 855 (E.D. Mich. 2001) ............................................ 21

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ............................................ 8

*In re LeapFrog Enters., Inc. Sec. Litig.*,
    527 F. Supp. 2d 1033 (N.D. Cal. 2007) ............................................ 16

*In re LendingClub Sec. Litig.*,
    254 F. Supp. 3d 1107 (N.D. Cal. 2017) ............................................ 15

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) ............................................ 23

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ............................................ 23

*In re Nw. Biotherapeutics Inc. Secs. Litig.*,
    2008 U.S. Dist. LEXIS 54028 (W.D. Wash. 2008) ........................................... 22

*In re PetroChina Co.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015) ........................................................ 11

*In re Rigel Pharm., Inc. Sec. Litig*,
    697 F.3d 869 (9th Cir. 2012) ................................................................ 15

*In re Sina Sec. Litig.*,
    2006 U.S. Dist. LEXIS 71089 (S.D.N.Y. 2006) ............................................. 13

*In re Snap Sec. Litig.*,
    2018 U.S. Dist. LEXIS 97704 (C.D. Cal. 2018) ............................................. 17

*In re Textainer P'ship Sec. Litig.*,
    2005 U.S. Dist. LEXIS 40974 (N.D. Cal. 2005) ............................................. 12

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) ....................................................... 21

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ................................................................ 24

*In re Violin Memory Sec. Litig.*,
    2014 U.S. Dist. LEXIS 155428 (N.D. Cal. 2014) ........................................... 17

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2017 U.S. Dist. LEXIS 112977 (N.D. Cal. 2017) ........................................... 16

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2018 U.S. Dist. LEXIS 34873 (N.D. Cal. 2018) ............................................ 16

*In re Xunlei Ltd. Secs. Litig.*,
    2019 U.S. Dist. LEXIS 154010 (S.D.N.Y. 2019) ........................................... 11

*In re Yukos Oil Co. Sec. Litig.*,
    2006 U.S. Dist. LEXIS 78067 (S.D.N.Y. 2006) ............................................. 10

*In re Zillow Grp., Inc. Sec. Litig.*,
    2019 U.S. Dist. LEXIS 67197 (W.D. Wash. 2019) .......................................... 23

*Jiajia Luo v. Sogou, Inc.*,
    465 F. Supp. 3d 393 (S.D.N.Y. 2020) ................................................... 13, 18

*Jasin v. Vivus, Inc.*,
    2016 U.S. Dist. LEXIS 52388 (N.D. Cal. 2016) ............................................ 17

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ......................................................... *passim*

*Lefter v. Yirendai Ltd.*,
    2017 U.S. Dist. LEXIS 105246 (C.D. Cal. 2017) ........................................... 15

*Matrixx Initiatives, Inc. v. Siracusano*,
   131 S. Ct. 1309 (2011) ......................................................................................... 20

*Meyer v. JinkoSolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014) ................................................................................ 18

*MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................. 21

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ................................................................................. 1

*Mulderrig v. Amyris, Inc.*,
   2020 U.S. Dist. LEXIS 185382 (N.D. Cal. 2020) ............................................... 21

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ............................................................................... 21

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) .......................................................................... 21, 24

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ........................................................................ 14, 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ............................................................................................ 3-4

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ............................................................................... 3

*Rapoport v. Asia Elecs. Holding Co.*,
   88 F. Supp. 2d 179 (S.D.N.Y. 2000) ................................................................... 10

*Rumbaugh v. USANA Health Scis., Inc.*,
   2018 U.S. Dist. LEXIS 179352 (D. Utah 2018) .................................................. 10

*S. Ferry LP #2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009) .......................................................... 22

*S. Ferry LP v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ............................................................................... 20

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ............................................................................... 14

*SEC v. Jackson*,
   908 F. Supp. 2d 834 (S.D. Tex. 2012) ................................................................ 10

*Sec. & Exhange Comm'n v. Steve Qi & Law Offices of Steve Qi & Assocs.*,
   2018 U.S. Dist. LEXIS 239178 (C.D. Cal. 2018) ................................................. 9

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) .............................................................. 22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ................................................................ 2, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................ 8, 20

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*,
  655 F.3d 1039 (9th Cir. 2011) ...................................................................... 3

*Zeid v. Kimberley*,
  930 F. Supp. 431 (N.D. Cal. 1996) ............................................................. 16

*Zelman v. JDS Uniphase Corp.*,
  376 F. Supp. 2d 956 (N.D. Cal. 2005) .......................................................... 3

**Statutes**

15 U.S.C. § 78j (§ 10(b)) ................................................................................... 8

15 U.S.C. § 78t (§ 20(a)) ................................................................................. 24

15 U.S.C. § 78u-4 (PSLRA) .............................................................................. 8

**Rules**

Fed. R. Civ. P. 12 ............................................................................................... 8

### <u>STATEMENT OF ISSUES TO BE DECIDED</u>

1.      Whether the Amended Complaint for Violations of the Federal Securities Laws ("Complaint") alleges facts giving rise to a strong inference that Defendants made materially false and misleading statements and/or omissions with the requisite scienter between March 16, 2019 and April 7, 2020, inclusive (the "Class Period"). *See In re VeriFone Holdings, Inc. Sec. Litig.,* 704 F.3d 694 (9th Cir. 2012).

2.      Whether Baidu's Class Period statements about: (i) its compliance with Chinese regulations; (ii) its strong ability to filter content; (iii) the reliability of its search results; and (iv) its purported risk warnings were rendered materially misleading by its simultaneous failure to disclose the contemporaneous regulatory actions against the Company in its filings with the Securities and Exchange Commission ("SEC"). *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322 (2011).

3.      Whether the Complaint adequately pleads "control person" liability under §20(a). *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945-46 (9th Cir. 2003).

1

## I.     INTRODUCTION

2         Defendant Baidu, Inc. ("Baidu" or the "Company") owns and operates one of the largest

3   internet companies in the People's Republic of China ("PRC") and has a long record of being

4   sanctioned by the Cyberspace Administration of China ("CAC"). Throughout the Class Period,

5   Defendants knew or recklessly disregarded that the Company's revenue and competitive market

6   position benefited from enabling or allowing its users to find illicit content, like pornography, on

7   Baidu's platforms. *See* ¶¶11, 100 (Defendant Li: "our AI-power algorithms help male users on the

8   Baidu platform find interesting content"); *see also* ¶104 (Chinese regulators noting that Baidu's

9   "behavior in the search field . . . put the company's interest above social interest[.]").[1] At the same

10  time, Defendants knew or deliberately disregarded that the PRC forbade dissemination of such content.

11  ¶¶63-74. Plaintiff alleges that Defendants misled investors by materially overstating Baidu's ability

12  (and willingness) to adhere to Chinese censorship policies. ¶12. Indeed, throughout the Class Period,

13  Defendants concealed punitive CAC enforcement actions against the Company from investors, which

14  materially obscured Baidu's risk profile. ¶¶101, 104, 110.

15        Baidu's motion to dismiss (ECF No. 50, "Mot.") argues that their proffered "context" rendered

16  the materially misleading statements alleged in the Complaint technically correct. Mot. at 12, 16-17.

17  Even if this were true, the federal securities laws require more than technical accuracy.[2] *Khoja v.*

18  *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1015 (9th Cir. 2018). "[T]he disclosure required by the

19  securities laws is measured not by literal truth, but by the ability of the material to accurately inform

20  rather than mislead prospective buyers." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

21  Here, Baidu failed to accurately inform investors about ***actual*** regulatory sanctions it faced for hosting

22  illicit material on its platform, and the risks that more would follow. For instance, Baidu repeatedly

23  claims that the Company's representation that: "in the opinion of its legal counsel, Baidu 'compl[ied]

24

25

26  [1]     All "¶" and "¶¶" references are to the Amended Class Action Complaint (ECF No. 41, "Complaint"). All emphasis added and internal citations and quotations omitted.

27  [2]     Only Baidu moved to dismiss. Notably, Defendants Li and Yu have yet to accept service of the Complaint in this matter.

28

1   with current PRC laws and regulations in all material respects'" could not mislead investors when read

2   in context. Mot. at 12. Plaintiff disagrees. The Complaint clearly alleges that Baidu concealed two

3   CAC enforcement actions from investors during the Class Period, while simultaneously touting its

4   regulatory compliance *via* its own outside counsel. ¶¶13-14, 86, 94, 103-104, 106, 110, 112, 118, 123.

5   The Complaint also alleges that the majority of Baidu's revenue was generated by online marketing.

6   ¶¶8, 45, 82. While the Company admitted that this revenue stream ***might*** be jeopardized if it failed to

7   comply with the PRC's strict censorship standards, its vague warnings about hypothetical risks wholly

8   failed to disclose that these risks had already materialized. *Berson v. Applied Signal Tech., Inc.*, 527

9   F.3d 982, 986 (9th Cir. 2008) ("[T]he [SEC filing], moreover, speaks entirely of as-yet-unrealized

10  risks and contingencies. Nothing alerts the reader that some of these risks may already have come to

11  fruition . . . ."); ¶¶83, 120. Ultimately, on April 7, 2020, the CAC announced that it was suspending

12  several Baidu channels indefinitely, pending rectification. ¶129. That revelation caused an estimated

13  half a billion dollars in damages to the putative class.[3] *Id.*

14       Baidu nevertheless raises four specific dismissal arguments. ***First***, Baidu claims that its risk

15  warnings totally shield the Company from liability. Nowhere in the Company's risk disclosures,

16  however, did the Company acknowledge that its reliance on pornography and other illegal content to

17  generate revenue caused the CAC to twice sanction the Company during the Class Period ***prior*** to

18  April 7, 2020. ¶¶13-14, 50, 78, 100, 104, 110; *see Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d

19  1167, 1172-81 (9th Cir. 2009) ("risk factors" that have already "come to fruition" found actionable);

20  *In re Facebook, Inc.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("risk disclosures are misleading

21  where the company warns only that a risk may impact its business when that risk has already

22  materialized"). While Defendant frames this issue as one having to do with accusing itself of fraud,

23  Plaintiff contends that Baidu was required to disclose these negative material developments to

24  investors, or refrain from misrepresenting its purportedly strong regulatory compliance efforts. ¶¶13-

25  14, 86, 94, 103-104, 106, 110, 112, 118, 123.

26

27  ─────────────

28  [3]     Baidu does not contest loss causation.

1    ***Second***, Defendant raises a "truth-on-the-market" defense. Mot. at 14. "As a general rule, the

2    truth-on-the-market defense is intensely fact-specific, so courts rarely dismiss a complaint on this

3    basis." *In re Amgen Inc. Sec. Litig*., 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008); *Amgen Inc. v. Conn.*

4    *Ret. Plans & Tr. Funds*, 568 U.S. 455, 481-82 (C.D. Cal. 2013) ("proof of that sort is a matter for trial

5    . . . ."). This is because "the truth-on-the-market defense is a method of refuting an alleged

6    misrepresentation's materiality." *Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1177

7    (9th Cir. 2011). Furthermore, to ultimately succeed on this defense, Baidu "must prove that the

8    information that was withheld or misrepresented was transmitted to the public with a degree of

9    intensity and credibility sufficient to effectively counterbalance any misleading impression created by

10   [the] insider's one-sided representations." *Amgen Inc. Sec. Litig.*, 2014 U.S. Dist. LEXIS 183034, at

11   *50 (C.D. Cal. 2014) (quoting *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996)). Even at

12   this stage, Baidu falls far short of meeting that standard.

13   ***Third***, Baidu asks the Court to ignore the Complaint's allegations of pre-Class Period

14   wrongdoing, stating that: "[k]nowledge of past issues with regulators does not equate to knowledge of

15   current problems." Mot. at 23. In making this argument, Baidu ignores that, "[w]hile the scienter itself

16   must be contemporaneous with the alleged misstatements, facts supporting the inference of scienter

17   will not always be." *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 971-72 (N.D. Cal. 2005);

18   *see  also WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1052-53 (9th Cir. 2011)

19   (crediting pre-Class Period scienter allegations). The Company's pre-Class Period history of failing to

20   satisfy PRC regulations (¶¶63-74) supports Plaintiff's allegations that Defendants either knew or were

21   deliberately reckless in not knowing that, during the Class Period, Baidu was not only noncompliant

22   with Chinese regulations, but suppressed these material developments from investors. ¶¶104-105, 110,

23   112, 117.

24   ***Fourth***, Baidu argues that its representations about the Company's legal compliance were just

25   "opinions." Mot. at 12-14. The distinct pleading standards for opinion statements, however, apply

26   when a speaker's ***own*** beliefs are at issue. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*

27   *Pension Fund*, 575 U.S. 175, 179 (2015) ("two sentences in the registration statement expressed

28

[defendant's] view of its compliance with legal requirements"). Here, by contrast, Baidu provided its *legal counsel's* advocacy that Baidu was complying with all applicable PRC regulations. *See*, *e.g.*, ¶¶86, 123. The federal securities laws, however, "prevent persons from evading liability . . . by employing others to act in their stead." *In re Enron Corp. Secs., Litig*, 2003 U.S. Dist. LEXIS 1668, at *44 n.22 (S.D. Tex. 2003). Accordingly, and for all the reasons set forth herein, Baidu's motion to dismiss should be denied.

## II.    STATEMENT OF FACTS

### A.    Baidu's Online Marketing Services are Critical to the Company's Operations

Baidu is the second largest search engine in the world, and offers a variety of mobile applications, including search, personalized news feed, social media, and user generated video sharing. ¶6. Baidu's "Core" business segment generates most of the Company's revenue by monetizing products through auction-based pay for performance ("P4P") online marketing services. ¶¶45-46. In its 2019 fiscal year, more than 72% of the Company's revenue was derived from online marketing, and the Company faced stiff competition from other leading internet companies seeking a larger share of China's digital advertising market. ¶45. Notably, and due at least in part to the Company's repeated regulatory compliance failures, a competitor called ByteDance recently supplanted Baidu as the second-largest digital advertising platform in China. ¶111.

At all relevant times, Defendant Li simultaneously served as the Company's Co-Founder, Chairman of the Company's Board of Directors, and Chief Executive Officer ("CEO"), and oversaw Baidu's search operations during the Class Period. ¶¶27-28. As of May 2018, Defendant Li simultaneously served as Vice President of the China Federation of Internet Societies ("CFIS"), an internet organization directly supervised by the CAC. ¶79. Defendant Yu has served as the Company's Chief Financial Officer ("CFO") since September 17, 2017 (¶29) and, prior to joining Baidu, served as CFO of a Chinese social media company. *Id.*

### B.    Chinese Authorities Sanctioned Baidu before the Class Period

China's State Internet Information Office ("SIIO") and CAC have repeatedly sanctioned Baidu for hosting illicit content. ¶63. The Company was "severe[ly] punish[ed]" in January 2009 for allowing

1    its users to find and access pornography. ¶63. In 2014, Chinese regulators again ordered the Company

2    to remove pornographic content from its platforms. *Id.* In March 2015, the Chinese government fined

3    Baidu for disseminating pornographic novels and for carrying online publications without the requisite

4    permits. *Id.* In January 2016, the SIIO ordered regulators to sanction Baidu for, *inter alia*, hosting

5    forums containing pornography and fraudulent advertisements. ¶64.

6        On May 6, 2016, the Chinese authorities again fined Baidu and suspended the Company's

7    cloud storage services for storing and selling pornographic videos. ¶69. In August 2017, the CAC

8    again investigated Baidu for hosting illicit content and levied the maximum fine available. *Id*. On

9    November 16, 2018, the CAC ordered Baidu and other Chinese social media platforms to remove,

10   *inter alia*, pornography from their platforms. ¶¶70-71. On January 3, 2019, the CAC ordered a one-

11   week suspension for some of Baidu's platforms after finding that they were spreading vulgar content,

12   citing the need for the Company to perform "deeper rectification." ¶71. Chinese authorities have also

13   sanctioned Baidu for publishing and promoting fraudulent content for the Company's own financial

14   gain. ¶¶64-67, 96.

15       **C.    Baidu Recklessly Concealed Compliance Issues During the Class Period**

16       The Class Period begins on March 16, 2019 with the filing of Baidu's 2018 Annual Report

17   ("2018 AR"), which represented that increases in Baidu's online marketing revenue in 2018 were

18   "mainly due to strength in education, franchising, personal care, and business services sectors." ¶¶82-

19   83. The 2018 AR contained purported risk disclosures, such as: "we cannot assure you that the PRC

20   government would agree that our contractual arrangements comply with PRC licensing, registration

21   or other regulatory requirements . . .[,]" but also assured investors that Baidu's outside counsel opined

22   that its business operations "***compl[ied] with current PRC laws and regulations in all material***

23   ***respects***." ¶¶84-87.

24       Baidu announced its first quarter results on May 16, 2019—a several week delay from its

25   historical April first quarter earnings announcements. ¶¶88-89. While the Company provided no

26   explanation for the delay, the earnings release was notable for two additional reasons: (i) the

27   Company's growth was significantly slowing; and (ii) the Company's Senior Vice President of Search

28

1  suddenly and unexpectedly resigned. *Id*. Subsequently, Defendant Li and his wife, Dongmin "Melissa"

2  Ma, began to personally oversee Baidu's Search and Feed sales operations. ¶97. During the 1Q19

3  earnings call on May 17, 2019, Defendant Li lauded Baidu's regulatory compliance stating that, while

4  the Chinese government was exercising "tighter government scrutiny on content," "we are

5  strengthening our vertical offerings such as health care and online literature, *filtering out poor and*

6  *questionable content* with Baidu AI." ¶94. But in a tacit acknowledgment that such "questionable"

7  content remained on the Company's platform, Defendant Li also stated that: "our AI-power algorithms

8  help *male users* on the Baidu platform *find interesting content* in the social commerce company's

9  Smart Mini Program . . . . " ¶100. In the wake of these disclosures, analysts noted that one of the "key

10  risks" to Baidu was "[r]egulatory risks leading to ad clean-up in other verticals." ¶101.

11       Such "interesting content" triggered the ire of the CAC, which a few weeks later condemned

12  Baidu for disregarding "social order and morality" and ordered Baidu to "rectify the issues

13  fundamentally, and remove such advertisements completely." ¶104. The following week, the

14  Company issued a public statement representing that: "Baidu search has cleaned up more than 2 billion

15  pieces of harmful information that is mainly harmful to social security and other illegal categories."

16  ¶103. Absent from the Company's statement, however, was any reference to the CAC's order, which

17  stemmed from a consumer complaint based on a Baidu Feed advertisement *created and reviewed*

18  *internally at Baidu*. ¶¶104-105.

19       In an August 19, 2019 press release, Baidu announced its financial results for the second

20  quarter fiscal year 2019 ending June 30, 2019 ("2Q19"). ¶106. The 2Q19 Press Release again

21  highlighted the Company's ability to filter questionable content, representing that: "[i]n the first half

22  of 2019, Baidu's AI filtered over one billion misleading, low-quality ad materials and tens of billions

23  of *offensive, inappropriate images, texts, videos, and weblinks*." *Id.* While perhaps technically

24  accurate, the accompanying 2Q19 Quarterly Report failed to disclose the CAC's June 2019 "social

25  order and morality" admonishment thereby rendering Defendants' statement materially misleading.

26  *Id.* On August 20, 2019, an analyst noted that it was "[u]nlikely" that Baidu could maintain advertising

27  market share, partly "due to market-wide macro and regulatory uncertainty." ¶108.

28

In early 2020, Baidu fired its senior content reviewer—who was responsible for overseeing almost the entirety of its 2,000 content reviewers—and replaced him with someone far less experienced. ¶¶16, 110. The new replacement failed to coordinate with regulatory authorities, triggering yet more sanctions from the CAC on February 5, 2020. ¶110. On February 28, 2020, the Company hosted an earnings conference call with investors to discuss Baidu's Fourth Quarter and Full Year 2019 earnings results, where Defendant Yu described the impact the coronavirus pandemic had on Baidu's outlook, stating: "[a]s a result of the coronavirus outbreak . . . the rebound for online marketing after Chinese New Year has been slow this year." ¶¶113-114. During the same call, Defendant Yu represented that "the users are going to come here because this is where they can verify more reliable information." ¶116.[4] At no point during the call did Defendants acknowledge that, only weeks earlier, the Company had been sanctioned by the CAC for posting what PRC authorities viewed as illegal information about the coronavirus. ¶117.

On March 13, 2020, the Company filed its 2019 Annual Report ("2019 AR"), which, like the 2018 AR, included several purported risk disclosures, including one obliquely warning that: "*we have been and may be* subject to penalties in the future for violations of those regulations arising from information displayed on or linked to our websites or mobile apps, including a suspension or shutdown of our online operations." ¶¶119-120. In doing so, Defendants concealed the CAC's February 2020 Order that specifically required the Company to "stop actions violating laws and regulations, and conduct deep rectification." ¶¶110, 124. The 2019 AR included an additional statement about regulations promulgated by the CAC in December of 2019, acknowledging that: "each network information content service platform is required, among others, not to disseminate any information prohibited by laws and regulations, such as information jeopardizing national security." ¶125. The 2019 AR, however, failed to disclose that Baidu's flawed registration management system allowed

---

[4]    Baidu claims that Plaintiff wrongly attributed this statement to Defendant Yu. Mot. at 18 n.6. Baidu is incorrect. While Defendant Li similarly touted Baidu's coronavirus-related information as reliable during that same call, Defendant Yu made this particular statement. ¶¶113, 116; *see* ECF No. 52 at 87.

1   users to illegally publish illicit content under others' names. ¶126.

2        On April 2, 2020, just five days before the end of the Class Period, Baidu announced a public

3   offering of *$1 billion* in senior bond notes on the Singapore Stock Exchange. ¶128. On April 7, 2020,

4   the CAC publicly announced that it had found "serious violations of multiple channels on Baidu App"

5   and ordered the suspension of several Baidu channels starting the next morning. ¶129. On this news,

6   Baidu's share price fell $4.46 per share on massive trading volume of over 10 million shares traded,

7   damaging investors. *Id.* In response, Barclays lowered its price target to $132 (from $150) based, in

8   part, on "increasing uncertainty from government regulation, as multiple news feed channels of Baidu

9   app remain suspended." ¶139.

10  **III.    LEGAL STANDARDS**

11       In assessing a Fed. R. Civ. P. 12(b)(6) motion in a Private Securities Litigation Reform Act

12  ("PSLRA") case, courts consider the complaint in its entirety, "accept all factual allegations . . . as

13  true" and construe them in the light most favorable to plaintiff. *Tellabs, Inc. v. Makor Issues & Rights,*

14  *Ltd.,* 551 U.S. 308, 322 (2007); *see Commc'ns. Workers of Am. Plan for Emps. Pensions & Death*

15  *Bens. v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007). The question is not whether a

16  plaintiff will prevail in the action, but whether she is entitled to offer evidence in support of her claim.

17  *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1241 (N.D. Cal. 2008). A complaint should not

18  be dismissed if it contains sufficient factual matter that, accepted as true, states a claim for relief that

19  is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 884 (2009).

20       To state a §10(b) claim under the Exchange Act of 1934, a plaintiff must allege: (i) a false

21  statement or omission; (ii) of material fact; (iii) made with scienter; (iv) on which the plaintiff

22  justifiably relied; and (v) that proximately caused the alleged loss. *See Binder v. Gillespie*, 184 F.3d

23  1059, 1063 (9th Cir. 1999); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Falsity is

24  adequately alleged by "specify[ing] each statement alleged to have been misleading" and "the reason

25  or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). Here, the Complaint

26  sufficiently pleads falsity because it identifies: (i) each statement or omission alleged to have been

27  misleading, who made it, and when (¶¶86, 90, 94, 103, 106, 112-116, 119-120, 123, 125); (ii) the

28

1    reason or reasons why the statement or omission is misleading (¶¶87, 91, 99, 105, 107, 117, 121-122,

2    124, 126-127); and (iii) all facts on which that belief is formed (¶¶5-19, 27-85, 88-89, 92-93, 95-98,

3    100-102, 104, 108-111, 118, 128-129, 138-142); *see Desaigoudar v. Meyercord*, 223 F.3d 1020, 1023

4    (9th Cir. 2000). Plaintiff therefore plainly identifies the "who, what, when, where, and how" for each

5    of Defendants' false statements and omissions. *See Sec. & Exhange Comm'n v. Steve Qi & Law Offices*

6    *of Steve Qi & Assocs.,* 2018 U.S. Dist. LEXIS 239178, at *8 (C.D. Cal. 2018).

7    **IV.    ARGUMENT**

8        **A.    Defendants' False and Misleading Class Period Statements Are Actionable**

9            **1.    The Company's Statements about Compliance with PRC**
               **Law Were Materially Misleading (Statements 2 & 10)**

10

11        The Company's 2018 and 2019 Annual Reports assured investors that Baidu was complying

12   with PRC cyberspace laws, regulations and policies by providing its own legal counsel's conclusion

13   that the Company's business units "compl[ied] with current PRC laws and regulations in all material

14   respects." ¶¶86, 123 (Statements 2 and 10). These statements were materially misleading when made

15   because they failed to disclose specific investigations by the CAC, Baidu's inadequate staffing to filter

16   illicit content on the Company's platforms and its reckless content review protocols. *See In re*

17   *BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 728-29 (S.D.N.Y. 2015) (legal compliance statement

18   may be deemed misleading if "it is formed on the basis of an omitted fact, not disclosed by the speaker,

19   that would likely conflict with a reasonable investor's own understanding of the facts conveyed by

20   that statement."); *see also In re BofI Holding, Inc. Secs. Litig.*, 2017 U.S. Dist. LEXIS 79062, at *32-

21   33 (S.D. Cal. 2017) (compliance statements deemed actionable).

22       Contrary to Baidu's assertion, the Complaint adequately alleges that the Company faced an

23   onslaught of content generated by third parties. ¶¶8, 43, 72. The sheer volume of data on its platforms

24   overwhelmed Baidu's inadequately staffed content review division, which had insufficient time to

25   review and screen out prohibited materials before publication. ¶49. Baidu similarly failed to timely

26   update its content review standards and black-list keywords to identify all prohibited content, resulting

27   in illicit content slipping past harried reviewers. ¶¶48-49. Baidu did not disclose that its compliance

28   capacity had been materially degraded by its operational challenges. ¶¶48-50. Baidu also faced PRC

1    scrutiny for its inability or unwillingness to screen problematic content in two separate instances just

2    months prior to filing its 2018 and 2019 Annual Reports. ¶¶71, 73-74, 86, 110, 123.

3            Defendant's argument that these (and other statements) fail because "Plaintiff is required to

4    identify and provide translations of the specific regulatory provisions Baidu supposedly violated" (*see*

5    Mot. at 10) is incorrect. Where the "contents of [foreign] law are relevant as facts," a plaintiff "must

6    plead some facts that would render plausible its allegation" about the underlying laws at issue. *SEC v.*

7    *Jackson*, 908 F. Supp. 2d 834, 858 n.15 (S.D. Tex. 2012). Here, the Complaint exceeds this standard

8    with its detailed allegations about Chinese internet laws (¶¶51-59) and the Chinese government's

9    repeated sanctions against Baidu for violating them (¶¶61-72, 104, 110). *Cf. Rapoport v. Asia Elecs.*

10   *Holding Co.*, 88 F. Supp. 2d 179, 185 (S.D.N.Y. 2000) ("[T]he amended complaint does not identify

11   any portion of Chinese law that Defendants have transgressed or even articulate a basic description of

12   how Plaintiffs allegedly committed the violation."). While Baidu suggests that such laws are nebulous

13   and unpredictable (Mot. at 11), the omissions alleged here do not pertain to arcane or novel regulatory

14   schemes. Rather they pertain to basic failures to maintain a regulatory compliance program consistent

15   with specific PRC enforcement priorities. ¶¶47-50, 70-74.[5]

16           Defendant's reliance on *Goldsmith v. Weibo Corp* is misplaced. 2018 U.S. Dist. LEXIS 95592,

17   at *28-29 (D.N.J. 2018). There, defendant affirmatively represented that it ***did not*** hold a license and

18   was ***not*** in compliance with PRC laws. Here, by contrast, the Complaint alleges that Baidu

19   affirmatively represented that it did ***comply*** with PRC laws, when it was regularly found in violation

20   of content policies.[6] *In re Immucor, Inc.*, 2011 U.S. Dist. LEXIS 73279, at *13-15 (N.D. Ga. 2011) is

21

22   _____

     [5]      Defendant's cases do not provide otherwise. In *Rumbaugh v. USANA Health Scis., Inc.*, 2018

23   U.S. Dist. LEXIS 179352, at *17 (D. Utah 2018), plaintiff did not allege that Chinese authorities
     concluded that the defendant was engaged in improper activity or required defendant to change its

24   business practices. Similarly, in *In re Yukos Oil Co. Sec. Litig.*, 2006 U.S. Dist. LEXIS 78067, at *43
     (S.D.N.Y. 2006), the allegations presented no basis to find that a purported "tax scheme" ran afoul of

25   Russian law. In contrast, here, Plaintiff alleges Class Period instances where the CAC sanctioned
     Baidu for hosting illegal content. ¶¶101, 110.

26
     [6]      Defendant contends that the Complaint "does not allege that Baidu did not become compliant"

27   between the date of the government action and publication of the 2018 Annual Report. Mot. at 14-15.
     But the converse is also true—Baidu itself never indicated that it had rectified its problems.

28

also inapposite because there, while defendant allegedly failed to disclose an antitrust price fixing conspiracy, plaintiff never pled any facts demonstrating an agreement to fix prices; *Cf In re PetroChina Co.*, 120 F. Supp. 3d 340, 356 (S.D.N.Y. 2015) (complaint's "primary defect" was reliance on corruption allegations occurring after defendants made statements at issue in their annual reports).

In March 2019, Baidu itself acknowledged that, *if* its websites "contain[ed] information that government authorities find objectionable, our platform or relevant products *may be* shut down and we *may be* subject to other penalties." ¶83. These high-stakes consequences underscore Baidu's motive to assure investors about its compliance with PRC law while concealing from shareholders and U.S. securities regulators the CAC's increasingly punitive actions against it. ¶¶86, 110, 117, 121. Baidu also claims the CAC's February 5, 2020 reprimand is insignificant because the Company was not fined or shutdown. Mot. at 15. This is beside the point because the CAC found that Baidu was "violating law" and ordered it "to conduct deep rectification" (¶14), contradicting Baidu's representation that it "complied materially with PRC laws."[7] The Company's disclosure that it "may not be aware of any potential violation of these policies and rules until they are enforced" (*see* Mot. at 11) was wholly inadequate to warn investors given that the CAC had *already* placed Defendants on notice of its violations. *See BioScrip.*, 95 F. Supp. 3d at 728 (purported warning that a company could make "no assurance that [it] will not receive subpoenas or be requested to produce documents in pending investigations," rendered misleading by the fact it had "received just such a request.").[8] Defendants were also either aware of or reckless in not knowing about the potential negative impact of further CAC enforcement actions if Baidu remained unwilling or unable to clean up its platforms. *See* ¶¶63-67, 69-71.

---

[7]    By contrast, in *Asay v. Pinduoduo Inc.*, 2020 U.S. Dist. LEXIS 56179, at *21 (S.D.N.Y. 2020), defendants disclosed enforcement actions, including a United States-based trademark action and a "governmental warning from January 2018 about enforcement of publication copyrights."

[8]    The CAC is an administrative agency with enforcement powers. ¶51, 63, 66, 69-72. In *In re Xunlei Ltd. Sec. Litig.*, the court found noncompliance claims insufficient because they were based on the findings of an "industry self-regulatory organization whose statements do not have the force of law." 2019 U.S. Dist. LEXIS 154010, at *25 (S.D.N.Y. 2019).

Baidu next argues that its material omissions about the CAC's sanctions are not actionable because they were publicly known. While the January 3, 2019 event was well-covered by the U.S. media (¶72), the same is not true for the June 12, 2019 or February 5, 2020 CAC actions. ¶¶104, 110, 112. That Defendants found a single article from the China Media Project "translating a public notice issued by the Cybersecurity Administration of China" (ECF No. 52 at 1) does not undermine Plaintiff's allegation that Defendants successfully concealed these activities from investors. ¶¶104, 110, 112. In any event, to prevail on this truth-on-the market defense, Baidu must show that "no rational jury could find that the market was misled," which is a "heavy burden of proof" *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 U.S. Dist. LEXIS 141724, at *19 (N.D. Cal. 2020). Defendants have not met that heavy burden here. Tellingly, the only information Defendant produced in support of its truth-on-the-market defense is a translation of the CAC's order provided by an organization that describes itself as "an independent research, fellowship and exchange program." ECF No. 52 at 90.[9] This is plainly insufficient given the "heavy burden" required to prevail on this defense and that courts hold that it "is not available at the motion to dismiss stage." *Uber*, 2020 U.S. Dist. LEXIS 141724, at *19.

Defendant's authorities are therefore unpersuasive because they involve instances where public knowledge of the underlying facts was undisputed. *See, e.g.*, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 977 (9th Cir. 1999) (finding that at summary judgment, defendants' alleged failure to disclose tax strategy was not actionable because both the strategy itself and the tax code were clearly publicly available); *In re Textainer P'ship Sec. Litig.*, 2005 U.S. Dist. LEXIS 40974, at *21 (N.D. Cal. 2005) ("[I]nvestors in a limited partnership whose sole assets were shipping containers would be aware of general trends in the market for such containers."). In contrast, the activities of the CAC are published on obscure web channels in Chinese and were not as readily available to U.S. investors. *See In re Enzymotec Secs. Litig.*, 2015 U.S. Dist. LEXIS 167403, at *51-52 (D.N.J. 2015) (where plaintiffs alleged that defendants "repeatedly and directly obfuscated the impact of the Chinese

---

[9]    Plaintiff does not object to the Court taking judicial notice of Defendant's proffered exhibits but does object to the Court accepting their contents as true to the degree Defendant submits them for that purpose. *See Khoja*, 899 F.3d at 1003.

regulations" it was "inappropriate to rule at [the pleading] stage whether the truth on the market

defense applies.").[10]

### 2.   Defendants Materially Misrepresented Baidu's Ability to Filter Illicit Content on its Platform (Statements 4-6)

Statements 4, 5 and 6 concern Baidu's inability to filter impermissible content (hereinafter, "Screening Statements"). On May 17, 2019, after noting that the Chinese government was exercising "tighter government scrutiny on content," Defendant Li represented that Baidu was successfully filtering "poor and questionable content with Baidu AI." ¶94; Mot. at 74. On June 19, 2019, Defendants reported that Baidu had "crack[ed] down on 3.4 billion pieces of harmful information such as pornography and gambling in May." ¶103. A Company press release dated August 19, 2019 similarly described how Baidu had: "filtered over one billion, misleading, low-quality ad materials and tens of billions of offensive, inappropriate images, texts, videos and weblinks." ¶106. While these Screening Statements may have been technically accurate, they remain actionable because Defendants failed to disclose that the CAC had just previously condemned Baidu in January and June of 2019 for disregarding "social order and morality," ordered it to "rectify the issue fundamentally" and "remove [advertisements at issue] completely." ¶104. The June 12, 2019 investigation was particularly adverse because it was instigated by a complaint *based on an advertisement that was created and reviewed internally at Baidu*. ¶105.

Defendants' statements therefore created the impression that the Company's "strength" in filtering out "poor and questionable content" was the result of "ordinary" factors that would "'bode well' for its continued ability to maintain compliance—not the result of aggressive enforcement

---

[10]     Baidu's other out of circuit authorities are inapt. For example, in *In re Sina Corp. Sec. Litig.*, defendants did not have a duty to disclose risks about the potential for a "surprise decision" to suddenly and strictly enforce "uncertain" regulations governing online fortune-telling. 2006 U.S. Dist. LEXIS 71089, at *25 (S.D.N.Y. 2006). But here there was nothing surprising about the enforcement of regulations against pornographic and fraudulent content. Baidu had been penalized for these very things before. Similarly, in *Jiajia Luo v. Sogou, Inc.*, a plaintiff alleged that defendant's screening mechanisms at the time of the IPO were *inadequate to comply with a new law passed after the IPO*. 465 F. Supp. 3d 393, 410 (S.D.N.Y. 2020). In contrast, the regulations at issue here were in effect when the misleading representations were made.

actions by the CAC." *In re Apple Sec. Litig.*, 2020 U.S. Dist. LEXIS 96953, at *32 (N.D. Cal. 2020). Defendant Li either knew or was reckless in not knowing about these discrepancies given his role directly overseeing sales in the division responsible for online marketing. ¶¶5, 49, 78, 97; *see Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004).

Next, Baidu claims that the Screening Statements are not actionable because "none of these statements stated or implied that Baidu could guarantee perfect compliance with all applicable regulations." Mot. at 17. Once Baidu emphasized its ability to filter out problematic content, however, the Ninth Circuit holds that it was "obligated to share [] information" that "diminishe[d] the weight" of these assertions. *Khoja*, 899 F.3d at 1015; *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). Baidu's claim that it had no duty to disclose the June 12 investigation because the June 19 statement did not "create the impression that no content was removed at the behest of the government," (Mot. at 18), takes far too narrow a view of the Company's disclosure obligations under the federal securities laws. *See Khoja*, 899 F.3d at 1015. Indeed, regulatory compliance was one of the "key risks" Baidu faced, and the PRC's role in clamping down on these issues was material to investors. ¶¶72, 101. The Screening Statements failed to disclose ***any*** role the PRC played in Baidu's compliance efforts, leading investors to conclude that Baidu's efforts were entirely voluntary. ¶¶104-105. Thus, the CAC's action (instigated ***by Baidu's own work product***) was material to investors. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 795 (9th Cir. 2017).

### 3. Defendants' Search Reliability Statements are Actionable (Statement 8)

During the Company's February 28, 2020 earnings conference call, Defendant Yu highlighted users' ability to find "reliable information" related to healthcare on the Company's platform. ¶116 (Statement 8). This statement was rendered materially misleading by the Company's simultaneous failure to disclose the February 5, 2020 action triggered by the CAC's determination that Baidu was "publishing purportedly illegal news and short videos concerning the coronavirus that Chinese

authorities claimed were designed to create panic." ¶¶14, 117.[11] Further, in making this statement. Defendant Yu knew or deliberately disregarded that: (i) in early 2020, Baidu replaced a Senior Content Manager with one who could not coordinate effectively with regulatory authorities; (ii) Baidu's expansion into the mobile marketplace and increased third-party postings, which made it nearly impossible for Baidu to adequately supervise content; and (iii) its keyword blacklists were critically outdated. ¶117; *see In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) (omission actionable because defendant represented that millions of dollars in loans were the result of "organic matches," while failing to disclose that the loan was "inflated artificially through self-dealing disguised as real transactions").

In seeking to challenge Statement 8, Defendant argues that "Plaintiff pleads no facts showing that Baidu did not in fact provide reliable information about the COVID-19 pandemic." Mot. at 19. This is incorrect. The Complaint alleges that Chinese authorities had recently determined that Baidu was publishing "illegal news" concerning the coronavirus such that Baidu's ability to provide "reliable information" had been materially compromised. ¶117; *see Uber,* 2020 U.S. Dist. LEXIS 141724, at *17-18 ("what was disclosed [] was not enough to render what was not disclosed, not misleading"); *Khoja*, 899 F.3d at 1014 ("Only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law.").[12]

### 4. Defendant's Risk Disclosures Are Actionable (Statements 9 & 11)

The Complaint alleges that Defendant's 2019 AR included a boilerplate disclosure that: "we

---

[11]    In *Lefter v. Yirendai Ltd.*, 2017 U.S. Dist. LEXIS 105246 (C.D. Cal. 2017), by contrast, plaintiffs did not allege that defendants omitted material information. Rather, they alleged that defendants "**gloss[ed] over**" a forthcoming Chinese regulation that was not only publicly available but discussed in the company's annual reports. *Id.* at *10-11.

[12]    In *In re Rigel Pharm., Inc. Sec. Litig*, 697 F.3d 869, 880 (9th Cir. 2012), plaintiffs argued that defendants should have disclosed more information concerning side effects in a press release about a clinical trial, though defendants had limited their disclosures to "key safety results." *Id*. Here, Defendants made **no mention** of the CAC's specific enforcement actions against Baidu. ¶117.

have been and may be subject to penalties in the future for violations of those regulations arising from information displayed on or linked to our websites or mobile apps, including a suspension or shutdown of our online operations" ¶120 (Statement 9). The 2019 AR also included another brief disclosure about regulations promulgated by the CAC in December 2019, stating in relevant part that: "each network information content service platform is required, among others, (i) not to disseminate any information prohibited by laws and regulations, such as information jeopardizing national security" (¶125) (Statement 11). While Baidu relies on these statements to suggest that the Company "warned the market of exactly the risk that manifested on April 8, 2020," they are incorrect because Statements 9 and 11 warn of the risk of regulatory enforcement "in the abstract, with no indication that the risk '[had] already [ ] come to fruition.'"[13] *Matrixx*, 585 F.3d at 1181. Baidu's citations to pre-*Matrixx* authorities, which the Ninth Circuit decided in 2009, are stale. *See* Mot. at 19-20.[14]

Defendant adds that Statement 9 is not actionable because Baidu "fully disclosed the risks associated with adverse regulatory action." Mot. at 19. Not so—Statement 9's use of both the conjunctive and disjunctive language renders the ostensible warning virtually meaningless. ¶120. It is unclear, for instance, whether Baidu is disclosing that it has been "subject to" temporary suspensions or permanent shutdowns of any of its websites, or both. Baidu does not even specify what regulations have been, or may be, at issue. Elsewhere in the risk disclosure, Baidu mentions that "PRC regulatory authorities" might find content "illegal" or "objectionable." ¶120. However, the Company does not specify, for example, that the PRC had by then already repeatedly found its pornographic content

---

[13]     Defendant also points to other statements purporting to warn investors about the risk of Chinese regulatory oversight. Mot. at 8-9. But these statements do not provide any additional meaningful information about the Company's specific regulatory failures and CAC enforcement activities.

[14]     *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) and *Zeid v. Kimberley*, 930 F. Supp. 431 (N.D. Cal. 1996) both "predate [*Matrixx*] and are therefore inapposite." *Flynn v. Sientra, Inc*., 2016 U.S. Dist. LEXIS 83409, at *29 n.4 (C.D. Cal. 2016). These decisions also fail to analyze risk disclosures in context. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig*., 2017 U.S. Dist. LEXIS 112977, at *688 (N.D. Cal. 2017) (reconsideration granted and denied on other grounds by *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2018 U.S. Dist. LEXIS 34873 (N.D. Cal. 2018)).

"illegal." ¶120. Courts often reject similar efforts "to rely on abstract and hypothetical risk warnings that fail to 'alert[] the reader that some of the[] risks may already have come to fruition.'" *In re Snap Sec. Litig.*, 2018 U.S. Dist. LEXIS 97704, at *13-14 (C.D. Cal. 2018) (quoting *Berson,* 527 F.3d at 986). Here, Baidu's statements failed to: (i) disclose that it was still hosting pornography and fraudulent ads on its platform; (ii) disclose that it had already incurred penalties for doing so; or (iii) warn of the elevated risks of adverse regulatory action by the CAC due to Baidu's repeated violations.

In this Circuit, such "general disclaimer[s]" do not provide blanket protection or prevent the statements from being materially misleading. *Atossa*, 868 F.3d at 797. In contrast, a case Defendant cites concerned a statement "contain[ing] *numerous* disclosures regarding the *highly technical* nature of the Flash Arrays and PCIe Cards, including *explicit* disclosures that the PCIe Cards may contain undetected defects." *In re Violin Memory Sec. Litig*., 2014 U.S. Dist. LEXIS 155428, at *37 (N.D. Cal. 2014). In another, *Jasin v. Vivus, Inc*., 2016 U.S. Dist. LEXIS 52388, at *55 (N.D. Cal. 2016), plaintiffs failed to provide *any basis* to suggest that the European Medicines Agency's concerns were "more serious than Defendants made them out to be in their statements."[15] Moreover, Baidu's "risk of disclosures must be read in context of 'comforting statements in the [Annual Reports].'" *Snap*, 2018 U.S. Dist. LEXIS 97704, at *13. When Baidu disclosed that it "may be subject to penalties," it simultaneously communicated that it "complied with current PRC laws and regulations in all material respects." ¶¶86, 123. This context, and the fact the actual risks alluded to had already manifested, rendered Baidu's purported risk disclosures materially misleading. *Snap*, 2018 U.S. Dist. LEXIS 97704, at *13-14.

Baidu also tries to undermine the Complaint allegations related to Statement 11, claiming: (i) it did not state that Baidu complied with the regulation; it just described it; and (ii) Baidu adequately disclosed that it might not be able to comply with the regulation. Like Statement 9, Statement 11 is actionable because Baidu failed to disclose facts then known or recklessly disregarded by it that the

---

[15]     Similarly, *In re Eventbrite, Inc. Sec. Litig*., 2020 U.S. Dist. LEXIS 74651, at *31 (N.D. Cal. 2020), the court dismissed claims which failed to identify which "key" features were the subject of defendants' allegedly misleading statements.

Company was unable to comply with PRC regulations. Baidu's claim that it was not "required to accuse itself of . . . violating Chinese law" (Mot. at 3) misconstrues the Complaint because Plaintiff simply alleges that the Company was required to disclose enforcement actions taken against it by the CAC during the Class Period. ¶127; *Khoja*, 899 F.3d at 1008-17 ("once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.").

Baidu's reliance on *Luo*, 465 F. Supp. 3d at 410, is misplaced, as there, a defendant's statements about screening mechanisms that were adequate at the time of the disclosure were not rendered misleading when a new law was subsequently passed. ¶¶53-59, 82-125. Further, *Luo* acknowledged that the statement would have been actionable had the plaintiff pled "that, prior to the [statement at issue], there was a failure with respect to the compliance measures or a violation of PRC law" and those "measures were inadequate to address the risk that a third party would post content that was then—at the time of [the statement]—in violation of Chinese law." 465 F. Supp. 3d at 411. Here, Plaintiff has alleged exactly that. ¶¶75, 81–125.

Baidu highlighted certain steps it purportedly took to comply with PRC regulations, but concealed other factors that undermined these steps; even when the Company was admonished for content it created. ¶¶94, 103, 105-107, 112, 124; *cf. Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (statement about pollution control measures misleading where such measures were "failing to prevent substantial violations of the Chinese regulations."). Baidu's risk disclosures similarly failed to warn investors of ongoing enforcement actions and penalties imposed by the CAC. ¶¶104, 110, 112; *Facebook*, 986 F. Supp. at 516 (ambiguous language about impacts of increased mobile usage of software products misleading where mobile use was already harming Facebook's revenue stream).

### 5.    Baidu's Boilerplate Risk Warnings Are Actionable (Statements 3 & 7)

The Complaint alleges that on May 16, 2019, Defendant Yu represented that: "despite government policies to improve the market condition for [small to medium sized enterprises], we anticipate online marketing in the near term to face a challenging environment." ¶90 (Statement 3).

1    Similarly, Plaintiff alleges that, on February 28, 2020, Defendants represented that the rebound for

2    online marketing would slow down due to the coronavirus outbreak. ¶¶113-114 (Statement 7). These

3    purported warnings, however, downplayed Baidu's regulatory compliance challenges while an

4    increase in third party posting (combined with the termination of the Company's Senior Content

5    Review Manager) had materially degraded the Company's ability to generate revenue in the face of

6    increasing CAC scrutiny of the Company's operations. ¶¶91, 117.

7            Baidu nevertheless argues that Statements 3 and 7 are inactionable because they did not

8    specifically address its regulatory compliance. Mot. at 16. In doing so, Baidu obscures the import of

9    the Company's regulatory compliance challenges on its marketing efforts. Most of Baidu's revenue

10   (*72%* in fiscal year 2019) was generated by online marketing. ¶45. To expand its user base (and sales),

11   the Company pays third parties for content. *Id.* Regulatory crackdowns by PRC cyber-authorities

12   impact Baidu directly as both a producer and seller of content such that any discussion of marketing

13   prospects should necessarily have addressed regulatory compliance. Next, Defendant claims that

14   Statement 3 was not misleading due to Defendant Li's comments the following day acknowledging

15   that "tighter governments [*sic*] scrutiny" was a factor contributing to the "challenging environment"

16   the Company faced. Mot. at 15-16; ECF No. 52 at 72. This argument is unavailing as neither Defendant

17   Yu's May 2019 statement, nor Defendant Li's statement during the May 17, 2019 earnings call alerted

18   investors that Baidu's future online marketing revenue had been materially jeopardized by: (i)

19   Defendants' disregard of content review standards; (ii) reckless publication of questionable content to

20   hit sales targets; and (iii) Baidu's inability to filter problematic content by ever-increasing numbers of

21   third-party publishers. ¶¶90-91.

22           Finally, Baidu claims that Statement 7 is not actionable because the slowdown that

23   accompanied the CAC suspension occurred in April 2020, about six weeks after the February 2020

24   earnings call. Mot. at 18-19. Defendant, however, overlooks that just a few weeks *before* the February

25   earnings call, the CAC concluded that Baidu was "violating laws" and ordered it "to conduct deep

26   rectification." ¶14. Such "rectification" materially impacted Baidu's marketing options since the

27   Company was then required to cull even more content.

28

1

### B.      The Complaint Adequately Pleads Scienter

2

Scienter is pled by "'stat[ing] with particularity facts giving rise to a strong inference' that

3

defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of

4

misleading investors." *Berson*, 527 F.3d at 987. Falsity and scienter often go hand-in-hand. *See In re*

5

*Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005). "[A]llegations may independently satisfy the PSLRA

6

where they are particular and suggest that defendants had actual access to the disputed information."

7

*S. Ferry LP v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). "The inference that the defendant acted

8

with scienter need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of

9

competing inferences.'" *Tellabs,* 551 U.S. at 324. A complaint survives "[w]hen the allegations are

10

accepted as true and taken collectively," a reasonable person would "deem the inference of scienter at

11

least as strong as any opposing inference[.]" *Id.* at 326; *see Matrixx Initiatives, Inc. v. Siracusano*, 131

12

S. Ct. 1309, 1324-1325 (2011).

13

Whether Defendant had motive to commit fraud is but one relevant consideration in the

14

scienter analysis. *Id.* at 325. As set forth in the Complaint, the Company was acutely aware that any

15

(publicly-disclosed) investigation into its inability to comply with PRC content regulations would have

16

a negative material impact, *via* fines or suspensions, on its ability to generate revenue. ¶¶63-71. Prior

17

public enforcement actions had already threatened the Company's public reputation. *Id.; see e.g.*, ¶96

18

(Defendant Li: "If we lose our users' support or fail to stick to our values, Baidu will be only 30 days

19

away from bankruptcy."; *see also Flynn*, 2016 U.S. Dist. LEXIS 83409, at *48 (where "manufacturing

20

and quality control" were central to defendant manufacturer's success and "operation[s] had been

21

flagged by [several regulatory agencies]," there was "a logical and strong, inference that [defendants]

22

were aware of the alleged severe and pervasive problems.").

23

A suspension of the Company's operations by the CAC would cause the Company "to lose

24

ground to popular news apps like ByteDance's Toutiao or [WeChat's] Tencent News" and negatively

25

impact its current and future prospects. ¶¶72, 138-139. Baidu claims—without support—that a more

26

27

28

plausible inference here is "that [the Company] believed it *could* maintain compliance."[16] Mot. at 25. This claim is belied by the Company's history—which Defendant does not address—of being investigated, fined, and suspended for allowing pornography to permeate its platforms. ¶¶62-74. Baidu was incentivized to conceal its regulatory failures to mollify investors' concerns about the prospect of being publicly sanctioned. ¶71; *see e.g.*, ¶72 ("[I]nvestors should see if the temporary ban leads to something bigger . . . [i]f that happens, we'll need to revisit Baidu . . . to see if their growth forecasts remain intact.").

Defendant also rhetorically asks why Baidu would conceal issues related to its inability to comply with PRC internet laws. Mot. at 4. In doing so, Defendant either ignores or wholly overlooks its well-timed April 2, 2020 *$1 billion* public bond offering on the Singapore Stock Exchange (just five days before the end of the Class Period). ¶128. Courts find such offerings probative of scienter and motive. *See Mulderrig v. Amyris, Inc.*, 2020 U.S. Dist. LEXIS 185382, at *63-64 (N.D. Cal. 2020) (secondary offering shortly after misleading disclosure supports inference of fraudulent intent); *Flynn*, 2016 U.S. Dist. LEXIS 83409, at *45-46 (same); *Daou*, 411 F.3d at 1084; *MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 648 (E.D. Va. 2000) (defendants' desire to raise capital through public offerings probative of scienter); *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (same); *In re Lason Secs. Litig.*, 143 F. Supp. 2d 855, 858-59, 861 (E.D. Mich. 2001) (same). Courts find secondary offerings suspicious when they are used to raise money for a company using artificially inflated stock. *See In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) ("to inflate the stock price to maximize revenue from the secondary offering, so as to provide it capital" is a sufficient allegation of motive).[17]

---

[16]     Contrary to Defendants' arguments, stock sales are not a prerequisite to establishing scienter. *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period.").

[17]     Baidu's reliance on the "unusual" case in *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020), is misplaced. *See Apple Sec. Litig.*, 2020 U.S. Dist. LEXIS 206298, at *35-36 (N.D. Cal. 2020) ("*Nguyen presents an unusual case* because both the Supreme Court and the Ninth Circuit

1   Baidu also attempts to use its boilerplate risk disclosures to negate motive. A publicly listed

2   company like Baidu has an obligation to disclose material facts, including core risks that have

3   materialized, to the Company's shareholders under SEC regulations. Here, Baidu's risk disclosures

4   are themselves independently actionable. *See* §IV.A.4, *supra*. In any event, scienter is pled by the

5   Complaint's detailed allegations describing Defendants' familiarity with Baidu's operations. *See In re*

6   *Nw. Biotherapeutics Inc. Secs. Litig.*, 2008 U.S. Dist. LEXIS 54028, at *3 (W.D. Wash. 2008); *see*

7   *also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1191 (C.D. Cal. 2008) ("a

8   defendant's position within the company is a relevant circumstance to consider in the *Tellabs*

9   analysis"); ¶¶27-34. Defendants Li and Yu also led analyst calls and fielded specific questions from

10  them regarding issues related to the Company's regulatory compliance efforts. ¶¶27-29, 94, 115-116.

11  Defendant Li's statements during those analyst calls illustrate his familiarity with key search-related

12  metrics and awareness that Chinese customers could use Baidu's products to access salacious material

13  that would be subject to PRC censorship laws. ¶¶94, 115. *See Shenwick v. Twitter, Inc.*, 282 F. Supp.

14  3d 1115, 1145-47 (N.D. Cal. 2017) ("By making 'detailed factual statement[s], contradicting

15  important data to which [the Individual Defendants] had access, a strong inference arises that [they]

16  knowingly mislead the public as to its clear meaning.'"). In sum, Li and Yu "displayed an intimate

17  knowledge" of Baidu's search and feed operations, which is "sufficient to satisfy the actual knowledge

18  analysis." *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009).

19  During the February 28, 2020 earnings call, and in direct response to Citigroup analyst Alicia

20  Yap's question about advertising revenue, for instance, Defendant Yu represented that advertising

21  spillover was likely because customers were coming to Baidu given that its coronavirus search results

22  were reliable and accurate. ¶116. Defendant Yu went even further in distinguishing the Company's

23

24  have found scienter on fairly similar allegations."). There, a plaintiff alleged that a medical device

25  company misrepresented that the FDA would likely approve its stent-like invention, while also aware

26  of isolated adverse events in Europe. *Nguyen*, 962 F.3d at 417. The Ninth Circuit held that the

27  European market events did not plausibly suggest that the company's statements about U.S. approval

28  were false. *Id.* at 417-18. By contrast, Baidu's compliance problems were systemic and enforcement

28  actions were levied by the same Chinese regulatory agencies both before and during the Class Period.

    *See* §§II.B, II.C, *supra*.

1  results from other feeds that purportedly peddled in "fake news." *Id.* Defendant Yu made this

2  representation even though, ***that same month****,* the Company published coronavirus related news in

3  violation of CAC regulations. *See* ¶110; *see Apple*, 2020 U.S. Dist. LEXIS 206298, at *29 ("[C]lose

4  timing between misleading statements and disclosure of inconsistent facts suggests that (1) the facts

5  existed at the time the challenged statements were made, and (2) the facts were not caused by

6  intervening factors[.]"). In other words, the Complaint "alleges particularized facts demonstrating that

7  [content monitoring] was part of [Baidu's] core operations and that [Li and Yu] made various

8  statements displaying [their] familiarity with [this program]." *In re Zillow Grp., Inc. Sec. Litig.*, 2019

9  U.S. Dist. LEXIS 67197, at *57 (W.D. Wash. 2019).

10         The Complaint also alleges facts demonstrating Defendant Li's awareness of regulatory

11  compliance staffing deficiencies. *Compare* Mot. at 23 *with* ¶28 (describing Li's involvement in

12  Baidu's search and sales operations); ¶¶95, 97 (Defendant Li and his wife oversaw online marketing

13  sales during the Class Period). Between April and May 2019, four additional Baidu executives

14  resigned—three had held positions in Baidu's Search division; the fourth was vice president of

15  government relations. ¶95. Defendants Li and Yu either knew or were reckless in not knowing that

16  losing five senior Baidu executives—all of whom held positions in divisions either directly impacted

17  by content regulations or responsible for coordinating with regulators—would negatively impact the

18  Company's operations particularly given increased CAC scrutiny of the Company at that time. *Id.*

19         Baidu suggests that Plaintiff alleges that the Company "satisfactorily resolved" past issues with

20  regulators. Mot. at 23. The Complaint alleges no such thing, making Baidu's reliance on *Lululemon*

21  misplaced. 14 F. Supp. 3d 553, 583 (S.D.N.Y. 2014) (statements that "company had taken steps to

22  remediate its quality control processes" not reckless where complaint did not allege "that these steps

23  were not in fact taken."). *In re NVIDIA Corp. Sec. Litig.* is similarly inapposite, as there, the court

24  found that the company's contemporaneous knowledge of product defects could not be inferred from

25  Plaintiff's conclusory allegation that the product failure was easily identifiable. 768 F.3d 1046, 1059

26  (9th Cir. 2014). Here, Defendants Li and Yu were either aware of or deliberately turned a blind eye to

27  the ongoing regulatory compliance issues at the Company by virtue of their detailed management style

28

and close ties to the PRC itself. ¶¶79-80; *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701-703 (9th Cir. 2012); *Oracle*, 380 F.3d at 1234. Because the Complaint adequately states a claim for the requisite primary violation as to Li and Yu, Plaintiff's § 20(a) control liability claims against Baidu should also be sustained. *See Am. W.,* 320 F.3d at 945.

## V.  CONCLUSION

For the foregoing reasons, Baidu's motion to dismiss should be denied in its entirety.


Respectfully submitted,

Dated: December 2, 2020          **KAHN SWICK & FOTI, LLC**

By:   *s/ Alayne K. Gobeille*

Lewis S. Kahn (*pro hac vice to be submitted*)
Alexander L. Burns (admitted *pro hac vice*)
Alayne K. Gobeille (admitted *pro hac vice*)
Morgan M. Embleton (admitted *pro hac vice*)
1100 Poydras Street, Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
lewis.kahn@ksfcounsel.com
alexander.burns@ksfcounsel.com
alayne.gobeille@ksfcounsel.com
morgan.embleton@ksfcounsel.com

Ramzi Abadou (SBN 222567)
ramzi.abadou@ksfcounsel.com
**KAHN SWICK & FOTI, LLP**
912 Cole Street, # 251
San Francisco, California 94117
Telephone: (415) 459-6900
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiff*
*And the Putative Class*

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on December 2, 2020, I electronically filed the foregoing with the Clerk

3

of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4

addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that

5

I have mailed the foregoing document or paper via the United States Postal Service to the non-

6

CM/ECF participants indicated on the attached Manual Notice List.

7

8
                                        _____*s/ Alayne K. Gobeille*_____
                                        ALAYNE K. GOBEILLE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 5:20-cv-02768-LHK Ikeda v. Baidu, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com,Ashley.Errington@ksfcounsel.com

- **Adam Marc Apton**
  aapton@zlk.com

- **Alexander Louis Burns**
  alexander.burns@ksfcounsel.com

- **Morgan Michelle Embleton**
  Morgan.Embleton@ksfcounsel.com

- **Alayne K Gobeille**
  alayne.gobeille@ksfcounsel.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,tcrockett@pomlaw.com,abarbosa@pomlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com

- **Virginia Faye Milstead**
  virginia.milstead@skadden.com,nandi.berglund@skadden.com,dlmlclac@skadden.com

- **Peter Bradley Morrison**
  peter.morrison@skadden.com,nandi.berglund@skadden.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@poml

- **Raza Rasheed**
  raza.rasheed@skadden.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)